```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3    UNITED STATES OF AMERICA,

 4                    Plaintiff,

 5       vs.                              Case No. 05-81165

 6    KHAOPHONE SYCHANTHA,

 7                    Defendant.

 8    _____/

 9                        JURY TRIAL - VOLUME 3
                    BEFORE THE HONORABLE SEAN F. COX
10                     United States District Judge
                  Theodore Levin United States Courthouse
11                     231 West Lafayette Boulevard
                            Detroit, Michigan
12                     Tuesday, October 15, 2024

13    APPEARANCES:

14    FOR THE PLAINTIFF:
                        JASON DORVAL NORWOOD
15                      THOMAS PATRICK MARTIN
                        United States Attorney's Office
16                      211 W. Fort Street
                        Suite 2001
17                      Detroit, Michigan 48226
                        313.226.9587
18                      313.226.9168

19    FOR THE DEFENDANT:
                        KHAOPHONE SYCHANTHA
20                      IN PRO PER
                        DAVID S. STEINGOLD
21                      (STANDBY COUNSEL)
                        Law Offices of David S. Steingold, PLLC
22                      30300 Northwestern Highway, Suite 111
                        Farmington Hills, Michigan 48334
23                      313.962.0000

24

25
```

1  **APPEARANCES CONTINUED:**

                    **CRAIG A. DALY**
2                      Craig A. Daly, PC
                    (On behalf of David Sok)
3                      P.O. Box 720
                    Royal Oak, Michigan 48068
4                      248.439.0132

5  **ALSO PRESENT:**  Special Agent Brian Manns
                    Yannie Andrus - Government Assistant
6                      Marissa Mandernach - Defense Assistant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

                         -    -    -
24  To obtain a certified transcript, contact:
        April A. Kurtz, CSR-7347, RPR, FCRR
25              www.transcriptorders.com

3

# TABLE OF CONTENTS

MATTER                                                              PAGE

**Jury Trial - (Volume 3)**............................ **3**


**Government's Case-in-Chief**

WITNESSES:

**TAMMIE THOMPSON**

Direct Examination by Mr. Martin:................... 12
Cross-Examination by Defendant Sychantha:........... 23
Redirect Examination by Mr. Martin:................. 24

**OFFICER DONALD VAUGHN**

Direct Examination by Mr. Martin:................... 25
Cross-Examination by Defendant Sychantha:........... 30


**JOHN TETREAU**

Direct Examination by Mr. Norwood:................. 31
Cross-Examination by Defendant Sychantha:........... 56
Redirect Examination by Mr. Norwood:............... 58

**OFFICER CHRISTOPHER WOLENTARSKI**

Direct Examination by Mr. Norwood:................. 60
Cross-Examination by Defendant Sychantha:........... 69


**STUART BERTRAM**

Direct Examination by Mr. Martin:................... 70
Cross-Examination by Defendant Sychantha:........... 88


**OFFICER MICHAEL OAKLEY**

Direct Examination by Mr. Norwood:................. 89
Cross-Examination by Defendant Sychantha:........... 97
Redirect Examination by Mr. Norwood:............... 98

4

TABLE OF CONTENTS CONTINUED

PAGE

WITNESSES:

**SPECIAL AGENT MARK KOCH (RECALLED)**

Redirect Examination by Mr. Norwood:............... 99
Recross-Examination by Defendant Sychantha:....... 107

**AGENT DANIEL CHRISTENSEN**

Direct Examination by Mr. Norwood:................ 108
Cross-Examination by Defendant Sychantha:......... 118


EXHIBITS RECEIVED:

Government Exhibits 10 - 12........................ 68
Government Exhibits 13 - 16........................ 66
Government Exhibit 22............................. 63
Government Exhibit 23............................. 103
Government Exhibit 25............................. 17
Government Exhibit 30............................. 23
Government Exhibit 31-1 - 33-2.................... 102
Government Exhibit 34............................. 102
Government Exhibit 46............................. 40
Government Exhibit 50............................. 102


Certificate of Reporter........................... 132

1   Detroit, Michigan

2   Tuesday, October 15, 2024

3   8:36 a.m.

4                              *  *  *

5           THE CLERK:  All rise.

6           The United States District Court for the Eastern

7   District of Michigan is in session.  The Honorable Sean Cox

8   presiding.

9           Please be seated.

10          The Court calls Case Number 05-81165, United States

11  of America versus Khaophone Sychantha.

12          Counsel, can I have appearances for the record,

13  please?

14          MR. NORWOOD:  Good morning, your Honor.  Jason

15  Norwood on behalf of the United States.

16          THE COURT:  Good morning.

17          MR. MARTIN:  Good morning, your Honor.  Patrick

18  Martin for the United States.

19          THE COURT:  Good morning as well.

20          DEFENDANT SYCHANTHA:  Good morning, your Honor.

21  Khaophone Sychantha.

22          THE COURT:  Good morning.

23          And good morning, Mr. Steingold.

24          MR. STEINGOLD:  Good morning, your Honor.

25          THE COURT:  Are you ready to proceed?

1          MR. NORWOOD:  Yes, your Honor.

2          MR. STEINGOLD:  Yes, your Honor.

3          MR. MARTIN:  Your Honor, I need one moment to make a

4    disclosure to defense.

5          DEFENDANT SYCHANTHA:  Your Honor, I have a motion I

6    want to file with the clerk.

7          THE COURT:  Okay.

8          DEFENDANT SYCHANTHA:  Okay.

9          THE COURT:  The clerk is not here yet.

10         DEFENDANT SYCHANTHA:  Do I go up there?

11         THE COURT:  We'll get it from you.

12         DEFENDANT SYCHANTHA:  Okay.

13         THE CLERK:  These are for filing?

14         DEFENDANT SYCHANTHA:  Yes.

15         Thank you.

16         THE COURT:  Okay.  Couple miscellaneous issues.

17         Juror number 7 called the jury office.  He said he

18   called at 7:00 this morning -- or 6:00 this morning, with some

19   sort of family emergency, so he's not going to be able to make

20   it here today.  Obviously, we're going to proceed without him.

21   We don't know when he would be available.  We're all ready to

22   go.

23         Any objection to the proceeding?

24         DEFENDANT SYCHANTHA:  No.

25         MR. NORWOOD:  No, your Honor.

 1          MR. STEINGOLD:  Juror number 7 is not able to make

 2   it, so they want to remove him as a juror, which would make

 3   number 13 part of your 12-man group.

 4          Do you understand?

 5          DEFENDANT SYCHANTHA:  Okay.

 6          And, your Honor, my discovery was missing on Friday

 7   and Saturday and Sunday.

 8          THE COURT:  Okay.  So I've been here since 7:15 this

 9   morning, and it's now 25 to 9:00.  We were supposed to start

10   five minutes ago with trial testimony.

11          Again, I --

12          DEFENDANT SYCHANTHA:  Well, I just want it on the

13   record that my file -- my discovery bag was missing from the

14   jail on Saturday and Sunday, and they just returned it to me

15   this morning.

16          I did what you said.  I asked to go to the law

17   library to see my discovery and they said they didn't have it.

18          THE COURT:  Who is they?

19          DEFENDANT SYCHANTHA:  The jail.

20          MR. STEINGOLD:  Your Honor, I can tell the Court that

21   Mr. Sychantha tried to call me on Saturday.  The phone system

22   wasn't working.  But I went to visit him yesterday and he told

23   me that when they arrived on Friday, marshals gave his

24   discovery to one of the deputies at Livingston County and he

25   hadn't seen it, and he had asked about it every day.

8

1    And when I asked about it yesterday for the hour or

2    so I was there, they eventually told me they were looking for

3    it.  They were still looking for it.  I couldn't imagine why.

4    I called Mr. Norwood.  Mr. Norwood called.  And they

5    found it in his property room, where they should have looked,

6    obviously, when he first asked for it on Saturday.  I don't

7    know when he received it.  It's my understanding he was going

8    to be given it yesterday, but it's true that they misplaced his

9    discovery for a couple of days.

10    THE COURT:  Well, I don't know about that, and I

11    can't dissect it right now.  Probably if someone would have

12    emailed me -- I check my emails every day -- I could have

13    emailed the marshals and we could have --

14    MR. STEINGOLD:  I didn't know until yesterday it got

15    taken care of, so...

16    THE COURT:  But it was taken care of.

17    MR. STEINGOLD:  I'm not sure what time it was taken

18    care of.

19    THE COURT:  Well, I don't --

20    MR. NORWOOD:  And, your Honor, just briefly for the

21    record.  We're not going to take Court's time.

22    Yesterday, I received a call from Mr. Steingold.  He

23    made us aware of this.  We called the jail.

24    THE COURT:  What time?

25    MR. NORWOOD:  He called me quarter -- about close to

1  noon, about a quarter to noon.  He spoke to us and we spoke to

2  Livingston County Jail.  Both myself and Agent Manns, we both

3  spoke.  The lieutenant assured us that his stuff was in his

4  property and that they would make sure that he had access to it

5  yesterday.  It was the first time that we heard about it.  We

6  took care of it yesterday and we were assured that he had

7  discovery yesterday and so that he would have it to review.

8            THE COURT:  Okay.  Perhaps you --

9            MR. NORWOOD:  And --

10           THE COURT:  Perhaps you can follow up with Lieutenant

11  -- what's his name?

12           MR. NORWOOD:  Roy Asquith is the lieutenant.

13           THE COURT:  And find out when in fact the defendant

14  received his material yesterday.

15           MR. NORWOOD:  Yes, your Honor.  Will do so.

16           THE COURT:  Okay.  Great.

17           DEFENDANT SYCHANTHA:  And something was missing out

18  of my bag.  My motion --

19           THE COURT:  It may be accurate or not accurate.

20  Taking a step at a time.  We're not going to stop.  We're

21  already late starting the trial.

22           Again, I should have been notified of this before I

23  walked out on the bench today.  I've been here for almost an

24  hour and a half.  This is the first time anybody contacted me

25  on the issue.

1    Okay.  Next thought is, is that I received some

2  issues regarding some emails regarding an immunity issue with

3  Mr. Sok and proposed jury instructions.  Again, I just received

4  them this morning.  I haven't had a chance, really, to look at

5  it.  It should have absolutely nothing to do with any testimony

6  here today, as I understand.

7    And finally, during the questioning of Loren

8  Pennington, according to my records, she was asked a question,

9  which would have been hearsay.  The Government responded,

10  citing 801(D)(2)(e), and I stated, based upon the record, there

11  was foundation for that testimony to be admitted under

12  801(D)(2)(e), and what I should have said, and what was -- had

13  been established is that, at that point, the Government had

14  established by a preponderance of the evidence that a

15  conspiracy existed and that the defendant was a member of the

16  conspiracy and the statements -- co-conspirator statement was

17  made in further of conspiracy.

18    Again, I wanted to place that on the record.

19    MR. NORWOOD:  Thank you, your Honor.

20    THE COURT:  Okay.  Who is our next witness?

21    MR. MARTIN:  Your Honor, next witness is Ms. Tammie

22  Thompson.

23    THE COURT:  Okay.  Thank you.

24    All right.  Let's bring the jury out.

25    THE CLERK:  All rise for the jury.

1              (JURY IN AT 8:45 a.m.)

2              THE CLERK:  Please be seated.

3              THE COURT:  All right.  Members of the jury, good

4    morning.

5              JURORS:  Good morning.

6              THE COURT:  Did you have a good break?

7              JURORS:  Yes.

8              THE COURT:  Very good.

9              As you can see, juror number 7, Mr. Jones, is not

10   with us.  He had a family emergency this morning, I think

11   somewhere around 6:00 a.m., and he's not going to be with us

12   today.

13             So we're going to continue with the trial, all right?

14             And the Government's next witness.

15             MR. MARTIN:  Your Honor, the Government calls

16   Ms. Tammie Thompson to the stand.

17             THE COURT:  Okay.  Great.

18             Ms. Thompson, could you come up and give us your full

19   name and spelling?

20             THE WITNESS:  Tammie, T-A-M-M-I-E.

21             THE COURT:  Okay.

22             THE WITNESS:  Thompson, T-H-O-M-P-S-O-N.

23             THE COURT:  Okay.  Could you raise your right hand?

24                          *  *  *

25                          *  *  *

1              **TAMMIE THOMPSON,**

2        being first duly sworn to tell the truth, was

3        examined and testified upon his oath as follows:

4                        -  -  -

5              THE COURT:  Okay.  Please have a seat in the witness

6    chair.

7              And would it be possible for you to remove your mask

8    while you're testifying, please?

9              THE WITNESS:  Okay.

10             THE COURT:  Thank you.

11             THE COURT:  You may proceed.

12             MR. MARTIN:  Thank you, your Honor.

13                                        (8:47 a.m.)

14                   DIRECT EXAMINATION

15   BY MR. MARTIN:

16   Q.   Good morning, Ms. Thompson.

17   A.   Good morning.

18   Q.   Ms. Thompson, feel free to adjust that mic so that you can

19   speak into it.

20             Can you take a moment and introduce yourself to the

21   members of the jury, please?

22   A.   Good morning.  My name is Tammie Thompson.

23   Q.   Ms. Thompson, where do you live currently?

24   A.   Texas.

25   Q.   How long have you lived in Texas?

1    A.   Since 2007.

2    Q.   Do you work?

3    A.   Yes.

4    Q.   What do you currently do?

5    A.   I'm a supervisor at a security company.

6    Q.   Where did you live in the 2004-2005 time frame?

7    A.   Highland Park, Michigan.

8    Q.   How long had you lived in that area?

9    A.   Can you please repeat that?

10   Q.   Of course.

11           How long had you lived in that area?

12   A.   Maybe about three years.

13   Q.   Are you from around the Michigan area, at least growing

14   up?

15   A.   Yes.

16           I was born in Cleveland, Ohio, and I moved to Detroit

17   when I was seven.

18   Q.   Back in 2004-2005, were you employed?

19   A.   Yes.

20   Q.   What did you do at that time?

21   A.   I was a certified nursing assistant.

22   Q.   And are you currently married?

23   A.   Yes.

24   Q.   I want to take you to February of 2004, and an incident

25   that occurred at the U.S./Canadian border.

```
 1              Do you know what incident I'm referring to?
 2    A.   Yes.
 3    Q.   Where you were stopped?
 4    A.   Yes, I was.
 5    Q.   What do you remember about the stop?
 6    A.   Well, the -- the lady was asking me questions.  I guess I
 7    didn't answer them good enough.  I got pulled over.
 8    Q.   And the lady you're referring to, is that somebody with
 9    the authorities, the law enforce- --
10    A.   Yes, the Canada border patrol.
11    Q.   And she asked you some questions.  Were you able to answer
12    them?
13    A.   I thought I did, but I was nervous answering them.
14    Q.   Why were you nervous?
15    A.   Because of what I was in Canada for.
16              THE COURT:  Pardon me?  I didn't hear.
17              MR. MARTIN:  I'm sorry, your Honor?
18              THE COURT:  What was your answer again?
19              THE WITNESS:  What I was in Canada for; picking up
20    marijuana, so I was nervous.
21    BY MR. MARTIN:
22    Q.   Where was the marijuana?
23    A.   In the trunk.
24    Q.   Was that a trip that you had made before to Canada?
25    A.   Yes.
```

1 Q.   And on that particular instance, do you know where in your

2 trunk the marijuana was?

3 A.   Inside of a tire.

4 Q.   Whose marijuana was it?

5 A.   I was giving it to Timothy.

6 Q.   Who was Tim?

7 A.   My first husband's first cousin.

8 Q.   Where did Tim live?

9 A.   In Highland Park, to my knowledge.

10 Q.   Near where you lived?

11 A.   Yes.

12 Q.   And where had you gotten the marijuana from?

13 A.   In Canada.

14 Q.   Do you know, from whom did you get it?

15 A.   The defendant.

16 Q.   Do you see that individual here in court today?

17 A.   Yes.

18 Q.   Can you identify him by where he's seated and what he's

19 wearing?

20 A.   He's in the middle with a suit on.

21      MR. MARTIN:  Your Honor, may the record reflect the

22 in-court identification?

23      THE COURT:  Could you give us some more

24 identification?

25      THE WITNESS:  I'm sorry.  Can you say that louder?

```
 1   BY MR. MARTIN:

 2   Q.   Can you identify him by the color of his suit and tie?

 3   A.   I think it's Navy.  I can't see the tie color.  He's

 4   writing now.

 5   Q.   He's writing right now?

 6        Okay.  Can you see his tie right now?

 7   A.   It's red.

 8        MR. MARTIN:  Your Honor, may the Court reflect the

 9   in-court identification?

10        THE COURT:  It's noted.

11        MR. MARTIN:  Thank you, your Honor.

12   BY MR. MARTIN:

13   Q.   Ms. Thompson, this was some time ago, is that correct?

14   A.   Yes.

15   Q.   I'd like you to look at the binder to your right, upper

16   right.  It's up on the stand there.  It's a white binder.  And

17   if you could turn to Exhibit 25.

18        Ms. Thompson, do you recognize the individual in that

19   photograph?

20   A.   Yes.

21   Q.   Who is that?

22   A.   The person I got the weed from in Canada.

23   Q.   Now, did you know that person by name?

24   A.   No.

25   Q.   And is that a fair and accurate depiction of the person
```

Jury Trial - Volume 3 - 10/15/2024

1    you received the weed from in Canada?

2    A.   Yes.

3           MR. MARTIN:  Your Honor, we'd move in Government's

4    Exhibit 25.

5           THE COURT:  It's received.

6           MR. MARTIN:  May we publish, your Honor?

7           THE COURT:  Yes.

8    BY MR. MARTIN:

9    Q.   Now, only because the jury hasn't seen this photograph,

10   who do you recognize Government Exhibit 25 to be?

11   A.   Can you repeat that?

12   Q.   Sure.  Again, who is this individual that's now shown on

13   the screen?

14   A.   The person I received the marijuana from in Canada.

15   Q.   Now, I want to focus your attention on the days before the

16   stop at the border, okay?

17   A.   Yes.

18   Q.   And, really, I want to go back as far as you can remember.

19          Had you made similar trips from the United States

20   over to Detroit to meet with this individual -- excuse me --

21   let me rephrase that -- from the United States over to Canada

22   to meet with this individual?

23   A.   Yes.

24   Q.   Approximately, how many times?

25   A.   I don't recall, but it was several.  It was -- I'm going

1    to say maybe six, seven times.

2    Q.   More than once a month?

3    A.   Yes.

4    Q.   Over several months?

5    A.   Yes.

6    Q.   And when you would go to Canada to meet with the

7    individual depicted in Government Exhibit 25, what would you do

8    every single time?

9    A.   Drive there and go into a garage -- no, I would drive

10   there and I would call Tim.  He would tell the defendant he was

11   -- I was outside.  And I would go in the garage and pop the

12   trunk, and I stayed in the car, and the tire was placed in the

13   trunk.

14   Q.   Now, did Tim ever identify the individual by name that you

15   were meeting with?

16   A.   He might have said his name, but it was so long ago.

17   Q.   You don't recall right now?

18   A.   No, I don't recall.

19   Q.   Do you have any doubt in your mind that this was the

20   individual you met with, though, in Canada, received the weed?

21   A.   I'm sure.

22   Q.   And in those instances, you would go to Canada, meet with

23   the individual in 25, did you watch him do anything to your

24   vehicle?

25   A.   No.

1   Q.   Okay.  Did you see anybody put anything in your vehicle?

2   A.   I mean, he would put -- place it in the trunk, the tire.

3   Q.   I'm sorry.

4   A.   Place the tire with the weed in it in the trunk.

5   Q.   Was there ever a difference in how he handled the

6   situation?  In other words, was it always a tire?  Was it

7   sometimes other things?

8   A.   I just remember the tire.

9   Q.   And on the February 3rd, 2004, instance, where, again, did

10  you receive the tire?

11  A.   Can you repeat that?

12  Q.   Yeah, let me just -- that was a poor question on my part.

13        The day you were stopped at the border, where were

14  you in the half an hour prior to being stopped at the border?

15  A.   In Canada.

16  Q.   Where exactly?

17  A.   Well, you said half an hour.  Probably leaving.

18        I'm not sure I understand the question.

19  Q.   Had you met with the person depicted in Exhibit 25 on that

20  day?

21  A.   Yes.

22  Q.   And had you received a tire from that person on that day?

23  A.   Yes.

24  Q.   And then when you were stopped at the border, tell us what

25  happened after you were asked those questions by the female

Jury Trial - Volume 3 - 10/15/2024

1    officer.

2    A.   They tagged my car, told me to pull over, so I was

3    watching them go through the trunk, which I seen that they

4    didn't find anything.  But then they put a dog in the trunk and

5    that's when they found it, the tire full of marijuana.

6    Q.   How were you able to see that happen?

7    A.   It was a glass window.  I was looking right at them do it.

8    Q.   What happened when the dog got near your vehicle?

9    A.   I knew I was going to be arrested.  Yeah, so --

10   Q.   Were you arrested?

11   A.   Yes, I was actually arrested immediately.  They took the

12   bobby pins out of my hair, because it was pinned up, and took

13   me to Hamtramck.

14   Q.   Who did you meet with there?

15   A.   Officer Vaughn, I think.

16   Q.   Did you do anything to either help or otherwise be --

17   A.   Yes, I had to place a call to Tim and tell him where the

18   car was so they could arrest him.

19   Q.   What happened after you placed that call?

20   A.   Once I made the phone call and told Tim where the car was,

21   he picked the car up with the marijuana in it and they arrested

22   him.

23            DEFENDANT SYCHANTHA:  Objection, your Honor.

24   Speculation.

25            THE COURT:  Overruled.

1    BY MR. MARTIN:

2    Q.   Now, just a few more questions about the trips you made

3    over to Canada.

4            Were you paid to make those trips from Canada across

5    the border?

6    A.   Yes.

7    Q.   How much, approximately?

8    A.   $700.

9    Q.   And to the best of your recollection, how many trips did

10   you make?

11   A.   Maybe six to eight.  It's been a long -- about six to

12   eight.

13   Q.   On -- sorry.

14           In February of 2004, when you were stopped at the

15   border, whose name were you using?

16   A.   Tammie Robbins.

17           You said -- scratch that.

18           Can you repeat that?

19   Q.   Yes.

20           What name were you using when you crossed the border

21   in February 2004?

22   A.   Oh, Tanya Meeks.  It was --

23   Q.   Is that --

24   A.   -- my twin.

25           No, it's my twin sister's name I was using because I

 1  didn't have a driver's license.

 2  Q.   Is she an identical twin?

 3  A.   Yes.  We're nine minutes apart, identical.

 4  Q.   And at the time, did you look similar or different than

 5  her?

 6  A.   We looked the same.

 7  Q.   What was --

 8  A.   I used my picture on her driver's license.

 9  Q.   I see.

10       Okay.  And then in terms of your true name at that

11  time, what was your true name at that time?

12  A.   Tammie Robbins.

13  Q.   Was that your married or your given name?

14  A.   My given name.

15  Q.   And Ms. Thompson is your married name?

16  A.   Yes.

17  Q.   Last question from me.

18       Could you take a look in your binder at Exhibit 30?

19       Do you recognize the individual in that exhibit?

20  A.   That's me.

21  Q.   Is that you back in 2004?

22  A.   Yes.

23       MR. MARTIN:  Your Honor, at this time, we'd move in

24  Government's Exhibit 30.

25       THE COURT:  Any objection?

```
 1                DEFENDANT SYCHANTHA:  No.

 2                THE COURT:  It's received.

 3                MR. MARTIN:  Permission to publish?

 4                THE COURT:  Yes.

 5                MR. MARTIN:  The Court's indulgence.

 6                Ms. Thompson, thank you for your patience.

 7                No further questions, your Honor.

 8                THE COURT:  All right.  Mr. Sychantha, any questions?

 9                DEFENDANT SYCHANTHA:  Yes.

10                          CROSS-EXAMINATION

11    BY DEFENDANT SYCHANTHA:

12    Q.    Who would you call before you went to Canada?

13    A.    Timothy.

14    Q.    And who would you call after?

15    A.    Timothy.

16    Q.    Okay.  It's been 20 years.  How -- how -- how good is your

17    memory?

18    A.    I'll never forget the face.

19    Q.    Okay.  How long was your sentence?

20    A.    I did a year probation.

21    Q.    So you didn't do no jail time for this?

22    A.    Can you repeat that?

23    Q.    You didn't do no jail time for that, the crime?

24    A.    Well, it was on my record.  I couldn't get a job.

25    Q.    That's what you gained from cooperating?
```

```
 1   A.    Yes.

 2              DEFENDANT SYCHANTHA:  Okay.  That's it.

 3              THE COURT:  Redirect?

 4              MR. MARTIN:  Briefly, your Honor.

 5                        REDIRECT EXAMINATION

 6   BY MR. MARTIN:

 7   Q.    Ms. Thompson, the year of probation that you were

 8   sentenced to, where did you get the drugs associated with that

 9   particular sentence?

10   A.    In Canada.

11   Q.    From whom, though?

12   A.    From the defendant.

13              MR. MARTIN:  Thank you, Ms. Thompson.

14              Your Honor, those are all the questions we have.

15              THE COURT: Recross?

16              DEFENDANT SYCHANTHA:  No, your Honor.

17              THE COURT:  All right.  Thank you very much for

18   coming in.  You're excused.

19              MR. MARTIN:  You're excused.  Thank you,

20   Ms. Thompson.

21              Your Honor, Government calls Officer Donald Vaughn.

22              THE COURT:  Sir, could you give us your full name,

23   please, give it to our court reporter, and the spelling?

24              THE WITNESS:  Donald Paul Vaughan, V-A-U-G-H-N.

25              THE COURT:  Could you raise your right hand?
```

1      **OFFICER DONALD VAUGHN,**

2          being first duly sworn to tell the truth, was

3          examined and testified upon his oath as follows:

4                          -  -  -

5          THE COURT:  Please have a seat.  You may proceed.

6          MR. MARTIN:  Thank you, your Honor.

7                                          (9:02 a.m.)

8                      DIRECT EXAMINATION

9  BY MR. MARTIN:

10 Q.   Officer Vaughn, if you could introduce yourself to the

11 members of the jury, please?

12 A.   Customs and Border Protection Supervisor Donald Vaughn.

13 Q.   And it may be hard for them to hear you.  That microphone,

14 you can pull it in a bit.

15          Officer Vaughn, where do you currently work?

16 A.   Detroit Metro Airport with Customs and Border Protection.

17 Q.   Customs and Border Protection, what is that entity?

18 A.   Department of Homeland Security.

19 Q.   What are your duties on a day in and day out basis now,

20 currently?

21 A.   Now, I'm a supervisor, mostly dealing with facilities and

22 administrative duties.

23 Q.   Were you with Customs back in 2004?

24 A.   I was.

25 Q.   What role did you serve for the agency at that time?

1  A.    I was an officer, mostly stationed at the tunnel, here in

2  Detroit.

3  Q.    And on a daily basis, in that role as an officer stationed

4  at the tunnel, what did you do?

5  A.    I was working both primary inspections and secondary

6  inspections.

7  Q.    What is primary inspection?

8  A.    Primary inspection is where any travelers entering the

9  United States would first meet an officer and be inspected for

10 entry into the United States.

11 Q.    What is secondary?

12 A.    Secondary is where a more thorough inspection would be

13 conducted.

14 Q.    I want to direct your attention to February 3rd of 2004.

15 Were you on duty on that day?

16 A.    Yes.

17 Q.    And did you have an opportunity to encounter a vehicle

18 being driven by a Tanya Meeks?

19 A.    Yes.

20 Q.    Can you tell us as to your role on that day with respect

21 to that encounter?

22 A.    At that time, I was working in secondary inspection.  The

23 vehicle was referred to secondary inspection.  A -- we did what

24 we refer to as a seven-point exam, which is basically a

25 complete inspection of the vehicle, frequently using

1  non-intrusive inspection; in this case, a buster, which is a

2  density meter.

3          With training, we can tell the difference in the

4  density if there's something that shouldn't be in a door panel

5  or a tire to give us cause to do further inspection.

6  Q.   Just a few questions about the density meter.

7          Is that some type of technology?

8  A.   Yes.

9  Q.   And it tells you what is amiss.

10          Does it tell you something is amiss or not?

11  A.   It just tells you that there's a higher density meter.

12  With training and experience, you know what, generally, the

13  density would be of an object and then what would be odd if

14  there was something additional behind the original panel.

15  Q.   Was the density meter then used on Ms. Meeks' car?

16  A.   Yes.

17  Q.   And what were the conclusions?

18  A.   That the density in the spare tire was higher than it

19  should have been.

20  Q.   What did you do next?

21  A.   Had a K9 unit come out and run the vehicle.

22  Q.   Any particular type of K9 unit?

23  A.   Narcotics K9.

24  Q.   What happened then?

25  A.   The K9 alerted on the spare tire and then a request for

1   destructive inspection was requested and granted.  We then cut

2   into the tire, which is the destructive part of the inspection.

3   We cut into the tire and found the packages of marijuana inside

4   the tire.

5   Q.    Packages of marijuana, did you know at the moment that you

6   found them they were marijuana?

7   A.    No, we had to cut into the packages and then run tests on

8   them.

9   Q.    What type of test did you run?

10  A.    The narcotics -- we have marijuana test kits.  When you

11  put a little bit of marijuana in them and run the test kit, it

12  will turn purple and then you know you've got marijuana.

13  Q.    And how many packages of marijuana did you find in that

14  tire?

15  A.    I don't recall right off the top of my head.  I believe it

16  was 15.

17  Q.    Do you recall, approximately, how much the 15 packages of

18  marijuana weighed?

19  A.    It was -- no, I don't recall the total.

20          MR. MARTIN:  Your Honor, for the record, approaching

21  the defendant with what has been marked as identification as

22  Government Exhibit 61.

23          May I approach the witness, your Honor?

24          THE COURT:  Just give me a sec.

25          MR. MARTIN:  And, your Honor, this is not for

Jury Trial - Volume 3 - 10/15/2024

1    admission.  This is for refreshing.

2              THE COURT:  Okay.  Sixty-one.

3    BY MR. MARTIN:

4    Q.   Officer, I'm handing you a copy of 61.  If you could just

5    set it to the side for a second.

6              Did you prepare a report in conjunction with your

7    encounter with Ms. Meeks that day?

8    A.   Yes, I did.

9    Q.   And have I just handed you a copy of that report?

10   A.   Yes.

11   Q.   Would reading that report help refresh your recollection

12   as to the weight of the marijuana that day?

13   A.   Yes.

14   Q.   And could you just read the bottom of that report?

15             And when you're done reading, look up and I'll have

16   another question for you, please.

17   A.   Okay.

18   Q.   Now, did that help refresh your recollection?

19   A.   Yes.

20   Q.   How much, approximately, was there in marijuana in the

21   tire?

22   A.   3.8 kilos.

23   Q.   Can you do the conversion from kilos to pounds,

24   approximately?

25   A.   Just over eight pounds.

 1   Q.   Thank you.

 2            Now, if you could just turn that exhibit over.

 3            What did you do with the marijuana and Ms. Meeks

 4   after you determined that it was indicative of marijuana?

 5   A.   It was turned over for -- it was turned over to the

 6   agents.

 7   Q.   Do you recall specifically the agent's name?

 8   A.   No.  No, I do not.

 9            MR. MARTIN:  Your Honor, no further questions.

10            THE COURT:  Okay.  Any questions, sir?

11                         CROSS-EXAMINATION

12   BY DEFENDANT SYCHANTHA:

13   Q.   Do you know me?

14   A.   No.

15   Q.   Okay.  Did you check the bag for fingerprints?

16   A.   I did not.

17   Q.   Okay.  How long was this ago?

18   A.   2004.

19            DEFENDANT SYCHANTHA:  Okay.  That's all, your Honor.

20            THE COURT:  Okay.  Redirect?

21            MR. MARTIN:  No, your Honor.

22            THE COURT:  Officer, thank you very much for coming

23   in.

24            THE WITNESS:  Thank you.

25            THE COURT:  Sir?

Jury Trial - Volume 3 - 10/15/2024

1          MR. NORWOOD:  Your Honor, the Government calls John

2     Tetreau to the stand.

3          THE COURT:  Sir, could you come up and give your full

4     name to our court reporter, as well as the spelling of your

5     last name?

6          THE WITNESS:  John Tetreau, T-E-T-R-E-A-U.

7          THE COURT:  Raise your right hand.

8                          **JOHN TETREAU,**

9          being first duly sworn to tell the truth, was

10            examined and testified upon his oath as follows:

11                            -   -   -

12          THE COURT:  Please have a seat in the witness chair.

13          You may proceed.

14          MR. NORWOOD:  Thank you, your Honor.

15                                              (9:09 a.m.)

16                        DIRECT EXAMINATION

17    BY MR. NORWOOD:

18    Q.   Good morning, Mr. Tetreau.  How are you?

19    A.   I'm all right.  How are you?

20    Q.   I'm well.  Thank you.

21          Have you ever used controlled substances in your

22    life?

23    A.   Yes.

24    Q.   Which ones?

25    A.   Ecstasy, cocaine, marijuana.

1    Q.   And when was the last time you used ecstasy?

2    A.   Probably 2007 or '08.

3    Q.   And when was the last time that you used cocaine?

4    A.   Same timeline.

5    Q.   Have you ever appeared in federal court?

6    A.   Yes.

7    Q.   For what reason?

8    A.   I was convicted of conspiracy with intent to distribute --

9    possess or distribute controlled substance.

10   Q.   And was that related to -- what was that related to?

11   A.   You know, I was -- let's see.  I mean, it was related to

12   this case.  But, also, I was, you know, part of a -- we'll call

13   it a smuggling operation that brought in drugs from Canada to

14   the U.S.

15   Q.   Mr. Tetreau, can you look in that binder that's right

16   there and look at what's been admitted at Government Exhibit

17   25?

18         And once you've had a chance to look at it, can you

19   indicate that you've had a chance to do so?

20   A.   Yeah.

21         Yes, I do.

22   Q.   Who is that a picture of?

23   A.   This is Cal.

24         MR. NORWOOD:  Your Honor, permission to publish?

25         THE COURT:  Yes.

1  BY MR. NORWOOD:

2  Q.    And who is Cal?

3  A.    He was the guy that I worked for essentially bringing in

4  drugs from Canada to the U.S.

5  Q.    And how was he involved?

6  A.    I would basically take orders from him for, you know,

7  everything and anything from -- you know, I was directed to

8  pick up money, pick up drugs, drop -- drop drugs off, drop

9  money off.  Just kind of do whatever I was asked to.

10  Q.    Now, do you see Cal in the courtroom today?

11  A.    I do.

12  Q.    Where is he sitting and what is he wearing?

13  A.    Over in the -- defendant wearing a suit with the red tie.

14          MR. NORWOOD:  Your Honor, I'd ask that the record

15  reflect that Mr. Tetreau has identified the defendant.

16          THE COURT:  Noted.

17  BY MR. NORWOOD:

18  Q.    How would you two typically communicate?

19  A.    On cell phones.

20  Q.    And can you explain what Cal would talk to you about on

21  the phone?

22  A.    Depended day-to-day, but kind of whatever was needed.  You

23  know, for quite a while, I should say about six months or so,

24  you know, I personally would go to Canada and pick up drugs.

25  So some of the conversations were about coming over and picking

1  up either ecstasy or marijuana and then bringing it back

2  and/or, you know, while in Detroit, meeting with people,

3  picking up money, you know, holding that money, and then

4  eventually either dropping it off to somebody or bringing it

5  back to Canada.

6  Q.    Now, you just mentioned a run.  Can you please explain for

7  the jury what would happen when you would go on a particular

8  run from Canada to the United States?

9  A.    I typically would go over on a, you know, Wednesday or

10 Saturday night, would meet up with Cal, and sometimes there was

11 another gentleman named Dave, and would go to, you know, either

12 a house or a garage.  They would put, you know, drugs

13 essentially into my -- at the time, I had a fake gas tank on my

14 car.

15 Q.    And let me just stop you right there.

16 A.    Sure.

17 Q.    Mr. Tetreau, how did that fake gas tank get into your car?

18 A.    Cal and Dave essentially -- I can't remember exactly which

19 one, but one of the first interactions I had, I actually just

20 brought some money over for them and then they asked me if I

21 wanted to, you know, put this gas tank on my Blazer.  I had the

22 same exact car they already had a gas tank for, and so they

23 took off my original gas tank, put the new one on, filled it

24 with, you know, at the time, ecstasy and then I brought it

25 back.  So, essentially, they put it on there.

1  Q.   You've mentioned Dave a couple times.  Who is Dave?

2  A.   Dave was Cal's partner and, you know, overall, he's

3  basically the mechanic.  He would work on the cars essentially

4  to take -- you know, take the cars apart, put the drugs in it,

5  put the cars back together.

6  Q.   Okay.  Mr. Tetreau, can you turn to what's been admitted

7  as Government Exhibit 26?

8  A.   Yep.

9       That's Dave.

10      MR. NORWOOD:  Permission to publish, your Honor?

11      THE COURT:  Yes.

12 BY MR. NORWOOD:

13 Q.   And is this the person that you described was the

14 mechanic, he'd take the cars apart and then put the pills into

15 it?

16 A.   Yes.

17 Q.   Okay.  Now, how did you get involved with Cal and Dave?

18 A.   I worked at a restaurant with another gentleman named Ron,

19 and essentially Ron was going on to school or medical school of

20 sorts and was essentially looking to -- well, retire is

21 probably not the right word -- but to get out of this game, so

22 he had essentially recruited me to come in and take his place.

23 Q.   Mr. Tetreau, can you turn to what's been marked and

24 admitted as Government Exhibit 29?

25 A.   Yep.

1          This is Ron.

2          MR. NORWOOD:  Permission to publish, your Honor?

3          THE COURT:  Yes.

4          MR. NORWOOD:  Thank you.

5    BY MR. NORWOOD:

6    Q.   And so you and Ron met.  Did you also work together?

7    A.   Yeah, we worked at a restaurant together in Troy.

8    Q.   Which restaurant?

9    A.   It was Bahama Breeze.

10   Q.   And what was Ron's last name, if you can remember?

11   A.   I think it's Quizon.

12   Q.   Can you explain what Ron's role was in the conspiracy?

13   A.   Yeah.  I think --

14          DEFENDANT SYCHANTHA:  Lack of foundation, your Honor.

15          THE COURT:  Response?

16          MR. NORWOOD:  Your Honor, the Government believes by

17   a preponderance of the evidence that it is proven that there

18   was a conspiracy that existed and that this is admissible under

19   Evidence Rule 801(d)(2)(E).

20          THE COURT:  Overruled.

21          You may proceed.

22   BY MR. NORWOOD:

23   Q.   You may answer the question, Mr. Tetreau.

24          Please explain what Ron's role was in the conspiracy.

25   A.   As far as I knew, you know, he essentially did what I was

1   doing, what I ended up taking over.  So he was --

2         DEFENDANT SYCHANTHA:  Objection, your Honor.

3   Speculation.

4         THE COURT:  Overruled.

5         Go ahead.

6         THE WITNESS:  He was moving money around on, you

7   know, Cal and Dave's behalf, and transporting drugs

8   specifically around Metro Detroit.  I'm not sure one hundred

9   percent if he ever brought drugs back and forth from Canada or

10  not, but --

11  Q.   And so when you took over for Ron, what was your role with

12  the defendant?

13  A.   I mean, I became that.  So here I was, you know, basically

14  running stuff around and getting -- kind of doing whatever I

15  was asked for the organization in terms of picking up money,

16  dropping off drugs, back and forth.

17  Q.   Now, you had mentioned earlier in your testimony that were

18  transporting ecstasy.  How did you know it was ecstasy?

19  A.   I mean, I had seen it before, you know, before I got

20  involved in this just kind of on the street, you know, and then

21  once I got -- you know, once I got, you know, caught,

22  everything was tested, and so, for sure, it was ecstasy.  But

23  they're just multi-colored pills with different symbols on

24  them.

25  Q.   Now, when you saw these pills, how were the pills

1  packaged?

2  A.   They were typically vacuum-sealed.

3  Q.   And why were they vacuum-sealed?

4  A.   To protect.  Essentially, if you double vacuum-sealed it,

5  we believed that the dogs coming in from Canada could not smell

6  it.

7  Q.   Now, you explained the first half of the run what would

8  happen when you were in Windsor with Cal and Dave.  What would

9  happen when you would take the pills over the border into the

10  United States?

11  A.   I would go to, you know, wherever, a house or somewhere --

12  all over the place, really -- and then take the gas tank off of

13  my car, take the drugs out, or take the spare tire off my car,

14  take the drugs out, and then, you know, take them wherever I

15  was asked to.

16  Q.   Now, over time, did you acquire more knowledge about the

17  inner workings of the operation?

18  A.   I would say so, yeah.

19  Q.   And did you meet additional individuals?

20  A.   Yeah.

21  Q.   Mr. Tetreau, can you turn in your binder to what's been

22  admitted as Government Exhibit 45?

23  A.   Yes.

24  Q.   Who is that individual?

25  A.   We always referred to her kind of as "the girl" and she

```
 1  would -- at times, I would speak with her and, you know, she
 2  would -- she would essentially set up sometimes for me to meet
 3  with other people.
 4          MR. NORWOOD:  Permission to publish what's been
 5  admitted as Government's Exhibit 45?
 6          THE COURT:  Any objection?
 7          DEFENDANT SYCHANTHA:  No.
 8          THE COURT:  You may publish.
 9          MR. NORWOOD:  Thank you.
10  BY MR. NORWOOD:
11  Q.   And where was she located?
12  A.   I believe she was a dual citizen, so she was in Detroit
13  and in Canada.  I think she went back and forth.
14  Q.   And would you see her in both places?
15  A.   I saw her mostly in Canada.  I'm trying to remember if I
16  saw her in Detroit.  I honestly can't remember at this point.
17  It's been a long time.
18  Q.   Now, were there any members of her family involved, too?
19  A.   Yeah, I believe her father was.
20  Q.   Mr. Tetreau, can you turn to what's been marked and
21  admitted as Government Exhibit 45?
22  A.   Yes.
23  Q.   What is -- well, 46.  I apologize.
24  A.   Sure.
25          Yeah, this -- this is what I believe to be her
```

40

1   father.

2           MR. NORWOOD:   Permission to publish and admit Exhibit

3   46, your Honor?

4           THE COURT:   Yes.

5   BY MR. NORWOOD:

6   Q.   And what would her father do?

7   A.   He would -- sometimes I would drop off ecstasy to him.

8   More often than not, though, I was picking up money from him,

9   you know, randomly.  And then sometimes, too, they -- he would

10  -- he would have ecstasy and we'd need to pick it up from him

11  depending on the day.

12  Q.   And was this all in inner workings with the defendant?

13  A.   Yes.

14  Q.   And where was he located?

15  A.   He was in Detroit.

16  Q.   Approximately, how many trips did you make for Cal and

17  Dave in Ron's place?

18  A.   I did, like, two trips a week for six, eight months.

19  Q.   And did this include those vacuum-sealed bags?

20  A.   Yeah.

21  Q.   How many vacuum-sealed bags would you have at a time?

22  A.   I'd say if I was bringing over pills, I don't know exact

23  amount of bags, but it would be anywhere from 10,000 to 30,000

24  pills depending on the day.  And it would be more -- more bags

25  depending if it was marijuana.  You know, there was just more

1    of it, more quantity, so there would be 10, 15 bags depending

2    on the run.

3    Q.    Now, would anyone go on trips with you?

4    A.    Sometimes, yeah.

5    Q.    Who would go with you?

6    A.    I had a -- I had a friend named Loren that would go back

7    and forth with me.

8    Q.    And how did you know Loren?

9    A.    I grew up with her since, like, third grade.

10   Q.    And did you guys also work together?

11   A.    We did.  We actually worked at Bahama Breeze, too.

12   Q.    So Bahama Breeze, you, Ron and Loren worked there

13   together?

14   A.    Yeah.

15   Q.    Mr. Tetreau, can you turn to what's been admitted as

16   Government Exhibit 28?

17   A.    Yep.

18   Q.    And who is that?

19   A.    That's Loren.  Loren Pennington.

20          MR. NORWOOD:  Your Honor, permission to publish?

21          THE COURT:  Yes.

22   BY MR. NORWOOD:

23   Q.    And so how did Loren get introduced into this?

24   A.    She would -- at first, she would go with me over to Canada

25   just so I didn't look like I was going over there alone.  And

1   then, you know, eventually got to a place where, you know, I

2   felt -- I was getting questioned more and more at the border

3   instead of just kind of driving through, you know, like I had

4   previously, started to get more questions.  So, at a certain

5   point, I had thought to, we'll say, enlist Loren into the

6   actual smuggling.

7   Q.   And did you introduce her to the defendant?

8   A.   I did.

9   Q.   Can you explain that introduction for the jury?

10  A.   Yeah, I think, you know, probably the original couple

11  times she was just riding with me along, you know, as I did --

12  we'll call it a run.  And then slowly, but surely, you know, I

13  had purchased a car for her so that she could start smuggling.

14  And then, you know, I was kind of in between Cal and Loren.

15  Q.   And so why did you purchase that particular type of

16  vehicle?

17  A.   Because it was -- it had space in the rear where you could

18  store drugs in it.

19  Q.   And you just mentioned that, you know, you were crossing

20  the border and there was some concern that you had.

21       Did Loren essentially work under you for the

22  defendant?

23  A.   Yes.

24  Q.   And what did she start doing in that role?

25  A.   She -- her primary role was just smuggling drugs back and

1   forth across the border.

2   Q.   And how did you know that she was doing this?

3   A.   I mean, I would get a call, you know, to -- that they

4   needed something moved across the border and then I would, you

5   know, essentially ask how much, and then I would call her and

6   negotiate for a less price, send her over, she would come back

7   and then I would unload the drugs and take them wherever they

8   needed to be.

9   Q.   And over this period of time, did Loren end up having

10  direct contact with the defendant?

11  A.   Yeah, I believe so.

12  Q.   Now, would she always go alone?

13  A.   No.  I believe -- no.

14  Q.   Who would she go with?

15  A.   She had a boyfriend at the time.  His name was Jacob.  I

16  know he would go with her most of the time.

17  Q.   And would she also transport ecstasy pills across the

18  border?

19  A.   Yeah, I believe so.

20  Q.   And you said your quantities were about 10 to 30,000 pills

21  every time you did it.  What were her quantities like?

22  A.   I'd say about the same.

23  Q.   Did Loren have any issues crossing the border that you

24  know of?

25  A.   Yeah.

1  Q.   At some point, was she stopped at the border?

2  A.   She was.

3  Q.   Did you two have a discussion about what happened?

4  A.   Yes, we did.

5          MR. NORWOOD:  Permission to publish?

6          Your Honor, permission to play what has been admitted

7  as Government's Exhibit 17A, with the transcript 17B showing?

8          THE COURT:  Yes.  Just give me a minute, though,

9  okay?

10         Again, I'm going to read the instruction to you that

11 you heard last week.  I'll just read it once today, all right?

12         You will hear some recordings that were received into

13 evidence and you will be seeing a written transcript of the

14 recordings.  Keep in mind that transcripts are not evidence.

15 They are being used to give you -- as a guide to help you

16 follow what is being said.  Only the recordings themselves are

17 evidence.  If you noticed -- if you notice any differences

18 between what you heard on the recordings and what you read in

19 the transcripts, you must rely on what you hear, not what you

20 read.  And if you cannot hear or understand certain parts of

21 the recordings, you must ignore the transcripts as far as those

22 parts are concerned.

23         Again, did everyone hear the instruction?

24         JURORS:  Yes.

25         THE COURT:  All right.  Thank you.

1              You may proceed.

2              MR. NORWOOD:   Thank you.

3              (Audio played at 9:29 a.m.)

4    BY MR. NORWOOD:

5    Q.    Did you hear what you said there, there's plenty of?

6    A.    Yeah.

7    Q.    What did you say?

8    A.    To be honest with you, I don't -- I heard -- I say,

9    there's plenty of, but I don't know what the end of it was.

10   Q.    Okay.   That's fine.

11             (Audio played at 9:30 a.m.)

12   BY MR. NORWOOD:

13   Q.    Now, there you said you had your car sniffed out before.

14   What did you mean when you said that?

15   A.    You know, while transporting drugs from Canada, I had had

16   my car sniffed out before, as well as I know Loren did.   We

17   never had any issues.

18             (Audio played at 9:31 a.m.)

19   BY MR. NORWOOD:

20   Q.    Now, Loren mentioned Cal and Dave.   Who are Cal and Dave?

21   A.    The same Cal and Dave we've been referring to that are

22   part of this case.

23             (Audio played at 9:31 a.m.)

24   BY MR. NORWOOD:

25   Q.    Now, after this period of time when Loren was caught at

Jury Trial - Volume 3 - 10/15/2024

1   the border, did she stop doing transactions for a little bit?

2   A.   Yeah.

3   Q.   And why was that?

4   A.   Because she had gotten caught at the border, so, you know,

5   at that time, you know, just didn't trust that, you know, she

6   was, I guess, working with the Government.

7   Q.   And so you had a speculation that she was working with the

8   Government at that time?

9   A.   Yeah.

10  Q.   And so who filled in for her?

11  A.   To be honest, I'm not a hundred percent sure because, at

12  the same time, I think, you know, I was probably looked at as

13  maybe, you know, I would say being a part or working with the

14  Government at that point, but, you know, I also, like, took --

15  had to take a break for a while for so many months.

16  Q.   Now, in January of 2009, did you begin to start doing

17  trips again?

18  A.   Yes.

19  Q.   And did you have contact with Cal and Dave?

20  A.   Yeah.

21  Q.   Did Cal ask you to do something around that period of

22  time?

23  A.   Yeah, yeah.  At that point, I stopped take -- bringing

24  stuff over from Canada and was just working mostly in Metro

25  Detroit or in the U.S.

Jury Trial - Volume 3 - 10/15/2024

 1  Q.   And so you were more in the role of coordinator?

 2  A.   Yeah.

 3  Q.   As opposed to courier at that point?

 4  A.   Correct.

 5  Q.   Now, did Cal ask you to do a trip related to Boston?

 6  A.   Yes.

 7  Q.   Okay.  Can you explain that for the jury?

 8  A.   Yeah.

 9       Just he said that he had -- I wanna say it was 10,000

10  pills that needed to go to Boston.

11  Q.   And so what did you do?  What was your role in that?

12  A.   I had, you know, talked through it and coordinated for

13  Loren to do the run, but also coordinated for the pills to get

14  to Loren so she could do the run.

15  Q.   Now, can you explain what happened during that period of

16  time?

17  A.   Yeah.  I mean, we, you know, had a couple phone calls back

18  and forth.

19       I'm trying to remember.  It's been a long time.

20       Basically figured out that the pills were here and

21  coordinated with -- I'm trying to remember, but I think it was

22  the girl.  Once again, I don't remember her name, but -- or

23  know her name, but coordinated for her father -- her and her

24  father to meet up with Loren to give Loren the pills to drive

25  to Boston.

1   Q.   And just --

2            MR. NORWOOD:  Your Honor, permission to publish to

3   Exhibit 45 again?

4            THE COURT:  Yes.

5            MR. NORWOOD:  Thank you, your Honor.

6   BY MR. NORWOOD:

7   Q.   And was this the girl that you were just referring to?

8   A.   Yes.

9   Q.   You can continue.

10  A.   And then it took a -- it took a couple extra hours to get

11  Loren there and -- but long story short, she ended up getting

12  the pills.  I believe she was with Jacob at the time.  They

13  went to Boston.  And as soon as they got to Boston to meet with

14  whomever, which I didn't know who it was, you know, as soon as

15  they -- they got there, basically that person, you know, had

16  gotten arrested.

17  Q.   Now, how were you feeling at the time?

18  A.   You know, bad, horrible.

19  Q.   And you already had speculation thinking that Loren was

20  working with law enforcement.  Did that heighten your level of

21  speculation about her?

22  A.   Oh, yeah, a hundred percent.

23  Q.   And did you two have a conversation after that trip?

24  A.   I believe so, yeah.

25            MR. NORWOOD:  Your Honor, permission to play what's

Jury Trial - Volume 3 - 10/15/2024

1    been admitted as Government's Exhibit ----

2              DEFENDANT SYCHANTHA:  Objection, your Honor.

3              They heard this tape two, three times already.

4              THE COURT:  Go ahead.

5              MR. NORWOOD:  Thank you, your Honor.

6              And then --

7              THE COURT:  Permission to play what?

8              MR. NORWOOD:  Permission to play Government's Exhibit

9    40A, and showing Government's Exhibit 40B, which is the

10   transcript.

11             THE COURT:  Objection?

12             DEFENDANT SYCHANTHA:  Your Honor, they heard this

13   tape two, three times already.

14             THE COURT:  And what tape -- what exhibit is it?

15             MR. NORWOOD:  This is 40A, your Honor.

16             THE COURT:  It's -- the exhibit purports to be a

17   conversation between Ms. Pennington and the witness.

18             You may proceed.

19             MR. NORWOOD:  Thank you, your Honor.

20             (Audio played at 9:38 a.m.)

21   BY MR. NORWOOD:

22   Q.   Mr. Tetreau, why did you ever stand up?

23   A.   Just trying to see if she had a wire.

24             (Audio played at 9:39 a.m.)

25   BY MR. NORWOOD:

1  Q.   You said that I already know what you did, I already know.

2  What were you talking about there?

3  A.   You know, I -- at that point, I knew that whoever she gave

4  the drugs to got arrested immediately, so I assumed that she

5  had, you know, essentially set me up.

6  Q.   Set you up how?

7  A.   You know, working with the Government, getting them

8  involved, and, you know, essentially them being a part of this

9  run and intercepting the drugs.

10         (Audio played at 9:40 a.m.)

11  BY MR. NORWOOD:

12  Q.   So, at that point, you said you get a phone call.  What

13  phone call were you referring to?

14  A.   It was a call to take the drugs to Boston.

15  Q.   And who gave you that phone call?

16  A.   Cal.

17         (Audio played at 9:42 a.m.)

18  BY MR. NORWOOD:

19  Q.   What are you talking about right there, Mr. Tetreau?

20  A.   Whoever they had dropped the drugs off to, essentially,

21  you know, got pulled over right away by law enforcement.

22         (Audio played at 9:43 a.m.)

23  BY MR. NORWOOD:

24  Q.   And so that person was stopped by law enforcement.  Were

25  you concerned that Loren was talking to you and that she wasn't

1  arrested?

2  A.   Can you repeat the question?

3  Q.   Sure.  And I'll actually rephrase.

4        So the individual that was caught around the corner

5  was arrested by law enforcement.  Were you concerned that Loren

6  wasn't arrested as well?

7  A.   Yes.

8  Q.   Why were you concerned?

9  A.   Because if, you know, essentially she was not working with

10  the Government, then she would have been arrested as well.

11  Like, if -- if he was working with the Government, she would

12  have gotten arrested, but since she was working with the

13  Government, he got arrested.

14  Q.   And based on your conversations with Loren, you knew she

15  was in Boston?

16  A.   Yeah.

17        (Audio played at 9:44 a.m.)

18  BY MR. NORWOOD:

19  Q.   Now, you mentioned right there that someone was ratted out

20  and there was four other people.

21        What were you referring to when you said there were

22  four other people?

23  A.   To be honest with you, I'm not -- I don't recall a hundred

24  percent.  I just know, you know, from being involved in this

25  organization, like, if somebody like this goes down, then, you

1  know, they're -- they're going to, you know, go after everybody

2  involved.

3         So, at that point, I assumed, you know, like the girl

4  and the -- her dad, the people that had essentially, you know,

5  coordinated Loren getting the drugs they would, I'm sure at

6  this point, be getting in trouble, as well as myself.  So I

7  don't know if I had necessarily four people in mind

8  specifically, but I just know, like, everybody involved is

9  essentially getting in trouble.

10 Q.   And so in the heat of that moment, you were upset and you

11 were saying, everybody I know is going down?

12 A.   Yeah.

13         (Audio played at 9:45 a.m.)

14 BY MR. NORWOOD:

15 Q.   And so going back to that for a second, you identified a

16 woman that was involved, correct?

17 A.   Um-hum.

18 Q.   And then her father?

19 A.   Yeah.

20 Q.   You also knew Ron Quizon in this?

21 A.   Yep.

22 Q.   You involved Loren?

23 A.   Yes.

24 Q.   And you were involved in this?

25 A.   Yes.

1    Q.    And you knew Cal?

2    A.    Yep.

3    Q.    And Dave was also involved?

4    A.    Yes.

5    Q.    Who did you think was leading this?

6    A.    Cal.

7               (Audio played at 9:46 a.m.)

8    BY MR. NORWOOD:

9    Q.    So you mentioned that they went over there and they didn't

10   get in trouble.  What did you mean when you said that?

11   A.    You know, I think typically in this situation, if whoever

12   is working with the Government doesn't, like, get arrested and

13   get pulled over and whoever's not gets arrested and, you know,

14   goes to jail essentially.

15              So, at that point, I assumed since they had dropped

16   the drugs off and essentially drove away scot-free with this

17   other, you know, gentleman, literally cut the corner and went

18   around the block and got pulled over, that, at that point, they

19   had been working with the Government.

20              (Audio played at 9:48 a.m.)

21   BY MR. NORWOOD:

22   Q.    Why did you say that?

23   A.    To be honest, I was mad.  I -- I don't -- I don't

24   necessarily know why.  I was just probably trying to scare her.

25              (Audio played at 9:48 a.m.)

1  BY MR. NORWOOD:

2  Q.   Now, there, you're mentioning that you're -- what are you

3  talking about there?

4  A.   I think when I got -- when I got -- when I got called for

5  the run, I -- I didn't personally want to do it.  I can't

6  remember why.  I didn't have time or something, but I was

7  scared to do it.

8        And so in talking it through with Cal, we -- you

9  know, he asked me if I could get her to do it.

10 Q.   And you said that "I've known her since the third grade."

11       Were you vouching for her?

12 A.   I was, yeah.

13 Q.   Because you trusted her?

14 A.   I did.

15 Q.   You had known her since the third grade?

16 A.   Yeah.

17       (Audio played at 9:51 a.m.)

18 BY MR. NORWOOD:

19 Q.   Mr. Tetreau, you had mentioned that you had been in

20 federal court before?

21 A.   Um-hum.

22 Q.   And you said that you were in federal court for conspiracy

23 with the -- to possess with the intent to distribute and

24 distribute controlled substances, is that right?

25 A.   Yeah.

1   Q.   Were you indicted in March of 2011?

2   A.   I was.

3   Q.   Has the Government motioned the Court to provide you with

4   credit with your cooperation?

5   A.   Yes.

6   Q.   How much time did you serve in prison?

7   A.   I was sentenced to 48 months.

8   Q.   And after that period of time, did you serve a term under

9   supervision with the probation office?

10  A.   Yeah, for a year.

11  Q.   Did you successfully complete that term?

12  A.   I did.

13  Q.   And so is your criminal case over?

14  A.   It is.

15  Q.   So, at this time, has the Government promised you with

16  anything for your testimony today?

17  A.   No.

18  Q.   Why are you testifying?

19  A.   To be honest, I was under the impression that as part of

20  my original plea deal that should court cases come back about

21  them, I'm supposed to testify.  Also, I was subpoenaed here

22  today.

23  Q.   Now, I just want to take a step back.

24          You had mentioned that you did about 10 to 30,000

25  pills every time you did a run.  Did you also do runs for

1    money?

2    A.    Yeah.

3    Q.    And how much money would you do on these runs?

4    A.    It depended on the day, but, you know, 20,000 to sometimes

5    $40,000 a trip.

6    Q.    And about how many 20 to 40,000 trips for cash did you do?

7    A.    I'd say, you know, one every couple weeks or so, you know,

8    in the heighth of everything going on.

9          You know, sometimes it was more, but I'd say average

10   was once every couple weeks.

11         MR. NORWOOD:  Your Honor, may I have a moment?

12         THE COURT:  Yes.

13         MR. NORWOOD:  Thank you, Mr. Tetreau.  I have no

14   furthers questions at this time.

15         THE COURT:  Okay.  Mr. Sychantha?

16         DEFENDANT SYCHANTHA:  Yes.

17                      CROSS-EXAMINATION

18   BY DEFENDANT SYCHANTHA:

19   Q.    Okay.  So what was your guideline, do you remember, for

20   your time?

21   A.    I don't -- I apologize.  I don't know what you mean.

22   Q.    The guideline, like, how much were you facing?

23   A.    I think the mandatory minimum was -- I think it was five

24   years because I had never been in trouble before.  It might

25   have been 10.  It's been a while.

1   Q.   Yeah, it says 10 there.

2        And then how much did you do?

3   A.   Two years.

4   Q.   Okay.  That's for cooperating?

5   A.   Correct.

6   Q.   And how long was the crime?

7   A.   I guess, what do you mean, like, the total length?

8   Q.   Yeah, like, how long was it ago that you got charged?

9   A.   You mean, like, how long was I, like, active bringing

10  drugs back and forth?

11  Q.   Yeah.

12  A.   I'd say probably the course of a year total.  Six to eight

13  months where I was, you know, going back and --

14  Q.   No.  How long is it from today?

15  A.   Oh.  It was '08, so it's been 16 -- 15 and a half, 16

16  years.

17  Q.   Okay.  So you don't really have a hundred percent memory

18  of what happened?

19  A.   I mean, I think -- I think that's fair to say.  I remember

20  a decent amount of it though, unfortunately.

21  Q.   Okay.  You said there was 10 to 30,000 pills in a thing.

22  Did you count the pills yourself?

23  A.   I did not.

24  Q.   Okay.  Did you count the money yourself?

25  A.   No.

```
 1            DEFENDANT SYCHANTHA:  That's it, your Honor.

 2            THE COURT:  All right.  Redirect?

 3            MR. NORWOOD:  Brief, your Honor.  Thank you.

 4                      REDIRECT EXAMINATION

 5   BY MR. NORWOOD:

 6   Q.   Mr. Tetreau, you were asked a question and I want to ask

 7   it to you again.

 8            How long did you do this crime?

 9   A.   I mean, I'd say the better part of a year total.

10   Q.   You did this for about a year.

11   A.   Um-hum.

12   Q.   Your sentence was 48 months.

13   A.   Yep.

14   Q.   And obviously, this has been a long time.

15   A.   Yeah.

16   Q.   But you remember the woman that you worked with, you

17   remember her father?

18   A.   Yes.

19   Q.   So you remember the woman?

20   A.   Yes.

21   Q.   You remember her father?

22   A.   Yes.

23   Q.   You remember Ron Quizon?

24   A.   Yes.

25   Q.   You remember Loren Pennington?
```

```
 1   A.    Yes.

 2   Q.    You remember working with Cal?

 3   A.    Yes.

 4   Q.    You remember working with Dave?

 5   A.    Yes.

 6   Q.    And you also remember working with Loren's boyfriend,

 7   Jacob?

 8   A.    Yes.

 9   Q.    And who were you all working for?

10   A.    Cal.

11   Q.    And Cal is the defendant?

12   A.    Yes.

13           MR. NORWOOD:  Thank you, your Honor.  No further

14   questions.

15           THE COURT:  Recross?

16           DEFENDANT SYCHANTHA:  No, your Honor.

17           THE COURT:  Okay.  Sir, thank you very much.  You may

18   step down.

19           MR. NORWOOD:  Your Honor, may we have a moment?

20           THE COURT:  Sure.

21           MR. NORWOOD:  Your Honor, the Government calls

22   Officer Wolentarski to the stand.

23           THE COURT:  Sir, could you give us your full name

24   here to the court reporter and the spelling?

25             DEFENDANT SYCHANTHA:  Sure.
```

1          Christopher Wolentarski, W-O-L-E-N-T-A-R-S-K-I.

2          THE COURT:  And could you raise your right hand?

3              **OFFICER CHRISTOPHER WOLENTARSKI,**

4          being first duly sworn to tell the truth, was

5          examined and testified upon his oath as follows:

6                          -   -   -

7          THE COURT:  Please have a seat in the witness chair.

8          You may proceed.

9          MR. NORWOOD:  Thank you, your Honor.

10                                         (9:58 a.m.)

11                      DIRECT EXAMINATION

12   BY MR. NORWOOD:

13   Q.   Good morning, Officer.  How are you?

14   A.   Good morning.  Good.

15        How are you?

16   Q.   Where are you currently employed?

17   A.   At the Detroit Tunnel.

18   Q.   And who is your employer?

19   A.   I'm with the Customs and Border Protection.

20   Q.   Now, how long have you been employed with the United

21   States Customs and Border Protection, also known as CBP?

22   A.   Little over 20 years.

23   Q.   And are you currently assigned to a certain division or

24   team?

25   A.   Yes.

1   Q.   And what division or team are you assigned to?

2   A.   Management.  I'm a chief over the tunnel.

3   Q.   Now, prior to being chief, what position did you hold?

4   A.   I was in an anti-terrorist contraband enforcement team.

5   Q.   Now, can you tell the jury what your duties were on that

6   contraband team?

7   A.   Our main focus was narcotics, intercepting narcotics on a

8   coming in, pre-primary, post-primary, on stations between the

9   bridge and tunnel and Fort Street, cargo facility.

10  Q.   And did you have any other law enforcement experience?

11  A.   No.

12  Q.   Now, were you on duty on October the 24th, 2008?

13  A.   Yes.

14  Q.   Do you remember anything in particular happening that day?

15  A.   I believe there was -- we were operating a ZBV.  That was

16  -- it's a mobile x-ray, and we were assigned to the Ambassador

17  Bridge.  And I was called to x-ray a -- I believe it was a

18  Plymouth van.

19  Q.   Now, let me ask you this question.  That was in 2008.

20           First, I'm going to ask you about your occurrence

21  with the van.

22  A.   Sure, yes.

23  Q.   Now, what happened in that occurrence with the van, the

24  Plymouth van you just talked about?

25  A.   Sure.

1          I was the operator of the mobile x-ray.  I did a scan

2   of the van and there was an anomaly that showed up.  It looked

3   like multiple packages on the side panel of the van, driver's

4   side.

5   Q.   And what happened after that?

6   A.   After the identification, I went up and there was -- after

7   we opened the door, I popped a little plastic piece, looked

8   down, and we saw a bunch of -- it looked like colored pills in

9   bags.

10  Q.   Now, can you explain what you and law enforcement did next

11  to search that van?

12  A.   Sure.

13          We -- after identification of the pills, the officers

14  extracted the bags, did a test, and they did an extrapolated

15  count, which is like an estimate count.

16  Q.   And what was the extrapolated count?

17  A.   I think it was, like, a little over 100,000 tabs.

18  Q.   When you say tabs, you mean those pills we were just

19  talking about?

20  A.   Individual tabs, yep.

21  Q.   Now, was there a field test?

22  A.   There was.

23  Q.   And what did the field test indicate?

24  A.   Positive for ecstasy.

25  Q.   Officer, can you turn to that binder that's in front of

Jury Trial - Volume 3 - 10/15/2024

1    you --

2    A.    Sure.

3    Q.    -- to what's been marked as Government's Exhibit 22 and

4    indicate when you've had an opportunity do so?

5    A.    Okay.  I got it.

6    Q.    All right.  What is Government's Exhibit 22?

7    A.    It's showing the Plymouth van and the license plate, the

8    rear of it, the license plate.

9    Q.    And is that -- are those pictures a fair and accurate

10   representation of what you seized on December of 2008?

11   A.    That is correct, yes.

12            MR. NORWOOD:  Your Honor, the Government moves for

13   admission of Government Exhibit 22.

14            THE COURT:  Any objection?

15            DEFENDANT SYCHANTHA:  No, your Honor.

16            THE COURT:  Exhibit 22 is received.

17            MR. NORWOOD:  Permission to publish?

18            THE COURT:  Yes.

19   BY MR. NORWOOD:

20   Q.    So, Officer, what is this first picture?

21   A.    It's the rear of the vehicle that we seized, showing the

22   license plate.

23   Q.    Going to picture two.  This picture as well?

24   A.    Yes.  Same vehicle.

25   Q.    Now, picture four, what does that depict?

1  A.   Those were the pills that were on the driver's side panel,

2  which is -- turned out to be ecstasy per test kit.

3  Q.   Picture five?

4  A.   Same.

5  Q.   Picture six?

6  A.   Same.

7  Q.   Now, picture seven, you had mentioned that there was this

8  plastic piece.  Can you explain what this picture shows for the

9  jury?

10  A.   Absolutely.

11         So if you open the driver's side door, if you look to

12  the right of this picture, it looks like an open space.  That's

13  what I popped off right there.  And if you look really close,

14  you could start to see the packages of the pills right there,

15  sort of -- yep, over just a little bit, but it was pretty clear

16  after we popped out that plastic panel.

17  Q.   And then the next picture, eight?

18  A.   Yep.

19  Q.   Now, is it these bags right here that you see that kind of

20  look red and clear-ish?

21  A.   Yes, that's correct.

22  Q.   Picture nine, please explain what the jury is looking at

23  here.

24  A.   So that's what, after the view, we pulled out to the

25  inside of the panel.  So if you were inside of the car pulling

1  out the inside of the panel, that's what we found.

2  Q.   And so the pills were stacked up on the side of that van's

3  panel?

4  A.   Correct, driver's side.  Driver's side.

5  Q.   Was it filled on the driver's side?

6  A.   Well, as you could see, it's -- it kind of fell, but it

7  was pretty much stacked up that whole panel going all the way

8  down, so yes.

9  Q.   And the next picture, what does this depict?

10  A.   Same.

11  Q.   Now, if I showed you some of those pills that you seized

12  on that day, would you be able to verify that that's what they

13  are?

14  A.   Sure.

15       MR. NORWOOD:  Your Honor, may I approach?

16       THE COURT:  Yes.

17  BY MR. NORWOOD:

18  Q.   Officer, I've handed you what's been marked as

19  Government's Exhibits 13, 14, 15 and 16.

20       Please review them and indicate when you've had an

21  opportunity to do so.

22  A.   Yep.  That's that.  Look pretty familiar with it, what we

23  extracted from the vehicle.

24  Q.   Now, let's start with 13.

25  A.   Okay.  I have 15, 19, 14 and 16.

1  Q.   If you actually --

2  A.   Am I looking at the wrong --

3           MR. NORWOOD:  Your Honor, may I approach?

4           THE COURT:  Yes.

5           THE WITNESS:  Sorry.

6           MR. NORWOOD:  That's all right.

7  BY MR. NORWOOD:

8  Q.   So what is Government's Exhibit 13, 14, 15 and 16?

9  A.   Ecstasy.

10 Q.   And where did you get that ecstasy from?

11 A.   The driver panel of the Plymouth.

12          MR. NORWOOD:  Your Honor, the Government moves for

13 admission of Government Exhibits 13, 14, 15 and 16.

14          DEFENDANT SYCHANTHA:  No objection.

15          THE COURT:  Any objection?

16          DEFENDANT SYCHANTHA:  No, your Honor.

17          THE COURT:  Thirteen, 14, 15 and 16 are received.

18          MR. NORWOOD:  Permission to show the jury, your

19 Honor?

20          THE COURT:  Yes.

21          MR. NORWOOD:  This is 13, this is 14, this is 15,

22 this is 16.

23 BY MR. NORWOOD:

24 Q.   Now, Officer, did you also make a stop related to a Grand

25 Am?

1   A.   Yes.

2   Q.   And was this in October of 2008?

3   A.   I believe so, yes.

4   Q.   Can you please explain what happened that day?

5   A.   I was -- we were working pre-primary at the bridge, and

6   that's before the booths of Customs.  We came across a red

7   Grand Am; had a female and a male in it.  The male was driving.

8   He seemed a little nervous.  Kind of caught our attention.  We

9   had a K9 with us.  Because of the nervous behavior and the K9

10  showing little interest, we brought it to our secondary for

11  further inspection.

12  Q.   And what happened after that?

13  A.   We discovered marijuana in the quarter panel, the rear

14  quarter panel of the vehicle.

15  Q.   And how much marijuana did you discover?

16  A.   I can't recall.  I mean, I'm guessing here on this.  I

17  think, like, 30 pounds.  It was a lot.

18         MR. NORWOOD:  Your Honor, may I have a moment?

19         THE COURT:  Yes.

20         THE WITNESS:  3.6 keys, I believe.  Something like

21  that.

22         MR. NORWOOD:  Your Honor, may I approach?

23         THE COURT:  Yes.

24  BY MR. NORWOOD:

25  Q.   Now, Officer, I brought you some pills, 13, 14, 15 and 16.

1    A.    Yes.

2    Q.    These are some of the other pills?

3    A.    Okay.

4    Q.    Can you tell me what 10, 11 and 12 came from?

5    A.    From the Plymouth, same car.

6    Q.    Same --

7    A.    Yes.

8    Q.    You said it was about 100,000 pills?

9    A.    Yes, it was a lot.

10           MR. NORWOOD:  Government moves for admission of 10,

11   11 and 12.

12           THE COURT:  Any objection?

13           DEFENDANT SYCHANTHA:  No, your Honor.

14           THE COURT:  Ten, 11 and 12 are received.

15           MR. NORWOOD:  Permission to show the jury, your

16   Honor?

17           THE COURT:  Yes.

18           MR. NORWOOD:  This is 10, this is 11, this is 12.

19           Your Honor, may I have a moment?

20           THE COURT:  Sure.

21           MR. NORWOOD:  Thank you.

22           Thank you, officer.  No further questions at this

23   time.

24           THE COURT:  Cross?

25                             *  *  *

1                      CROSS-EXAMINATION

2    BY DEFENDANT SYCHANTHA:

3    Q.   Do you know me?

4    A.   No.

5              DEFENDANT SYCHANTHA:  Okay.  That's it.

6              THE COURT:  Redirect?

7              MR. NORWOOD:  No redirect, your Honor.

8              THE COURT:  Sir, thank you very much for coming in.

9    You're excused.

10             THE WITNESS:  All right.  Thank you.

11             MR. NORWOOD:  Your Honor, we're prepared for another

12   witness.

13             THE COURT:  Yes.

14             MR. MARTIN:  Inspector Bertram is called to the

15   stand.

16             THE COURT:  Sir, could you come up and give your full

17   name to our court reporter, as well as the spelling?

18             THE WITNESS:  Stuart Bertram, S-T-U-A-R-T

19   B-E-R-T-R-A-M.

20             THE COURT:  And could you raise your right hand?

21                           **STUART BERTRAM,**

22          being first duly sworn to tell the truth, was

23          examined and testified upon his oath as follows:

24                             -  -  -

25             THE COURT:  Please have a seat in the witness chair.

1          You may proceed when you're ready.

2          MR. MARTIN:  Thank you, your Honor.

3                            * * *

4                                          (10:16 a.m.)

5                       DIRECT EXAMINATION

6   BY MR. MARTIN:

7   Q.   Good morning, sir.

8   A.   Good morning.

9   Q.   Could you introduce yourself to the members of the jury,

10  please?

11  A.   My name is Stuart Bertram.  I'm a police officer with the

12  Ontario Provincial Police in Ontario, Canada.

13  Q.   So I'm addressing you correctly, what is your title with

14  that organization?

15  A.   Inspector.  I hold the rank of inspector within the OPP.

16  Q.   And the Ontario Provincial Police, what is that

17  organization?  What do they do?

18  A.   So the Ontario Provincial Police, if I was to compare it

19  as like a state police's agency.  So we're a provincial police

20  agency.  We have officers across all of Ontario.  We police

21  municipalities, as well as all the major highways within

22  Ontario, and we -- we're across all parts, from east to west,

23  north to south.

24  Q.   You're a law enforcement entity?

25  A.   Yes.

1    Q.   And may I call it the OPP for short?

2    A.   Please.

3    Q.   Does the OPP have a particular focus in terms of crimes it

4    investigates?

5    A.   We follow the criminal code, so we uphold the criminal

6    code of Canada, as well as all provincial statutes, so Highway

7    Traffic Act, Liquor License Act, all the different provincial

8    acts that a law enforcement agency is considered to uphold,

9    so...

10   Q.   Does the OPP have any role in investigating crimes that

11   may concern the border?

12   A.   Yeah, we do.  Obviously, we're interested in ensuring that

13   the border is -- we uphold the laws for both sides of the

14   border.  We want to make sure that any criminality coming into

15   Ontario, into Canada, that we try to intercept or try to stop

16   whatever activity that may be coming across from the United

17   States into Canada, that we uphold our laws against those

18   people that choose to break those laws.

19   Q.   Sir, how long have you worked with the OPP?

20   A.   Started in 1994, so just over 30 years now.

21   Q.   Did you work for the OPP in the 2007, 2008 time frame?

22   A.   Yes, I did.

23   Q.   What was your position with the OPP at that time?

24   A.   I was detective constable with our Provincial Operations

25   Intelligence Bureau, a bit of a mouthful, but it was our

1  intelligence office at the Windsor location.

2  Q.   In terms of the intelligence office, what was that

3  office's function for the OPP, generally?

4  A.   We were there to investigate subjects of interest to

5  determine any criminality, and it ranged from drugs, weapons.

6  We -- we -- I had a focus as well for gaming with Windsor

7  Casino, so anything related to the Windsor Casino, so any

8  gaming offenses, money laundering.  Just any, I would say, more

9  organized criminal offenses.

10  Q.   During your tenure with the Intelligence Bureau, did you

11  come to investigate or at least consider as a subject of

12  interest a Khaophone Sychantha?

13  A.   Yes, I did.

14  Q.   And would you recognize that individual if you saw that

15  individual in the courtroom here today?

16  A.   Yes, I would.

17  Q.   Can you identify that person, if he is here?

18  A.   Gentleman sitting with the suit with the red tie.

19       MR. MARTIN:  Your Honor, may the record reflect the

20  inquiry identification of the defendant.

21       THE COURT:  It's noted.

22       MR. MARTIN:  Thank you, your Honor.

23  BY MR. MARTIN:

24  Q.   Now, without getting into the particulars, how long had

25  you been investigating the defendant as a subject of interest?

1  A.    In totality, it was approximately four to five years.

2  Starting, I believe, in around -- yeah, I -- I'd say at least

3  four to five years in around 2005, 2006, I believe is when I

4  started.

5  Q.    And without getting into the particulars, what were you

6  investigating the defendant for?

7  A.    He was known for high volume drug activity, drug

8  smuggling, drug transportation.

9  Q.    Did that investigation concern as well drug trafficking

10  across the border?

11  A.    Yes, it did.

12  Q.    And as part of your investigation, did you perform

13  surveillance from time to time on the defendant?

14  A.    Yes, we did.

15  Q.    I'd like to direct your attention to December 18th of

16  2008.

17        Do you recall if you were conducting surveillance of

18  the defendant on that date?

19  A.    Yes, we did.

20  Q.    And can you tell the jury when you picked up surveillance

21  of Mr. Sychantha on that date?

22  A.    We started approximately 10:00 a.m. on that day, and we

23  had attended his known residence at that time, which was at 647

24  Irvine Street in Windsor.

25  Q.    Now, I believe you're the first witness that has testified

1    to surveillance.  So, at least with the OPP and the team that

2    you were part of at that time, how did you prepare for this

3    surveillance?

4    A.    We had organized, typically the day before, that we were

5    going to be conducting surveillance the following day.  We

6    solicited -- I was working with different enforcement agencies,

7    and so we solicited those different enforcement agencies to see

8    who had members available to conduct the surveillance, because

9    we always tried to have a minimum number of officers doing that

10   surveillance so that we could conduct the surveillance

11   properly.

12           So we would have identified all the members that were

13   going to be available for the surveillance the next day.  We

14   would have identified where we were going to be locating or

15   setting up, which would have been the 647 Irvine Street.  We

16   would have communicated what surveillance channel we would be

17   using to communicate with each other so that we could provide

18   information as to what we observed during that day.

19   Q.    Were there certain protocols or procedures your team would

20   have used in conducting that surveillance?

21   A.    Yes.  So we would -- we would have one person that we

22   would consider the eye at certain times, so that would be one

23   person that would have a visual of the target, either the

24   target vehicle or the target themselves.

25           And then the other members would cover off kind of

1    the northeast/west areas around where the target was located so

2    that when the target would move, the eye wouldn't move, they

3    would just call the person out, and then somebody else from the

4    other team would then pick up the target moving, and then

5    surveil them, and then we would alternate who would be behind

6    the target so that we wouldn't give away our -- the fact that

7    we were following this person.

8    Q.    Do you have a recollection about how many different

9    vehicles were involved in the surveillance of the defendant

10   that day?

11   A.    In total, we had about nine.  I believe we started with

12   six vehicles that day, but then as the day progressed, we

13   elicited a few more people as was necessary for the

14   surveillance that we were conducting.

15   Q.    Do you recall why you needed additional vehicles to

16   participate in the surveillance that day?

17   A.    We got to a point where we realized that we may have to

18   split the team up in two so that if we -- we were at a location

19   and one vehicle moved and another didn't that we would want to

20   stay with both vehicles, so we needed enough members to be able

21   to do that.  So we gathered more at the later end of our

22   surveillance that day to have nine so that we could split up.

23   And one followed Mr. Sychantha while the other one stayed at

24   the residence that we had followed him to.

25   Q.    Perhaps this is obvious, but the vehicles used by the

1  surveillance team, are they marked as OPP vehicles or something

2  else?

3  A.   No, they're just regular -- regular vehicles of different

4  types, different brands, like different makes, so from Chevy,

5  Honda, Nissan, all different types, very generic colors, and no

6  police markings whatsoever.

7  Q.   And, again, perhaps obvious, but were you in uniform that

8  day?

9  A.   No, I was what we consider plain clothes, so I would have

10  been in jeans and a sweater of some sort.  Something along that

11  line.

12  Q.   Let me take you back to -- I believe you said 647 Irvine

13  Street.

14  A.   Correct.

15  Q.   Is that where the surveillance teams' surveillance first

16  started?

17  A.   Yes, that's where we had first set up and we had seen that

18  Mr. Sychantha's vehicle, at that time, was parked in the

19  parking lot of that apartment complex.

20  Q.   How were the members of the surveillance team staying in

21  communication as to what was occurring at that address at that

22  time?

23  A.   So we would be using our surveillance radio and we had one

24  member identify that the vehicle was in the parking lot, so the

25  rest of us would just cover off a section.  So I -- for example

1    I might say I got the east covered off, so then somebody said,

2    okay, I have the west, somebody would say I have the north,

3    somebody would say I have the south, so then we knew we had the

4    area covered off should the vehicle and Mr. Sychantha move.

5    Q.   Covered off, what does that term mean?

6    A.   So that once the member that was the eye that had visual

7    of Mr. Sychantha's vehicle and called that the vehicle was

8    moving and leaving the area, that person would stay and then

9    another vehicle would then -- would get in motion, because if

10   the eye would say, okay, the vehicle is away, heading westbound

11   on Irvine Street, for example, well, then the person that was

12   either east or west of the location would get ready to pick the

13   vehicle up and then start surveilling it.  And the eye would

14   stay put for a little while until the vehicle was out of range,

15   and then that vehicle would move away so that, again, not to

16   have anyone notice that we were sitting there watching the

17   vehicle.

18   Q.   So that morning, did there come a time when what was

19   identified as the defendant's vehicle left that location of 647

20   Irvine Street?

21   A.   Say it again.  Sorry.

22   Q.   Was there a time when --

23   A.   Yeah.  So it was shortly after 10:00.  I believe it was

24   around 10:49 that morning the vehicle left the parking lot.

25   Q.   Now, you provided a very specific time.

Jury Trial - Volume 3 - 10/15/2024

1          In preparation for your testimony here, did you

2     review any series of reports concerning your surveillance

3     activities that day?

4     A.   Yes, I reviewed the surveillance report, as well as my

5     notes.

6     Q.   And those surveillance reports, are they taken

7     contemporaneously or is it done after the fact?

8     A.   It was done after the fact.

9     Q.   Are your notes taken contemporaneously?

10    A.   My notes were taken contemporaneously, yes.

11    Q.   In terms of the defendant's vehicle leaving that location

12    on Irvine Street, where did it go?

13    A.   I don't exactly remember what street it exited on, but I

14    do know that it stopped at a couple of residences along the

15    way.  I believe one was on Armstrong, and then it went to a

16    Riverside Drive address, and then eventually it ended up at 201

17    Golfview in Belle River.

18    Q.   Did you know that address from your investigation?

19    A.   201 Golfview, yes, that was the family residence, the

20    Sychantha family residence.

21    Q.   Is that located in a particular city in --

22    A.   In Belle River, yes.  So it would be outside of the city

23    of Windsor and just outside the city of Tecumseh.

24    Q.   Now, you had mentioned a couple stops along the way, if

25    you will.

1    A.    Yes.

2    Q.    At any time, did -- were there any other vehicles other

3    than the defendant's vehicle that were under surveillance?

4    A.    Yeah, so it was at the first residence, Mr. Sychantha's

5    vehicle stopped at -- I believe it was on Armstrong that we

6    picked up a blue minivan, blue Plymouth minivan, and that was

7    at the residence there when Mr. Sychantha's vehicle left the

8    blue minivan, left with him.  And then both those vehicles

9    attended the Riverside address for a short period of time, and

10   then when, again, those two vehicles left the Riverside address

11   and then both attended the 201 Golfview in Belle River address.

12   Q.    The known family residence for Mr. Sychantha?

13   A.    Correct.

14   Q.    Mr. Sychantha, if I could direct you to the binder,

15   Exhibit 22, which is already in evidence.

16         And, Inspector Bertram, if I could direct you to look

17   at Exhibit 22.

18         MR. MARTIN:  Your Honor, permission to publish what

19   has already been admitted as Exhibit 22?

20         THE COURT:  Yes.

21         MR. MARTIN:  Thank you, your Honor.

22         THE COURT:  Mr. Martin, sometime in the next couple

23   minutes, few minutes, figure out a logical to take our morning

24   break, okay?

25         MR. MARTIN:  Yes, your Honor.  I think I have about

1    three or four minutes.

2            THE COURT:  Okay.

3            MR. MARTIN:  Thank you, your Honor.

4    BY MR. MARTIN:

5    Q.    Showing you what's been admitted as Exhibit 22, the first

6    page of that exhibit, do you recognize that blue vehicle?

7    A.    Yes, this was the van that we had seen initially at the

8    Armstrong address, then left and was with Mr. Sychantha's

9    vehicle as they attended the Riverside address, and this was

10   vehicle that we had then surveilled all the way to 201 Golfview

11   in Belle River.

12   Q.    How is it you can identify this blue vehicle versus any

13   other blue vehicle that looks like it?

14   A.    The license plate of it.  We had identified the license

15   plate at the Armstrong address, and then I had identified the

16   license plate at the Riverside address as well.

17            MR. MARTIN:  Can we go to page 2 of that exhibit,

18   please?

19   BY MR. MARTIN:

20   Q.    Do you recognize that van?

21   A.    Yes, it's the same vehicle.  That was the vehicle that was

22   -- that we had been surveilling with Mr. Sychantha.

23   Q.    And photograph three, do you recognize that van?

24   A.    Yes.

25   Q.    Same van?

1    A.   Same van.

2    Q.   Now, was the team able to identify the driver of that van?

3    A.   At the time, no, we did not.  I don't recall that we had

4    identified the driver.

5    Q.   If I recall your testimony, Mr. Sychantha's vehicle and

6    that blue minivan went to the 201 Golfview address?

7    A.   Correct.

8    Q.   What did the team observe at that time?

9    A.   When?

10   Q.   What did they observe?

11   A.   Oh, team observed that the vehicle -- both vehicles went

12   into the driveway, drove up to the residence, and the blue van

13   had gone into the garage, and the garage then was closed.

14   Q.   Approximately, how long did that blue minivan stay in the

15   garage, if you recall?

16   A.   It was a couple of hours for sure.  I think maybe three --

17   three or four hours, I believe, that it was at that address and

18   inside the garage.

19   Q.   And at that time, was Mr. Sychantha's car also at the 201

20   Golfview address?

21   A.   It was not for the complete time.  Shortly after, I think,

22   1:00 p.m.; not shortly after, but after 1:00 p.m., I believe

23   Mr. Sychantha's vehicle left, and I was part of the team that

24   left with Mr. Sychantha and followed him to -- into Windsor and

25   we ended up attending at Devonshire Mall, and that was where we

1  had left a team -- part of our surveillance team at the 201

2  Golfview residence, knowing that that van was still at that

3  residence.

4  Q.   At some point, did that van leave that 201 Golfview

5  address?

6  A.   Yes, it did.  I believe it was sometime after 2:00 p.m. in

7  the day.

8  Q.   What was done with that information?

9  A.   So, then, that vehicle, the van, was -- was followed by

10 the other half of our team.  And they surveilled that vehicle

11 to the Ambassador Bridge, at which time that vehicle crossed --

12 was crossing into Detroit across the Ambassador Bridge, and

13 then a member of our team contacted Brian Manns to advise that

14 this vehicle with the license plate was coming across and would

15 be a vehicle of interest.

16           MR. MARTIN:  Court's indulgence.

17           Thank you, Inspector.

18           Your Honor, those are all the questions we have at

19 this time.

20           THE COURT:  Okay.  Members of the jury, we're going

21 to take our morning break, okay?

22           THE CLERK:  All rise for the jury.

23           (JURY OUT AT 10:33 a.m.)

24           THE CLERK:  Please be seated.

25           THE COURT:  I was thinking -- I know that's

1  dangerous -- Special Agent Manns perhaps, could you contact the

2  Livingston Jail and follow up with the lieutenant that I

3  believe you spoke to yesterday, or one of you spoke to

4  yesterday, and find out what time Mr. Sychantha got his trial

5  materials?  And we got to make sure if it hasn't been

6  occurring, that he's getting -- that Livingston is following

7  their protocol with respect to his access, okay?

8          MR. MARTIN:  Yes, your Honor.

9          THE COURT:  All right.  We're on break.

10          THE CLERK:  Court is in recess.

11          (Off the record at 10:34 a.m.)

12          (Back on the record at 11:04 a.m.)

13          THE CLERK:  All rise.  The United States District

14  Court is back in session.

15          Please be seated.

16          THE COURT:  Yes, sir?

17          MR. NORWOOD:  Yes, your Honor.

18          So pursuant to the Court's request to call Lieutenant

19  Roy Asquith, we did call him.  We had to leave him a voicemail

20  unfortunately, but I had an opportunity to speak with Agent --

21  Deputy Marshal Adam Hundley, and he updated me on what the

22  process was yesterday and when Mr. Sychantha would have

23  approximately received his record.

24          And so, Deputy Marshal Hundley can speak to that.

25          MARSHAL:  We reached out to Livingston to make sure

1    it doesn't happen again.  It's my understanding that he most

2    likely received his legal documents yesterday afternoon.  And

3    we're waiting to hear back from Livingston why that occurred.

4    But we have reached out to them and we're in the process to

5    make sure this doesn't happen again, that Mr. Sychantha has

6    access to his legal documents.

7            THE COURT:  He had access sometime yesterday

8    afternoon, but we don't know what time?

9            MARSHAL:  I don't know what time yet, your Honor.

10           THE COURT:  There has to be a responsible person

11   there that we can deal with at the jail.

12           MARSHAL:  Yeah, and our supervisor is in the process

13   of making that contact.

14           THE COURT:  Okay.

15           MR. NORWOOD:  I also had an opportunity to talk to

16   Mr. Sychantha and Mr. Steingold as well.  Mr. Sychantha told us

17   that he was given photocopies of his discovery.  He said that

18   that was not the particular discovery that he wanted, but he

19   also said that he had to do count and then eat, and then that's

20   when he reviewed the documents that he requested.

21           And so we believe that he had access to those

22   documents earlier on, but he had to go through the count and

23   then go through chow, and then he reviewed the documents.

24           THE COURT:  What time did he review the documents?

25           DEFENDANT SYCHANTHA:  Around 5:00.

1          THE COURT:  Yesterday?

2          DEFENDANT SYCHANTHA:  Yep.

3          THE COURT:  And then what time do you have to go back

4    in your cell?

5          DEFENDANT SYCHANTHA:  I was in my cell at 3:00 p.m.

6    I was -- I was out in the morning and I was in my cell at

7    3:00 p.m.  They gave it to me in my cell.

8          THE COURT:  Oh, they gave it to you in your cell?

9          DEFENDANT SYCHANTHA:  Yeah, the photocopy.

10          THE COURT:  Are they still -- I mean, is that process

11    going to continue?

12          DEFENDANT SYCHANTHA:  Pardon?

13          THE COURT:  I thought the protocol was he couldn't

14    review it in his cell.

15          MR. NORWOOD:  Your Honor, we were told, just as the

16    Court was, that he would have to go to the library.  But due to

17    the issue that was caused, they made photocopies and allowed

18    him to take that into his cell so that he had his own access to

19    it.

20          THE COURT:  So did you have a copy of your documents?

21          DEFENDANT SYCHANTHA:  Yeah, but I -- it was all

22    messed up.  Like, I had it in order in my right hand, right?

23    But when they gave it to me, it was all messed up and I had to

24    put it together.  Took me, like, couple hours.

25          So I -- I -- I -- I didn't even have time to look at

1     it yesterday.

2               THE COURT:  I'm getting confusing information here.

3               MR. NORWOOD:  So, your Honor, --

4               THE COURT:  This is easy.  I want somebody, a name of

5     who is responsible at Livingston so I'm not going through this

6     every day.  It was Lieutenant so-and-so, I thought.

7               MR. NORWOOD:  Lieutenant Roy Asquith, your Honor.

8               THE COURT:  Okay.  So you can't get ahold -- you

9     weren't able to get ahold of him?

10              MR. MANNS:  Your Honor, I called him, left a message,

11    I've emailed him as well.  Just waiting for his return.

12              THE COURT:  Maybe he might want to take a trip down

13    here if he's not going to be available to us.

14              All right.  Let's continue with the trial.

15              MR. NORWOOD:  One more thing.

16              THE COURT:  I didn't anticipate dealing with this

17    right now.  I thought we'd be dealing with testimony.  I

18    understand there's a witness issue, or are you --

19              MR. NORWOOD:  So, your Honor, we have --

20              THE COURT:  That's why -- when I walked out here,

21    that's why I asked the question.

22              MR. NORWOOD:  Oh.  So, your Honor, we have three

23    additional witnesses that we plan to call today.

24              THE COURT:  Sure.

25              MR. NORWOOD:  And there are two additional witnesses

1    that we may call, but we wanted to take it up with the Court,

2    because Mr. Sok's testimony, if he were to testify, there are

3    four witnesses --

4              THE COURT:  Counsel, counsel, what did I say well

5    before we started the trial?  What did I say?  Don't bring up

6    issues just as I'm bringing the jury in to hear testimony.

7    It's now five after 11:00.  I'll deal with Sok.  He's scheduled

8    at 1:00.  I can deal with him when we're concluded with the

9    jury, okay?

10             MR. NORWOOD:  Yes, your Honor.

11             THE COURT:  Bring the jury out.

12             THE CLERK:  All rise for the jury.

13             (JURY IN AT 11:10 a.m.)

14             THE CLERK:  Please be seated.

15             THE COURT:  Okay.  Our next witness.

16             MR. MARTIN:  Your Honor, I believe Inspector Bertram

17   is still on the stand.

18             THE COURT:  Oh, that's correct.

19             MR. MARTIN:  Your Honor, I have no further questions

20   for the inspector at this time.

21             THE COURT:  Sir, any questions for --

22             DEFENDANT SYCHANTHA:  Yes.

23             THE COURT:  You may proceed.

24                          *  *  *

25                          *  *  *

Jury Trial - Volume 3 - 10/15/2024

1              CROSS-EXAMINATION

2   BY DEFENDANT SYCHANTHA:

3   Q.   Who was in the driver's seat of the car you were

4   following?

5   A.   When -- at the Irvine --

6   Q.   Yeah.

7   A.   You were in the driver's seat.  I identified you as the

8   driver of that vehicle when it left the Irvine residence.

9   Q.   Okay.  You said this was around what time?

10  A.   It was after 10:00 a.m.  I don't remember the exact time.

11  I believe around 10:50.  10:49, 10:50.

12  Q.   And the man with the van around?

13  A.   It was the next address that you went to, which was on

14  Armstrong, so it was around 11:00 a.m.

15          DEFENDANT SYCHANTHA:  That's all, your Honor.

16          THE COURT:  Redirect?

17          MR. MARTIN:  No, your Honor.

18          THE COURT:  All right.  Inspector, thank you very

19  much.

20          MR. NORWOOD:  At this time, the Government would call

21  Officer Mike Oakley to the stand.

22          THE COURT:  Sir, could you give us your full name and

23  the spelling, please?

24          THE WITNESS:  Sure.  Michael --

25          THE COURT:  Speak up nice and loud.

1        THE WITNESS:  Oakley, O-A-K-L-E-Y.

2                    **OFFICER MICHAEL OAKLEY,**

3        being first duly sworn to tell the truth, was

4        examined and testified upon his oath as follows:

5                         -  -  -

6        THE COURT:  Please have a seat in the witness chair.

7        You may proceed.

8        MR. NORWOOD:  Thank you, your Honor.

9                                          (11:13 a.m.)

10                   DIRECT EXAMINATION

11   BY MR. NORWOOD:

12   Q.   Good morning, Officer.  How are you?

13   A.   Good morning.  Good.

14   Q.   Where are you currently employed?

15   A.   With the State of Michigan Liquor Control Commission.

16   Q.   Now, what is your law enforcement background?

17   A.   I worked with Trenton PD for 28 years, about two and a

18   half years with the Wayne County Sheriff before that.

19   Q.   During your time with the Trenton PD, what ranks did you

20   hold?

21   A.   I started as a patrolman.  I worked for a short time as a

22   detective, assigned to the Homeland Security Investigations

23   Task Force, then promoted to sergeant, then lieutenant, deputy

24   chief and ultimately chief of police.

25   Q.   Now, you had mentioned that you were a task force officer

1  with Homeland Security Investigation.  What were your duties as

2  a task force officer?

3  A.   That's correct.  I was assigned to a team that

4  investigated international narcotics smuggling, generally

5  located in the Detroit area.  It involved narcotics crossing

6  the international border between Detroit and Windsor.

7  Q.   And Windsor, Canada?

8  A.   Yes.

9  Q.   And how long did you work on that particular team?

10  A.   About four and a half years.

11  Q.   And what was that time period?

12  A.   It was -- I started January 2008 until September 2012.

13  Q.   And did you assist in the investigation of those drug

14  trafficking operations?

15  A.   I did.

16  Q.   What were your duties?

17  A.   So it depended if I was the officer in charge or not.

18        If I was the officer in charge, it would start with

19  responding to the border when -- when there was a seizure of

20  narcotics.  I would interview the suspects.  Again, if it was

21  my case, then I would -- I would pursue a warrant request with

22  the Wayne County Prosecutor's Office and attend court hearings,

23  if necessary.

24        If I was not the officer in charge, I would be in

25  more of an assistive role.  I would assist with surveillance,

1    anything else that an agent handling a case would -- would need

2    help on.

3    Q.    Can you explain what that surveillance would entail?

4    A.    Sure.

5         If we were surveilling a suspect, it could involve

6    mobile surveillance of vehicles, following vehicles from one

7    point to another, trying to witness any activity they'd be

8    involved in, sometimes stationary surveillance, watching a

9    vehicle, an individual house.

10   Q.    And you also said that you worked with several

11   individuals, you would do interviews with them.  What were some

12   of the topics you would cover in those interviews?

13   A.    Well, generally, it would be the circumstances of their

14   arrest, their detention.  If they were -- if they were stopped

15   by CVP and suspected of smuggling narcotics, I would interview

16   them regarding where the narcotics came from, where they were

17   going, anything that we could do to follow up on the

18   investigation.

19   Q.    And did you ever work with cooperating individuals or

20   persons?

21   A.    Yes.

22   Q.    And are there particular protocols and procedures that you

23   use when you're working with those types of individuals?

24   A.    Well, generally, it would start with the interview, see

25   how much information they were willing to give me.  If it

1    seemed like valuable information, then we would act on it.  You

2    know, if we could use that to further the investigation, we

3    would.

4           And then, you know, I would discuss that with the

5    prosecuting attorneys to determine where the case would go from

6    there.

7    Q.   Now, did you ever do controlled deliveries with these

8    individuals?

9    A.   Occasionally.

10   Q.   Now, are there particular protocols and procedures that

11   you would follow when you would do controlled deliveries with

12   these individuals?

13   A.   It -- you know, it would very surgery on case-by-case

14   basis.  But, again, you know, I was assigned to the task force.

15   Generally, the controlled deliveries were handled by the

16   agents.  I wasn't the officer in charge on -- generally, on

17   cases that involved controlled deliveries.

18   Q.   And what was your assisting role with those controlled

19   deliveries?

20   A.   Again, it would usually -- usually involve surveillance,

21   sometimes take-down or arrest team once the delivery happened.

22   Q.   How many drug investigations did you participate in as a

23   TFO?

24   A.   Hard to say.  Maybe 20, 30, 40.  It would be hard to put a

25   number on it.

1  Q.   Sure.

2           Let's fast forward to October of 2008.

3           Did anything of note happen at the beginning of that

4  month -- well, during that month, I should say?

5  A.   Yes.  I was called to the Ambassador Bridge to follow up

6  on a seizure of suspected marijuana.

7  Q.   Now, were you personally involved in this investigation?

8  A.   Yes.

9  Q.   What did you do?

10 A.   When I responded, initially I made contact with the

11 Customs and Border Protection officers who discovered the

12 suspected marijuana.  I took the information from them, found

13 the circumstances that they discovered, and then I conducted

14 interviews with the two suspects.

15 Q.   And who are those individuals?

16 A.   Loren Pennington and Jacob Webb.

17 Q.   Officer, can you please turn in that binder to what's been

18 marked as Government's Exhibit 28?

19           MR. NORWOOD:  Your Honor, permission to publish

20 what's been admitted as Government Exhibit 28?

21           THE COURT:  Yes.

22           MR. NORWOOD:  Thank you, your Honor.

23 BY MR. NORWOOD:

24 Q.   Who is this a picture of?

25 A.   That is Loren Pennington.

Jury Trial - Volume 3 - 10/15/2024

1    Q.   And was she arrested with someone else?

2    A.   Yes.

3    Q.   Who was that individual?

4    A.   Jacob Webb.

5    Q.   Officer, can you please turn to what's been marked as --

6    marked and admitted at Government's Exhibit 32-1?

7             MR. NORWOOD:   And permission to publish what's been

8    admitted at Government's Exhibit 32-1?

9             THE COURT:   Yes.

10            MR. NORWOOD:   Thank you.

11   BY MR. NORWOOD:

12   Q.   And what is this a picture of, Officer?

13   A.   That is Jacob Webb.

14   Q.   Now, how much marijuana was seized?

15   A.   I believe it was just over four kilograms.

16   Q.   And if you were able to -- how much is that in pounds?

17   A.   Little over nine, I believe.

18   Q.   Nine pounds?

19   A.   Nine pounds.

20   Q.   So what happened after it was seized?

21   A.   So I conducted an interview with Ms. Pennington and

22   Mr. Webb.  And at the conclusion of the interviews, they were

23   released and I took custody of the suspected marijuana and the

24   vehicle that they were -- that they were using.

25   Q.   Now, did you have any additional involvement with Loren

1    and Jacob in this case?

2    A.    Yes.

3    Q.    What was your involvement with them?

4    A.    So we had -- there was a meeting.  I don't remember the

5    date.  But we conducted surveillance, monitored a meeting

6    between Loren Pennington and John Tetreau.  And then we also

7    made a trip to Boston, Massachusetts, where Jacob Webb

8    participated in a controlled delivery.

9    Q.    Controlled delivery of what?

10   A.    Suspected ecstasy.

11   Q.    And prior to the trip, what were the activities that you

12   did with Loren and Jacob?

13   A.    Again, we monitored a meeting between Loren and John

14   Tetreau.

15   Q.    And after you monitored that, was there an arrangement of

16   the trip and their travel?

17   A.    Yes.

18   Q.    Were you involved in that?

19   A.    Yes.

20   Q.    What was your role in doing that?

21   A.    Mostly assisting; assisting the case agents and arranging

22   the details of the trip.

23   Q.    And so did Loren and Jacob travel to Boston?

24   A.    Yes.

25   Q.    And did you travel with them?

1   A.   Yes.

2   Q.   And after you arrived in Boston, what took place next?

3   A.   There was a coordination meeting with special agents, HSI

4   special agents in Boston with Loren and Jacob.  And we

5   discussed and arranged a controlled delivery with suspects in

6   the Boston area.

7   Q.   And after that was arranged, what happened?

8   A.   Then the controlled delivery took place.

9   Q.   And what happened during that controlled delivery?

10  A.   During the controlled delivery, I was in the car with

11  another agent from the Detroit area.  We were not directly

12  involved in the take-down or surveillance.  We were more in a

13  supportive role.  So I didn't -- I didn't have any visual

14  observations of exactly what took place.

15  Q.   And so your role essentially stopped when you were trans-

16  -- you took Loren and Jacob to Boston, made sure that they were

17  there, and then you turned them over to Boston authorities to

18  conduct the controlled delivery operation?

19  A.   That's correct.

20           MR. NORWOOD:  Your Honor, may I have a moment?

21           THE COURT:  Sure.

22           MR. NORWOOD:  Thank you, Officer.  No further

23  questions at this time.

24           THE COURT:  Any questions?

25           DEFENDANT SYCHANTHA:  Yes, your Honor.

97

1         THE COURT:  Sure.

2                      CROSS-EXAMINATION

3    BY DEFENDANT SYCHANTHA:

4    Q.   Did -- did -- let me see.

5         Did you -- did Loren and Jacob text anybody for

6    instruction?

7    A.   Did they text anybody for instruction?

8    Q.   Yeah.

9    A.   What are you referring to?

10        Are you referring to the night that I first contacted

11   them?

12   Q.   Yeah.

13   A.   No.

14   Q.   No?

15   A.   Not that I recall.

16   Q.   How about when they got to Boston, did they text anybody

17   for instruction there?

18   A.   I don't recall.

19   Q.   When did this happen, 2008?

20   A.   The initial seizure here in Detroit was 2008, October.

21   Q.   Yeah.

22        That was, what, 16 years ago?

23   A.   Sixteen years.

24   Q.   Yeah.

25        So you -- your memory is not fresh?

```
 1   A.   Not completely, no.

 2   Q.   Yeah.

 3        DEFENDANT SYCHANTHA:  That's all, your Honor.

 4        THE COURT:  Okay.  Redirect?

 5        MR. NORWOOD:  Briefly, your Honor.

 6                    REDIRECT EXAMINATION

 7   BY MR. NORWOOD:

 8   Q.   And although it's been a period of time, you do recall the

 9   seizure of the vehicle?

10   A.   I do.

11   Q.   And you do recall the seizure of over nine pounds?

12   A.   Yes.

13   Q.   And do you also remember 2009, January, with Loren and

14   Jacob?

15   A.   Yes.

16   Q.   Involved in the Boston controlled operation?

17   A.   Yes.

18   Q.   Your memory is clear on that?

19   A.   Yes.

20        MR. NORWOOD:  Thank you, your Honor.  No further

21   questions.

22        THE COURT:  Okay.  Anything else?

23        DEFENDANT SYCHANTHA:  No, your Honor.  That will be

24   all.

25        THE COURT:  Thank you very much.
```

1    MR. NORWOOD:  Your Honor, at this time, the

2  Government would recall Special Agent Mark Koch.

3    THE COURT:  Okay.  Sir, you're still under oath,

4  okay?  Just have a seat in the witness chair.

5    You may proceed.

6    MR. NORWOOD:  Thank you, your Honor.

7    (11:27 a.m.)

8    DIRECT EXAMINATION CONTINUED

9  BY MR. NORWOOD:

10  Q.  Good morning, Agent.  How are you?

11  A.  Good.

12  Q.  How did you get involved in this investigation?

13  A.  Oh, I got involved in this investigation shortly after

14  Loren Pennington Oman and Jacob Webb were stopped at the border

15  with their marijuana.

16  Q.  And was that in October of 2008?

17  A.  Yes, it was.

18  Q.  Were you personally involved in that part of the

19  investigation?

20  A.  Yes, I was.  Yes.

21  Q.  What was your role?

22  A.  I eventually became the case agent over Jacob and Loren.

23  Q.  Did you conduct interviews with them?

24  A.  I did.

25  Q.  Did you also work with them on different operations as it

Jury Trial - Volume 3 - 10/15/2024

1   relates to this case?

2   A.   Yes, I did.

3        MR. NORWOOD:  Your Honor, permission to publish

4   what's been admitted as Government's Exhibit 28?

5        THE COURT:  Yes.

6   BY MR. NORWOOD:

7   Q.   Now, Agent Koch, who is this a picture of?

8   A.   That is a picture of Loren Pennington Oman.

9   Q.   And what was your initial involvement with Loren?

10  A.   My initial involvement was -- again, after she was stopped

11  at the border with marijuana, my initial involvement after that

12  -- or my involvement after that was interviewing her and just

13  continuing to work with her as this investigation proceeded.

14  Q.   And did she agree to cooperate?

15  A.   Yes, she did.

16  Q.   And as a part of that cooperation, did you record a

17  conversation between Loren Oman and John Tetreau after the

18  Boston trip?

19  A.   Yes, I did.

20  Q.   So let's take a step back to the Boston trip.

21       Were you also involved in the Boston controlled

22  operation?

23  A.   Yes, I was.

24  Q.   And what was your role?

25  A.   I -- again, I was the case agent, the local Detroit case

1    agent, over the Boston controlled delivery.

2    Q.   And so what was the first step that you took?

3    A.   The first step we took when we realized that Mr. Tetreau

4    had offered Loren Pennington and Jacob Webb a trip out there,

5    we coordinated the pickup of the pills in Michigan -- pickup of

6    the ecstasy pills in Michigan.

7    Q.   And did that take place on January 24, 2009?

8    A.   January 24th, yes.

9    Q.   And if I showed you those physical pills as well as

10   pictures related to those pills, would you be able to identify

11   them?

12   A.   Yes, I would.

13            MR. NORWOOD:  Your Honor, may I approach?

14            THE COURT:  Yes.

15            MR. NORWOOD:  Thank you.

16   BY MR. NORWOOD:

17   Q.   Agent, I've handed you what's been marked as Government's

18   Exhibit 33-1, Government's Exhibit 33-2, Government's Exhibit

19   34 and Government's Exhibit 50.

20            Let's start with Government's Exhibit 33-1.

21            What is it?

22   A.   33-1, these are ecstasy pills.

23   Q.   And where did they come from?  What date?

24   A.   These were seized on January 24th, 2009.

25   Q.   And let's go to Government's Exhibit 33-2.

1          What is that?

2    A.    33-2, these are ecstasy pills.

3          Again, these were seized on January 24th, 2009.

4    Q.    And then Government's Exhibit 34?

5    A.    Again, ecstasy pills that were seized on January 24th,

6    2009.

7    Q.    Now, what were those pills stored in when they were

8    located?

9    A.    These pills were stored in this Huggies box.

10   Q.    Is that Government's Exhibit 50?

11   A.    Yes, it is.

12         MR. NORWOOD:  Your Honor, the Government moves for

13   admission of Government's Exhibits 33-1, 33-2, 34 and 50.

14         THE COURT:  Any objection?

15         DEFENDANT SYCHANTHA:  No, your Honor.

16         THE COURT:  All right.  They're received.

17         MR. NORWOOD:  Permission to show the jury, your

18   Honor?

19         THE COURT:  Yes.

20         MR. NORWOOD:  This is 33-1, this 33-2, this is 34,

21   this is 50.

22   BY MR. NORWOOD:

23   Q.    Now, Agent, if I were to show you pictures from that

24   seizure, would you be able to verify them for the Court?

25   A.    Yes, I would.

1      MR. NORWOOD:  Your Honor, may I have a moment?

2   BY MR. NORWOOD:

3   Q.   Agent, can you please turn to what's been marked as

4   Government's Exhibit 23 and indicate when you've had an

5   opportunity to do so?

6   A.   Yes, I have.  I've looked at them.

7   Q.   What is Government's Exhibit 23?

8   A.   These are pictures of the ecstasy that was seized on

9   January 24th, 2009, as well as the Huggies box that the pills

10  were in when we -- when Jacob and Loren received them.

11      MR. NORWOOD:  Your Honor, the Government moves for

12  admission of Government's Exhibit 23.

13      THE COURT: Any objection?

14      DEFENDANT SYCHANTHA:  No, your Honor.

15      THE COURT:  It's received.

16      MR. NORWOOD:  Permission to publish?

17      THE COURT:  Yes.

18      MR. NORWOOD:  Thank you.

19  BY MR. NORWOOD:

20  Q.   Now, let's start with picture number 1.

21       What is this a picture of?

22  A.   This is a Huggies box with ecstasy pills inside.

23  Q.   Page 2?

24  A.   Page 2, again, the Huggies box with ecstasy pills inside.

25  Q.   Page 3?

1   A.   This is ecstasy pills on my left, to the left of the

2   picture, and then the Huggies box on the right.

3   Q.   Now, was there an actual approximate pill count of how

4   many pills were in that box?

5   A.   Yes, the approximate pill count was 30,000 pills.

6   Q.   And although I showed you a sample of that today, those

7   were not all the pills that were in that box?

8   A.   That is correct, yes.

9   Q.   And why is that the case?

10  A.   We maintain a sample of the ecstasy, the total bulk that

11  was seized, just for storage purpose.  And then the bulk of the

12  current -- or bulk of the ecstasy does get destroyed.  However,

13  we hold a sample for proceedings.

14  Q.   And then picture 4?

15  A.   This is the ecstasy.

16  Q.   And then picture -- well, actually, it's a zoomed-in

17  picture 4.

18            That's good.  Thank you.

19            Now, what does picture 5 show?

20  A.   Picture 5 shows just a close-up image of the ecstasy

21  pills.

22  Q.   Now, it may be hard to pick out here, but are there

23  symbols on these pills, Agent?

24  A.   Yes, there appears to be.

25  Q.   And these symbols, what would be the type of items that

1    they would resemble on them?

2    A.    As far as the symbols on the pills?

3    Q.    The symbols.

4    A.    All kinds of symbols.  Various symbols.

5            It's hard to see -- to see what this one is on the

6    orange one, the two orange and the top left.  But the various

7    symbols could be anything from a Nike swoosh to a Mercedes Benz

8    symbol.  Anything, basically, that is a symbol of some sort of

9    item.

10   Q.    So cartoons?

11   A.    Cartoons --

12           (Multiple speakers)

13   BY MR. NORWOOD:

14   Q.    (Inaudible) symbols?

15   A.    Correct.

16   Q.    And, in fact, these ecstasy pills would contain illegal

17   controlled substances in them?

18   A.    That is correct, yes.

19   Q.    But they would come in all shapes and sizes and colors?

20   A.    That's correct.

21   Q.    And they were packaged in this Huggies box?

22   A.    Yes, they were.

23   Q.    Now, fast-forwarding back to Boston, was there -- you said

24   there was another individual, and his name was Jacob Webb,

25   that's correct?

1    A.   That is correct, yes.

2             MR. NORWOOD:  Your Honor, permission to publish

3    what's been marked as -- well, admitted as Government's Exhibit

4    32-1?

5             THE COURT:  Yes.

6    BY MR. NORWOOD:

7    Q.   Now, who is this a picture of?

8    A.   That is a picture of Jacob Webb.

9    Q.   And was Jacob also involved in the Boston controlled

10   operation?

11   A.   Yes, he was.

12   Q.   What was your role with Jacob Webb during that operation?

13   A.   Again, I was the case agent of the operation, so Jacob was

14   cooperating with us at the time, and I was overseeing his --

15   him and Loren while in Boston.

16   Q.   And did that controlled operation take place?

17   A.   Yes, it did.

18   Q.   Was that operation successful?

19   A.   Yes, it was.

20             MR. NORWOOD:  Your Honor, may I have a moment?

21             THE COURT:  Take your time.

22             MR. NORWOOD:  Thank you, Agent.  No further questions

23   at this time.

24             THE COURT:  All right.  Any questions?

25             DEFENDANT SYCHANTHA:  Yes, your Honor.

Jury Trial - Volume 3 - 10/15/2024

1                      CROSS-EXAMINATION

2    BY DEFENDANT SYCHANTHA:

3    Q.   And so you busted the people in Boston, you said?

4    A.   Yes, we did.

5    Q.   Yeah.

6              Did they mention my name?

7    A.   They did not.

8    Q.   Okay.  Was my print on the bag?

9    A.   No, it wasn't.

10   Q.   On the box?

11   A.   No, it wasn't.

12             DEFENDANT SYCHANTHA:  Okay.  That's all, your Honor.

13             THE COURT:  Redirect?

14             MR. NORWOOD:  No, your Honor.

15             THE COURT:  Thank you very much.

16             THE WITNESS:  Thank you.

17             MR. NORWOOD:  Your Honor, the Government would like

18   to call Agent Christensen to the stand.

19             THE COURT:  Sir, could you come up and give your full

20   name to our court reporter, please?

21             THE WITNESS:  Sure.

22             My name is Daniel Christensen.

23             THE COURT:  And how do you spell your last name?

24             THE WITNESS:  C-H-R-I-S-T-E-N-S-E-N.

25                      **AGENT DANIEL CHRISTENSEN,**

1    being first duly sworn to tell the truth, was

2    examined and testified upon his oath as follows:

3    - - -

4    THE COURT:  Please have a seat in the witness chair.

5    (11:41 a.m.)

6    DIRECT EXAMINATION

7  BY MR. NORWOOD:

8  Q.  Good morning, Agent.  How are you?

9  A.  Good.  Thank you.

10  Q.  Where are you currently employed?

11  A.  I'm currently employed in Detroit, Michigan, with Homeland

12  Security Investigations.

13  Q.  And how long have you been employed with Homeland Security

14  Investigations?

15  A.  Since March of 2002.

16  Q.  And when you first started with HSI, did you receive

17  initial training?

18  A.  I did.

19  Q.  What did that initial training include?

20  A.  Training was at the Federal Law Enforcement Training

21  Center.  It included many different facets of investigations,

22  narcotics investigations, financial investigations, physical

23  training, firearms training.

24  Q.  Now, what did your narcotics training include?

25  A.  Identification of narcotics, we talked about undercover

1   investigations, we talked about controlled deliveries and

2   surveillance of narcotics groups.

3   Q.   Now, after you completed that initial training, were you

4   assigned to a particular team?

5   A.   When I returned to Detroit, I was assigned to the

6   financial group.

7   Q.   And then after you worked with the financial group --

8   well, first, how long did you work with the financial group?

9   A.   From approximately 2002 to 2004.

10  Q.   And then what was the next team that you worked with?

11  A.   Then I was assigned to the Detroit DEA office for

12  approximately two to three years.

13  Q.   And what did you do with the DEA group?

14  A.   We conducted narcotics investigations.

15  Q.   And what did those investigations include?

16  A.   They were primarily marijuana investigations and cocaine

17  investigations.

18  Q.   And did you also work on investigations as it relates to

19  ecstasy pills?

20  A.   Not at DEA, no.

21  Q.   And then after you worked with DEA, where did you work?

22  A.   I returned back to Homeland Security Investigations and I

23  worked with the narcotics group.

24  Q.   And with the narcotics group, what narcotics did you

25  investigate?

1  A.   At that time, we conducted a variety of investigations.

2  One of our primary types were ecstasy, or MDMA, cases.

3  Q.   And so when you say ecstasy and MDMA, is there a street

4  name for that?

5  A.   Well, the street name would be ecstasy, or X.

6  Q.   Now, you mentioned that you worked with MDMA.  But these

7  ecstasy pills, would they often contain more than one

8  substance?

9  A.   That's correct.

10  Q.   And so usually when you worked -- when you seized these

11  pills, sometimes they had two or three, maybe four different

12  illegal controlled substances in them, is that correct?

13  A.   When they would get sent to the lab, often times, they

14  would have multiple types of drugs in them, that's correct.

15  Q.   Now, what were the activities that you did when you were

16  involved in these smuggling cases?

17  A.   Well, I did a variety of things.  We conducted

18  surveillance, responded to the border for seizures and arrests,

19  we conducted interviews of cooperating defendants, assisted on

20  controlled deliveries, we conducted arrests and search

21  warrants.

22  Q.   Now, approximately, how many types of these investigations

23  did you work on?

24  A.   Dozens.

25  Q.   Now, at some point, were you promoted?

1    A.    Yes.

2    Q.    And what position were you promoted to?

3    A.    Supervisor in November of 2017.

4    Q.    Of what team?

5    A.    The narcotics group.

6    Q.    And so what were your duties as a supervisor of the

7    contraband smuggling team at that point?

8    A.    It was to oversee the agents in the group that were

9    conducting narcotics investigations, assigning cases and leads,

10   and monitoring their investigative activities.

11   Q.    Now, have you served in a temporary duty capacity related

12   to drug smuggling in collaboration with Canada?

13   A.    I have.

14   Q.    Can you explain that for the jury?

15   A.    Well, often times, over the years, we would conduct joint

16   training.  Because a lot of the cases involved both countries,

17   there was a collaborative effort to make sure that we worked

18   together, we were on the same page, training on interviewing.

19   We discussed surveillance techniques and trends when it came to

20   narcotics and firearms investigations.

21   Q.    Now, are you familiar with the transport of illegal

22   controlled substances between the United States and Canada

23   between 2003 and 2011?

24   A.    Yes.

25   Q.    Can you please explain the methods that these pills would

1   be smuggled into the United States?

2   A.   Generally, at that time, the narcotics were being smuggled

3   via commercial trucks and passenger vehicles.

4   Q.   Now, let's talk specifically about those passenger

5   vehicles.

6        What type of vehicles would be used?

7   A.   During that time period, we saw a lot of sedans.  For

8   example, Pontiac Grand Ams were utilized.

9   Q.   Now, based on your training and experience, why would it

10  be these types of vehicles, Pontiac Grand Ams and the like?

11  A.   Well, I think the organizations felt like they had a lot

12  of natural voids and places to hide drugs.

13  Q.   And where would those natural voids be on the vehicle?

14  A.   The bumpers and paneling of the vehicle, the doors.  Some

15  organizations even used gas tanks, spare tires.

16  Q.   And based on your training and experience, why would it be

17  placed in those locations in a car?

18  A.   I think they were -- they were difficult places to find

19  things when they're inspected by the officers.

20  Q.   Now, let's talk a little bit about the pills for a second.

21        What was the street value of these pills during this

22  time in United States currency?

23  A.   The street value, I think it ranged from approximately at

24  least 15 to $20 per pill.

25  Q.   Now, if you were to have a seizure potentially of --

Jury Trial - Volume 3 - 10/15/2024

1  hypothetically, 100,000 pills, how much would that have been

2  worth around this period of time?

3  A.   Let's say approximately $15 for a pill, 100,000 pills,

4  you're -- approximately 1.5 million.

5  Q.   Now, how were these pills packaged?

6  A.   One of the packaging that we saw was FoodSaver bags.

7  Q.   And was there a particular reason, based on your training

8  and experience, for that?

9  A.   I think for a couple reasons.  They're -- FoodSaver bags

10  were easy to find, easy to obtain.  It was easy to pack the

11  pills into.  It was easy to fill those voids with something

12  that's malleable, like a FoodSaver bag.  And also, we believed

13  that those organizations suspected it was hard for the drug

14  dogs to smell the narcotics if they were in these FoodSaver

15  bags.

16  Q.   Now, were there particular locations in Canada these pills

17  were typically coming from?

18  A.   Typically, they came from the greater Toronto area or out

19  west in British Columbia.

20  Q.   Let's talk about the couriers for a moment.

21       Who were the types of individuals that these leaders

22  of the organizations would choose to be couriers?

23  A.   They seem to be younger -- younger people, people with

24  dual citizenship or were commuters for work and school.  So

25  they were frequent border-crossers.

1  Q.   Now, based on your training and experience, is there a

2  particular reason why these people were recruited?

3  A.   Well, we believe that if they were frequent crossers,

4  perhaps they'd be scrutinized less by the officers if they saw

5  them daily.

6  Q.   Now, how would the organization leaders use these

7  individuals to start?  What would their roles typically be when

8  they first were starting out in an organization?

9  A.   A lot of times with narcotics organizations, they would

10  start them out with either a small amount to test them out, to

11  see if they were trustworthy, to see if they could successfully

12  get through the border.  And sometimes they would give them a

13  test load that's not even a narcotic just to see how they would

14  perform.

15  Q.   Now, would their responsibilities increase over time once

16  they gained the trust of the leaders?

17  A.   Sure, they would up the amount that the smugglers would

18  take.

19  Q.   Now, was there also bulk cash associated with these deals?

20  A.   Yes.

21  Q.   Can you explain that for the jury?

22  A.   Well, at that time, drugs were a cash business, so if the

23  pills are getting sold at rave parties or somewhere on the

24  street, they're getting cash for these sales, and the cash

25  would be collected and then smuggled back across the border to

1  Canada to the organization.

2  Q.   Now, how much money was crossing the border at a time

3  associated with these deals?

4  A.   I would say tens of thousands of dollars at a time.

5  Q.   Now, based on your training and experience, why wouldn't

6  they do wire transfers or put money in the bank in this type of

7  business?

8  A.   Well, I think a lot of organizations wanted to avoid

9  reporting requirements, they wanted to avoid law enforcement

10 detection, so the easiest way would be bulk currency smuggled

11 physically across the border.

12 Q.   And so in your training and experience, would they use the

13 same individuals for pills sometimes to transport their drugs

14 -- drug money as well?

15 A.   Yes, they did.

16 Q.   Now, would organization leaders typically cross the

17 border?

18 A.   Typically, no.

19 Q.   Why not?

20 A.   I would say for a few reasons.  Some of them had criminal

21 histories already so they wanted to avoid crossing the border.

22 Maybe they were inadmissible.  Others wanted to utilize those

23 couriers that we talked about to do the -- kind of do the dirty

24 work, so to speak.

25 Q.   Was it also a way for them to protect their identity?

1    A.    Yes.

2    Q.    Now, what type of pill quantities seized would indicate

3    that you were dealing with a high-level organization?

4    A.    I would say in the tens of thousands or up to 100,000

5    range.

6    Q.    Now, would these high-level organizations use one or

7    multiple couriers?

8    A.    They would use multiple couriers.

9    Q.    And why would they do so?

10   A.    I would say to have -- I guess to hedge their bets, to

11   have multiple options.  And also, at times, organizations would

12   perhaps send multiple couriers across the border at the same

13   time.

14   Q.    Now, would there ever be times that the head of the

15   organization would not specifically speak to the recipient of

16   the pills?

17   A.    Yeah, I'd say, you know, the higher up on the ladder that

18   you go, the less interaction you have with couriers and lower

19   level dealers.

20   Q.    And so why would a leader of an organization not have

21   direct contact with that recipient as opposed to talking to

22   them directly and using their couriers instead?

23   A.    I believe to insulate themselves and to not incriminate

24   themselves.

25   Q.    Now, in your training and experience, would these packages

Jury Trial - Volume 3 - 10/15/2024

1  typically have fingerprints of leaders on them?

2  A.   Of leaders, typically, no.

3  Q.   Why not?

4  A.   I think the organizations would utilize employees or

5  middlemen to pack the narcotics and to courier -- curry(ph) the

6  drugs across the border.

7  Q.   Now, was this another way of them protecting their

8  identity?

9  A.   Yes.

10  Q.   Now , consistent with your experience, how often -- well,

11  let me strike that and take a step back for a second.

12       You mentioned that they would use these FoodSaver

13  bags that were plastic, correct?

14  A.   Yes.

15  Q.   Now, consistent with your experience, how often would

16  these seized plastic packages have identifiable latent

17  fingerprints on them?

18  A.   We made it a practice to send them to the lab, but rarely

19  did they come back with fingerprints on them.  And I think that

20  -- those FoodSaver bags have a -- you know, they're rough on

21  the outside.  They're not very smooth, generally.  So I think

22  that, most cases, we weren't able to pull fingerprints off of

23  them, latent prints.

24       MR. NORWOOD:  Your Honor, may I have a moment?

25       THE COURT:  Sure.

1          MR. NORWOOD:  Thank you, Agent.  No further questions
2   at this time.
3          THE COURT:  Sir, any questions?
4          DEFENDANT SYCHANTHA:  Yes.
5                      CROSS-EXAMINATION
6   BY DEFENDANT SYCHANTHA:
7   Q.   Do you know me?
8   A.   No.
9          DEFENDANT SYCHANTHA:  Okay.  That's all.
10         THE COURT:  All right.  Any further questions?
11         MR. NORWOOD:  No, your Honor.  Thank you.
12         THE COURT:  Sir, thank you very much for coming in.
13         MR. NORWOOD:  Your Honor, may we approach briefly?
14         THE COURT:  Sure.
15         THE COURT:  No more witnesses today.
16         MR. NORWOOD:  That's correct.
17         THE COURT:  Okay.
18         MR. NORWOOD:  Thank you.
19         MR. MARTIN:  Thank you, your Honor.
20         THE COURT:  So we're moving ahead of schedule.
21   That's all the witnesses we have available for you today, okay?
22   So you're leaving an hour early, all right?
23         With that, have a great afternoon.
24         And what can't you do?
25         JURORS:  Talk.

1          THE COURT:  All right.  We'll have Alex take you into

2   the jury room and Jen will be in there in a minute, okay?

3          THE CLERK:  All rise for the jury.

4          (JURY OUT AT 11:58 a.m.)

5          THE COURT:  Anything else?

6          MR. NORWOOD:  Your Honor, the Government has 11

7   potential additional witnesses, but we do believe, based on our

8   case, that we will be able to finish our case in chief

9   tomorrow.

10          THE COURT:  Okay.

11          MR. STEINGOLD:  I'm sorry, finish it tomorrow?

12          MR. NORWOOD:  Case in chief, yes.

13          MR. STEINGOLD:  Okay.

14          THE COURT:  See how it all plays out.  We have plenty

15   of time, okay?

16          Anything else?

17          MR. NORWOOD:  Nothing else, thank you.

18          THE COURT:  I thought you were going to mention

19   something before we brought the jury in at about five after

20   11:00 about Mr. Sok and witnesses.

21          MR. NORWOOD:  Yes, your Honor.

22          So we have four witnesses, your Honor, on our witness

23   list currently, that if Mr. Sok testified, we would call two

24   lab witnesses that we wouldn't otherwise call, and then another

25   witness in addition to Mr. Sok.

1        And so if he does not testify, that would make our

2   number 7 as opposed to 11.

3        THE COURT:  Okay.  See how it all plays out.

4        MR. NORWOOD:  Thank you, your Honor.

5        THE COURT:  And I assume he's here, Mr. Sok?

6        MR. NORWOOD:  He is going to be transported tomorrow,

7   your Honor, the day of his anticipated testimony.

8        THE COURT:  I thought he was going to be here today.

9        MR. STEINGOLD:  I thought it was 1:00.

10        THE COURT:  At 1:00.

11        MR. MARTIN:  Your Honor, that is our fault.  If you

12   wanted him here, typically --

13        THE COURT:  I think I was perfectly clear that we

14   were going to have the hearing at 1:00 to determine whether or

15   not he was going to testify before testifying on Wednesday.

16        MR. MARTIN:  Your Honor, it's our position that his

17   presence for that hearing isn't necessary because the

18   application, he has no standing one way or another to object to

19   the application that the United States filed.

20        THE COURT:  Well, I get that part of it.

21        The question is, is he going to testify or is he not

22   going to testify and be subject to contempt?

23        That's what we were going to talk about today.

24        MR. MARTIN:  Your Honor, at least the Government's

25   position on the process with respect to compulsion order, then

121

1    contempt is a two-step process.  If the Court accepts the

2    Government's application and grants it, then the Court is

3    compelling him to testify, and then it cannot be anticipatory.

4    In other words, we couldn't put him on the stand outside the

5    jury's presence and ask him because it's a present intent not

6    to testify.

7         So we have to know -- the Court has to know whether

8    when called the stand under the compulsion order he would say,

9    I understand I'm under a compulsion order, your Honor, I still

10   refuse to testify in front of the jury.

11        THE COURT:  I get that, but that doesn't occur in

12   front of the jury, right?

13        MR. NORWOOD:  Your Honor, I -- I've seen it done both

14   ways, but I understand.

15        THE COURT:  Well, I think if we're going to

16   anticipate that he's going to refuse to testify, that's why we

17   had the hearing today, to find out if he's going to refuse to

18   testify or testify.

19        We can't -- it's -- if my memory serves me well, you

20   can't put somebody up as a trial witness knowing that

21   individual is going to refuse to testify or take the Fifth, or

22   whatever.  I don't know what he's going to say in front of the

23   jury.  That's why I thought we were doing the hearing today at

24   1:00.

25        MR. MARTIN:  Your Honor, the Government's position is

1  that the Court can take this two-step process and we can

2  inquire immediately before he testifies.  We do think there's

3  some case law in the Sixth Circuit that suggests that it can't

4  be an anticipatory decision.  In other words, even for the

5  Court to inquire today, Mr. Sok could change his position

6  tomorrow, which is when we'd be calling him.

7           THE COURT:  I understand that, but I don't want to do

8  it in front of a jury.

9           MR. MARTIN:  Your Honor, we appreciate that, and

10  that's fine.  We would just ask the Court do that inquiry right

11  before he testifies outside the presence of the jury then, then

12  you'll have as close in time to when he would be called versus

13  a day apart.

14           And we can submit some case law.  That's what we're

15  concerned with, is the --

16           THE COURT:  You can't -- when am I supposed to review

17  the case law?

18           MR. NORWOOD:  Your Honor, we would suggest that --

19           THE COURT:  My docket is stacked.

20           MR. MARTIN:  Your Honor, we would suggest that we

21  break for the day, we can submit the case law, it's a single

22  case, it's called Johnson, this afternoon.  It talks about

23  anticipatory invocation of basically not wanting to testify

24  despite the compulsion order and then we could take this up at

25  8:30 in the morning, or earlier.

1        And I apologize, your Honor, for not having him here

2   today.

3            THE COURT:  Just help me out.

4        He was supposed to be here today at 1:00 for a

5   hearing, right?

6            MR. MARTIN:  Your Honor, we understand that was the

7   Court's intent and we failed to do that, yes.

8            THE COURT:  Mr. Steingold, was I in clear, or what

9   was your understanding?

10           MR. STEINGOLD:  I was absolutely certain today at

11  1:00 we were going to find out whether he was going to testify.

12  You said we were going to have a hearing at 1:00.  I thought he

13  was going to be here with Mr. Daly.

14           THE COURT:  That's exactly it.  I thought he was

15  going to be here with Mr. Daly.

16       My question before you made that statement, sir, was:

17  Is Mr. Daly here yet as well?

18           MR. MARTIN:  Your Honor, again, that was my fault.

19  We've communicated with Mr. Daly to be here tomorrow.  We

20  didn't anticipate --

21       Well, it was our fault, your Honor.  We should have

22  had him here.

23           MR. STEINGOLD:  Mr. -- we have an email from Mr. Daly

24  saying that he would be here at 1:00, unless that's changed.  I

25  think he still plans on being here.  That was at 9:00 a.m. it

1  was sent.

2          THE COURT:  Did he send it to the Government, too?

3          MS. MANDERNACH:  Yes.

4          It was to Mr. Steingold, Ms. McCoy, Mr. Norwood,

5  Mr. Martin.  But we've been in trial since then, so they

6  probably just haven't seen that.

7          MR. MARTIN:  Your Honor, we just received that at

8  9:09, and, of course, our phones have been off, but we should

9  have checked it at the break.

10          MS. MANDERNACH:  He said, "I can be there at 1:00

11  when the Judge addresses Mr. Sok's issue."

12          THE COURT:  Does he know it's -- does he -- is he

13  aware that it's not going to be at 1:00 today, that you had

14  planned on doing it tomorrow morning?

15          MR. MARTIN:  Your Honor, what we've communicated to

16  Mr. Daly was that we were going -- the Court had questions

17  about the application.  And again, our confusion on that, but

18  that's what we communicated to Mr. Daly, and that he, of

19  course, could be present for that.  And that -- so that's why

20  my presumption is he's coming at 1:00.

21          I'm sorry, your Honor.

22          The Court's indulgence.

23          Okay.  All right.  Your Honor, we communicated to

24  Ms. McCoy this morning at around 8:00 that we understood the

25  Court would be addressing the application at 1:00, and that we

 1    were planning to call Mr. Sok tomorrow to testify, if compelled

 2    by the Court to testify.  We copied Mr. Steingold and Mr. Daly

 3    at that time.  And the response from Mr. Daly at 9:09 a.m. is,

 4    "I will be there at 1:00 today when the Judge addresses --

 5              THE COURT:  Well, I have the email in front of me.

 6    And the plan was to call Mr. Sok.  I understand for tomorrow

 7    for trial.

 8              But as is indicated in your email from Mr. Norwood is

 9    we were going to have a hearing at 1:00.

10              MR. MARTIN:  Your Honor, again, I apologize.  We were

11    planning on having the hearing.  We thought it was a two-step

12    process.  We didn't think Mr. Sok had frankly standing as to

13    the application.  It's between the Government and the --

14              THE COURT:  Well, I have the application.  I could

15    just merely sign it, right?

16              MR. MARTIN:  Correct, your Honor.

17              THE COURT:  I wouldn't necessarily need a hearing to

18    sign it.

19              MR. MARTIN:  That's correct, your Honor.

20              THE COURT:  So what did you anticipate we were going

21    to do at 1:00?

22              MR. MARTIN:  Your Honor, we thought, because the

23    application was still under consideration, the Court had

24    questions for us about the application.  And because of the

25    case law, and I know, your Honor, I had not shared that with

1   the Court, and I will as soon as I can, we did not think the

2   Court can make an anticipatory contempt finding today when we

3   were going to call him to testify tomorrow.

4           THE COURT:  Do we know anything more about access to

5   his records since we broke earlier?

6           MR. NORWOOD:  Let me check, your Honor.

7           THE COURT:  His court records.

8           As I understand it from last week is, he has access

9   to the law library at Livingston Jail, he has access to his

10  paperwork, his records.

11          MR. NORWOOD:  That's correct, your Honor.

12          THE COURT:  Except he's not allowed to take them into

13  his cell.  And as was stated -- sorry -- I believe by the

14  defendant, is that he did not have access to his documents over

15  the weekend.

16          And, Mr. Steingold, I need you for a minute here.

17          Did you hear what I just said?

18          MR. STEINGOLD:  I understood, yes, you were talking

19  about what happened in Livingston County.

20          THE COURT:  Yeah, that I understood -- backtrack --

21  is that he had -- based upon our conversations last week, he

22  had access to his documents, records, his trial materials at

23  the library, he just couldn't have them in his cell, and they

24  were -- Livingston was going to store his records for him to

25  make sure that it would be put away at night and available to

Jury Trial - Volume 3 - 10/15/2024

1  him as he comes to court the next morning, which didn't occur.

2         Is it Friday or Thursday?  I'm losing track.

3         MR. STEINGOLD:  Friday.

4         THE COURT:  And marshals went and picked up his trial

5  materials and had them here probably about 10:00-ish, 10:30-ish

6  Friday morning, which was outstanding.

7         So we have an issue about his access this weekend.

8  We're in the middle of a trial.  And it would seem to me that

9  Livingston would cooperate with a case agent in charge and let

10 us know, did he have access last weekend or not?  And if he had

11 access, when he had access, and assure that he will have access

12 when he goes back this evening, if that's the policy of

13 Livingston.  And we need to know -- have a responsible person

14 at Livingston, that if there's an issue, we can get an answer

15 rather than guessing.

16        So why don't we work on that for a little while?

17        MR. NORWOOD:  We will, your Honor.

18        THE COURT:  Okay.  All right.  Stick around for a

19 minute.  Let's see what else I have.

20        THE CLERK:  All rise.

21        Court is in recess.

22        (Off the record at 12:24 p.m.)

23        (Back on the record at 12:24 p.m.)

24        THE CLERK:  All rise.

25        THE COURT:  So I just signed the order compelling

1    witness to testify and provide information.  And I guess we'll

2    see him tomorrow at 8:30 and find out what Mr. Sok's going to

3    do or not do.

4              Make sure you advise his attorney, Mr. Daly.

5              I briefly reviewed U.S. versus Johnson, which talks

6    about anticipatory contempt.  Again, I just skimmed it.

7              I was under the impression that if Mr. Sok does not

8    honor the order, it would be criminal contempt, is that

9    accurate?

10             MR. MARTIN:  Your Honor, our understanding is the

11   Court has the option, but, yes, it could be criminal or civil

12   contempt.

13             THE COURT:  I wasn't sure about civil because my

14   preliminary research indicated that it would be criminal.  But

15   you didn't brief that issue.

16             MR. MARTIN:  No, your Honor.  We can look into that

17   this afternoon.

18             THE COURT:  What kind of contempt would you be asking

19   for?

20             MR. MARTIN:  Your Honor, be asking for criminal.

21             THE COURT:  That's the question I have.

22             MR. MARTIN:  I apologize.  Yes, your Honor.  We'd be

23   asking for a finding of criminal contempt.

24             THE COURT:  All right.  Then brief it out no more

25   than eight pages, okay?

1          MR. MARTIN:  Yes, your Honor.

2          THE COURT:  And attach your main cases.

3          Have we had any luck with Livingston?

4          MR. MARTIN:  Your Honor, my understanding --

5          THE COURT:  I understand it's only been, like,

6    20-some minutes.

7          MR. MARTIN:  Short answer is no, your Honor.

8          THE COURT:  Okay.

9          MR. MARTIN:  But we are trying other avenues to reach

10   the officer with the knowledge.

11          THE COURT:  All right.

12          MR. STEINGOLD:  I was just thinking, your Honor, they

13   may take him to Milan.  I don't know.

14          MARSHAL:  I'm sorry?

15          MR. STEINGOLD:  Do you know whether he's going to

16   Livingston or Milan if we finished right now?

17          MARSHAL:  He would still go to Livingston.

18          THE COURT:  That would be my assumption.

19          So when he goes back, does he have access to the

20   library?

21          MARSHAL:  Your Honor, if I may?

22          THE COURT:  Yes.

23          MARSHAL:  I spoke to Lieutenant Pringle just moments

24   ago, and she stated that Lieutenant Roy Asquith was the

25   gentleman and the point of contact handling this specific

1    issue, but she assured me that Mr. Sychantha will not have any

2    further issues going forward.  We don't have specific times,

3    but we know that Mr. Sychantha did request his legal documents

4    this weekend.  He received it Monday afternoon, probably about

5    the time he says.  There's no reason to not believe what he

6    told us.

7           THE COURT:  He said about 3:00, if I recall

8    correctly.

9           MARSHAL:  That's probably about right, your Honor.

10           She assured me that -- she believes, but she's

11    reviewing video tapes and documents that were requested to give

12    us an accurate description of what happened.  But she says he

13    will have access to his legal documents when he returns today.

14    He'll be able to keep them in the cell if need be, but they

15    will not restrict that.

16           What she believes happened was the officer who

17    returned Mr. Sychantha on Friday misplaced the documents and

18    they put them into property instead of discovery.  So everyone

19    kept going to discovery to look for this -- these property --

20    this property and these documents, and they weren't there.

21           So the request kept going to this specific division

22    within Livingston.  They didn't have it because it was

23    misplaced by the officer who transported him on Friday.

24           THE COURT:  So I probably should know the answer to

25    this question.

Jury Trial - Volume 3 - 10/15/2024

Page 131

1        When they're downstairs in lockup, do they have

2   access to their discovery?

3        MARSHAL:  They do, your Honor.

4        THE COURT:  Okay.  And so we're done, but

5   Mr. Sychantha won't be going back until about 4:00 at the

6   earliest, right?

7        MARSHAL:  Correct.

8        THE COURT:  Okay.  All right.

9        MARSHAL:  And I was assured by Lieutenant Pringle

10  that this won't happen again, your Honor.

11       THE COURT:  Okay.  Very good.  Thank you.

12       Anything else?

13       MR. NORWOOD:  Your Honor, just that I showed

14  Mr. Sychantha, as well as Mr. Steingold, our potential closing

15  slides just so that he's been able to review them.

16       THE COURT:  Well, you wouldn't close --

17       MR. NORWOOD:  No.

18       THE COURT:  Oh, can you work with Mr. Steingold about

19  an instruction on the immunity issue should Mr. Sok agree to

20  testify tomorrow?

21       MR. NORWOOD:  We will, your Honor.

22       MR. MARTIN:  Yes, your Honor.

23       THE COURT:  All right.  Thank you.

24       THE CLERK:  All rise.

25       (PROCEEDINGS CONCLUDED AT 12:29 p.m.)

Jury Trial - Volume 3 - 10/15/2024

Page 132

1                    * * * * *

2            **C E R T I F I C A T I O N**

3        I certify that the foregoing is a correct transcription

4    of the record of proceedings in the above-entitled matter.

5

6    **s/ April A. Kurtz, CSR-7347, RPR, FCRR**        **10/30/2024**
     April A. Kurtz, CSR-7347, RPR, FCRR              Date
7    Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25