```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                          SOUTHERN DIVISION

3    UNITED STATES OF AMERICA,

4                        Plaintiff,

5        vs.                            Case No. 05-81165

6    KHAOPHONE SYCHANTHA,

7                        Defendant.

8    _____/

9                       JURY TRIAL - VOLUME 4
                   BEFORE THE HONORABLE SEAN F. COX
10                   United States District Judge
                 Theodore Levin United States Courthouse
11                   231 West Lafayette Boulevard
                         Detroit, Michigan
12                   Wednesday, October 16, 2024

13   APPEARANCES:

14   FOR THE PLAINTIFF:
                         JASON DORVAL NORWOOD
15                       THOMAS PATRICK MARTIN
                         United States Attorney's Office
16                       211 W. Fort Street
                         Suite 2001
17                       Detroit, Michigan 48226
                         313.226.9587
18                       313.226.9168

19   FOR THE DEFENDANT:
                         KHAOPHONE SYCHANTHA
20                       IN PRO PER
                         DAVID S. STEINGOLD
21                       (STANDBY COUNSEL)
                         Law Offices of David S. Steingold, PLLC
22                       30300 Northwestern Highway, Suite 111
                         Farmington Hills, Michigan 48334
23                       313.962.0000

24

25
```

Jury Trial - Volume 4 - 10/16/2024

1   **APPEARANCES CONTINUED:**
                         **CRAIG A. DALY**
2                        Craig A. Daly, PC
                         (On behalf of David Sok)
3                        P.O. Box 720
                         Royal Oak, Michigan 48068
4                        248.439.0132

5   **ALSO PRESENT:**   Special Agent Brian Manns
                         Yannie Andrus - Government Assistant
6                        Marissa Mandernach - Defense Assistant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
                              -      -      -
24              To obtain a certified transcript, contact:
                   April A. Kurtz, CSR-7347, RPR, FCRR
25                      www.transcriptorders.com

TABLE OF CONTENTS

MATTER                                                         PAGE

Jury Trial - (Volume 4)............................. 3

Motion regarding David Sok testimony................ 5

**Government's Case-in-Chief**

WITNESSES:

**DONTE RA'SHAWN SHAVERS**

Direct Examination by Mr. Norwood:.................. 15
Cross-Examination by Defendant Sychantha:.......... 25
Redirect Examination by Mr. Norwood:............... 28
Recross-Examination by Defendant Sychantha......... 30

**ASAD MALIK**

Direct Examination by Mr. Norwood:.................. 32
Cross-Examination by Defendant Sychantha:.......... 44
Redirect Examination by Mr. Norwood:............... 45

**TIMOTHY ANDERSON**

Direct Examination by Mr. Martin:.................. 46
Cross-Examination by Defendant Sychantha:.......... 54
Redirect Examination by Mr. Martin:................ 55

**CARRIE GALLAGHER**

Direct Examination by Mr. Martin:.................. 56
Cross-Examination by Defendant Sychantha:.......... 70
Redirect Examination by Mr. Martin:................ 71
Recross-Examination by Defendant Sychantha......... 72

**ALEXANDRA AMBRIZ**

Direct Examination by Mr. Martin:.................. 73
Cross-Examination by Defendant Sychantha:.......... 83
Redirect Examination by Mr. Martin:................ 83

Jury Trial - Volume 4 - 10/16/2024

TABLE OF CONTENTS CONTINUED

WITNESS                                              PAGE

**HEATHER MILLER**

Direct Examination by Mr. Martin:.................. 84
Cross-Examination by Defendant Sychantha:.......... 90


David Sok Motion

Argument by Mr. Daly............................... 92
Argument by Mr. Martin............................. 94
Argument by Mr. Daly............................... 97
Argument by Mr. Martin............................. 107


Certificate of Reporter........................... 113

1   Detroit, Michigan

2   Wednesday, October 16, 2024

3   8:45 a.m.

4                              *  *  *

5           THE CLERK:  The Court calls Case Number 05-81165,

6   United States of America versus Khaophone Sychantha.

7           Counsel, can I have appearances, please?

8           MR. NORWOOD:  Good morning, your Honor.  Jason

9   Norwood on behalf of the United States.

10          MR. MARTIN:  Good morning, your Honor.  Patrick

11  Martin for the United States.

12          DEFENDANT SYCHANTHA:  Khaophone Sychantha.

13          MR. DALY:  David Steingold, advisory counsel.

14          Good morning, your Honor.

15          THE COURT:  Good morning, everyone.  Please have a

16  seat.

17          Mr. Daly, nice to see you again.

18          MR. DALY:  Thank you, Judge.

19          THE COURT:  I had a nice chat with Mr. Daly yesterday

20  about 1:00.  He was appearing for the Sok hearing that had been

21  scheduled that didn't happen.  And I see he's here again

22  probably for the Sok hearing as well.

23          So a couple thoughts.  Wasn't I supposed to get a

24  memo on the contempt issue?  Did I get it?

25          MR. MARTIN:  Late, your Honor.  I have another copy I

1    can provide to the Court.

2                THE COURT:  I have nothing.

3                MR. MARTIN:  I filed it at 8:00.  That's ECF number

4    145, and I can provide a copy to the Court.

5                May I approach your Honor?

6                THE COURT:  Sure.

7                I was wondering, did you do any -- for the research

8    on the anticipatory contempt issue?

9                MR. MARTIN:  I'm sorry, your Honor.  I did not hear

10   that.

11               THE COURT:  Did you do any further research on the

12   anticipatory contempt issue?

13               MR. MARTIN:  Your Honor, no, not beyond Johnson.

14               THE COURT:  Which was a 40-year-old case.

15               MR. MARTIN:  Yes, your Honor, but I believe still

16   binding on this court.

17               THE COURT:  Well, then you should have done more

18   research and then you'd find a much current -- more current

19   case, a Court of Appeals decision, Sixth Circuit decision, and

20   the individual who wrote the opinion was Judge Drain, who was a

21   visiting judge to the Sixth Circuit.  And that's U.S. versus

22   Fahar, F-A-H-A-R, 766 F.3d 599.

23               And it would seem to me -- I could be wrong -- based

24   upon my reading of that case, there was no reason why we

25   couldn't have Sok hearing yesterday.

1          MR. MARTIN:  Your Honor, I haven't reviewed the case.

2  I have no reason to question the Court's interpretation of that

3  case.

4          THE COURT:  I haven't said anything.  I just asked if

5  you read the case and then I just gave you kind of my

6  impression of the case.

7          MR. MARTIN:  Your Honor, I have not read the case.

8          THE COURT:  But it's obviously a much, much more

9  current case.

10         So are we ready to proceed with Mr. Sok this morning?

11         DEFENDANT SYCHANTHA:  I have something to say on the

12  record.

13         THE COURT:  Not yet.

14         MR. MARTIN:  Your Honor, we are not -- he's still in

15  transport.  He's expected to arrive around 9:30.

16         THE COURT:  Do we know why he's late?

17         MR. NORWOOD:  Your Honor, I had an opportunity to

18  speak with the United States Marshal this morning.  They

19  informed me at about 8:05 this morning that they went to go

20  pick up Mr. Sok, and Mr. Sok would not be released from FCI

21  Milan because they said that they needed a writ.  We had to

22  explain to them that that was effectively a writ, the prisoner

23  production request that they had requested from us yesterday

24  for Mr. Sok.

25         THE COURT:  Explain to who?

1           MR. NORWOOD:  They had to explain it to FCI Milan.

2           And so FCI Milan is now with the proper paperwork and

3    they are on their way to go pick up Mr. Sok.

4           THE COURT:  Okay.  I don't know if Mr. Daly can

5    answer that question or not.

6           Do we know where Mr. Sok stands about testifying or

7    not testifying, or do we have to -- or are we going to wait and

8    find out?

9           MR. DALY:  I think we need to wait.  I need to speak

10   to him again.  I know what he said in the past.  I don't know

11   if that remains true right now, Judge.

12          THE COURT:  Okay.

13          MR. DALY:  I need to speak with him.

14          THE COURT:  I signed the order yesterday, as I think

15   you probably know.

16          MR. DALY:  Yeah, I saw that.  And I filed a motion to

17   quash the order, so we need an argument around that, too,

18   Judge.

19          THE COURT:  I didn't see that, either.

20          MR. DALY:  Yeah, that's okay.

21          THE COURT:  When was that filed?

22          MR. DALY:  Last evening.

23          THE COURT:  Idea of about what time?

24          MR. DALY:  My best guess would be about 7:30, I

25   think.  It was in part response to the Government's motion to

1  hold him in contempt, and I anticipated was coming.  And part

2  of it is due to the fact that I was under the impression that

3  if the order, the compulsion order, wouldn't be issued unless

4  we had an opportunity to be heard, and there was a basis for

5  the order, one of our objections would be, so I'm trying to

6  catch up as this is moving forward, Judge.

7        THE COURT:  Okay.  Take it a step at a time, okay?

8        MR. DALY:  Sure.

9        THE COURT:  There may be no issue or there may be an

10  issue.  We'll wait and find out.

11        MR. DALY:  What would you like me to do at this

12  point?

13        THE COURT:  I just -- wait for your client, talk to

14  your client, and then we'll figure out what the next step is.

15        Was he subpoenaed per chance -- by chance, or no?

16        MR. NORWOOD:  Mr. Sok was subpoenaed.

17        THE COURT:  Okay.

18        MR. NORWOOD:  And that was issued and given to his

19  counsel.

20        THE COURT:  And when was he subpoenaed?

21        MR. NORWOOD:  He was subpoenaed -- let me check, your

22  Honor.

23        THE COURT:  Just approximately.

24        MR. NORWOOD:  So we sent the subpoena to Mr. Daly on

25  September the 13th, your Honor.

1    THE COURT:  Okay.  All right.  All good.

2    All right.  Before I proceed further, come on up for

3 a sidebar.

4    Maybe we don't need a sidebar.

5    Normally, I have my 10:30 break, right, and -- but at

6 10:30 today, I have to go down and do a dry run for Judge

7 Borman's Portrait Ceremony.  So that kind of occupies that 20

8 minutes.  So I'm just trying to figure out when we can focus on

9 Mr. Daly and his client.

10    So just give me a chance to figure it out, okay?

11    All right.  And, Mr. Sychantha, you had something you

12 wanted to address?

13    DEFENDANT SYCHANTHA:  Yes.

14    Well, yesterday, I got to the jail at 3:00 p.m. and

15 they said I could see my discovery at 5:00, after dinner, but I

16 didn't get to see it until 10:00 p.m., and I seen it

17 12:00 p.m., and I only had five hours' sleep.

18    So I just wanted to put that on the record.

19    THE COURT:  Okay.  Well, we'll follow up on that.

20    Is it Lieutenant Pringle who is responsible?

21    MR. MANNS:  That was the individual that the Marshal

22 identified yesterday as doing the research.

23    I spoke to Lieutenant Roy Asquith, I believe it was

24 Monday, but the Marshals were having conversations with

25 Lieutenant Pringle directly without me.

1       THE COURT:  Well, you were here.  The Marshals were

2   here.  You could have talked to the Marshals.

3       MR. MANNS:  Your Honor, I've had experience in the

4   past with dealing with jails directly and the Marshal service,

5   and they take affront when a different agency deals with their

6   contracts.  In fact, I was disciplined once when I did do just

7   that.  So --

8       THE COURT:  Well, if there was a reluctance, you

9   should have approached me.

10       So I guess we got to get ahold of Pringle.

11       MARSHAL:  Yes, your Honor.  I'm sending this over as

12   we --

13       THE COURT:  Okay.  As I understand, Mr. Sychantha

14   said he didn't have access to his discovery until 10:00 p.m.,

15   and he was reviewing it until 12:00 p.m.  But, of course, you

16   had access to your discovery yesterday in lockup before you

17   were transported back to Livingston.

18       DEFENDANT SYCHANTHA:  No, because it was on the thumb

19   drive.  I need a computer to look at it.

20       THE COURT:  Your written documents, your bag,

21   whatever --

22       DEFENDANT SYCHANTHA:  Yeah.

23       THE COURT:  -- you had access to all that yesterday

24   afternoon.

25       So we'll learn a little bit more, okay?

1          All right.

2          MR. MARTIN:  Your Honor, may I approach with a copy

3    of a document that's referenced in Mr. Daly's motion that he

4    filed last night?

5          I talked to Mr. Daly.  It's a proffer document that

6    should have been attached as an exhibit and we'll provide that

7    to the Court so that when the Court has a chance to review

8    Mr. Daly's motion, you'll have the reference document as well.

9          THE COURT:  Does Mr. Daly have it?

10         MR. MARTIN:  Mr. Daly has it.

11         MR. DALY:  I do have a copy.

12         THE COURT:  Oh, okay.  Sure.

13         MR. DALY:  I should just indicate, Judge, because

14   it's as this thing has been unfolding, as we move forward, I

15   have additional arguments to make in terms of my motion to

16   quash.  So I would appreciate an opportunity for a hearing with

17   regards to how this whole thing unfolded and the Court's

18   position, the Government's, and Mr. Sok's position.

19         THE COURT:  Okay.  Let's do a step at a time.

20         MR. DALY:  Sure.

21         THE COURT:  Okay.  All right.  A step at a time.

22         MR. DALY:  Okay.

23         THE COURT:  I got a lot thrown at me.

24         Ms. Andrus saw me early this morning.  You got here,

25   what, about 7:25, or something like that?

1          THE WITNESS:  I think it was 7:40, your Honor.

2          THE COURT:  Okay.  I was here about 10 after 7:00,

3   7:15.  The door was wide open.  Could have dropped off a hard

4   copy of your -- of your memo.  And as you know, same thing

5   yesterday, I was here about 10 after 7:00, and we don't start

6   until 8:30.

7          So, all right.  So we'll be right back and we'll

8   bring out the jury, okay?

9              (Off the record at 8:57 a.m.)

10              (Back on the record at 9:15 a.m.)

11          THE CLERK:  All rise.

12          The United States District Court is back in session.

13          Please be seated.

14          THE COURT:  Can we have a sidebar?

15          Well, we don't need a sidebar.

16          This is for the Government, primarily.

17          I explained how the trial is going to be managed.

18   And the defendant's been more compliant with how the trial was

19   -- my directives as to how the trial was going to be managed

20   than the Government.

21          Yesterday, twice in a row, as we're bringing the jury

22   out, the Government brought up issues that could have been

23   addressed first thing yesterday morning or when our break

24   started.

25              I directed that Sok's hearing be 1:00, yesterday.

Jury Trial - Volume 4 - 10/16/2024

1    You did not bring him here for that hearing.  And because of

2    that, we've lost 45 minutes of trial time.

3            Yesterday, Mr. Daly was here.  Had Sok and Daly been

4    -- all right.  And you've been there.  These issues could have

5    been fleshed out that I'm dealing with this morning, or at

6    least I would have had a heads-up as to Mr. Daly's position and

7    his objection and his motion rather than learning on the fly

8    after 8:30 this morning.

9            Potentially, I'm going to lose a trial day tomorrow.

10           You must comply with my directives.  When I set a

11   date, a hearing, on your own, you don't decide not to have a

12   witness show up.

13           All right.  Let's bring the jury out.

14           THE CLERK:  All rise for the jury.

15           (JURY IN AT 9:19 a.m.)

16           THE CLERK:  Please be seated.

17           THE COURT:  All right.  Members of the jury, good

18   morning.  We had a little bit of a delay.  Sorry about that.

19           And we're going to continue with the Government's

20   presentation of its case to you.

21           Our next witness?

22           MR. NORWOOD:  Your Honor, the Government calls

23   Mr. Dante Shavers to the stand.

24           THE COURT:  Sir, could you give your full name to our

25   court reporter, please?

15

1         THE WITNESS:  Donte Ra'shawn Shavers.

2         THE COURT:  And could you raise your right hand?

3               **DONTE RA'SHAWN SHAVERS,**

4        being first duly sworn to tell the truth, was

5       examined and testified upon his oath as follows:

6                   - - -

7         THE COURT:  Please have a seat in the witness chair.

8       You may proceed.

9         MR. NORWOOD:  Thank you, your Honor.

10                           (9:20 a.m.)

11            DIRECT EXAMINATION

12 BY MR. NORWOOD:

13 Q.   Good morning, Mr. Shavers.

14 A.   Good morning.

15 Q.   Mr. Shavers, can you take that binder that's in front of

16 you and turn to what's been marked as Government's Exhibit 25?

17 A.   Okay.

18 Q.   Who is in that picture?

19 A.   Next picture.

20       Khaopong.

21       MR. Norwood:  Your Honor, permission to publish what

22 has been admitted at Government's Exhibit 25?

23        THE COURT:  You may.

24 BY MR. NORWOOD:

25 Q.   And can you also turn to what's been marked as

1    Government's Exhibit 26?

2              Who is that a picture of?

3    A.   Dave.

4              MR. NORWOOD:  Your Honor, permission to publish

5    what's been admitted at Government's Exhibit 26?

6              THE COURT:  Yes.

7    BY MR. NORWOOD:

8    Q.   How do you know them?

9    A.   I met them through my cousin Mamie Arterberry in Windsor.

10   Q.   And how did Mamie introduce you to them?

11   A.   As their friend, Khaopong told me he could help me make

12   some money.

13   Q.   Now, do you see Khaopong in the courtroom today?

14   A.   Yes.

15   Q.   Where is he sitting and what is he wearing?

16   A.   A suit, sitting here.

17   Q.   And what color is his tie?

18   A.   Red.

19             MR. NORWOOD:  Your Honor, I'd ask that the record

20   reflect that Mr. Shavers has identified the defendant.

21             THE COURT:  Well, we have two red-ish ties there.

22   BY MR. NORWOOD:

23   Q.   Can you describe the hair?

24   A.   The hair?  Mostly bald-headed, like me.

25             MR. NORWOOD:  Your Honor, same?

1           THE COURT:  Yep.  It's noted.

2    BY MR. NORWOOD:

3    Q.   Now, what was the nature of that initial meeting,

4    Mr. Shavers?

5    A.   The initial meeting was just to meet and greet and let me

6    know what they were doing.

7    Q.   And what did they let you know that they were doing?

8    A.   Selling ecstasy.

9    Q.   And did that come from Khaopong?

10   A.   I believe so.

11   Q.   Now, where did you meet?

12   A.   The first time we met, I believe it was at Mamie's house.

13   Q.   And was that Mamie's house in Canada or Detroit?

14   A.   In Canada.

15   Q.   Windsor, Canada?

16   A.   Yes.

17   Q.   Okay.  And so Khaopong asked to you transport marijuana --

18   well, not marijuana -- ecstasy pills?

19   A.   Yes.

20   Q.   And did he tell you how much ecstasy pills you'd be

21   transporting?

22   A.   It would vary, depending on what they had at the time.

23   Q.   And what was the variance?

24   A.   First time was probably, say, 20, 30,000 pills, and the

25   last time when I was arrested was about 100,000 pills.

1    Q.   All right.  So let's walk through that for a second.

2         So Khao was the person who gave you the orders?

3    A.   Yes.

4    Q.   What did David do?

5    A.   David worked on the cars, as far as opening up, taking the

6    panels off, and placing the drugs inside, and then putting the

7    panels back.

8    Q.   Now, were you compensated for this?

9    A.   Yes.

10   Q.   How much were you compensated?

11   A.   It was a per pill price tag, but I couldn't tell you

12   offhand exactly what was -- the amount was.

13   Q.   Okay.  So let's walk through what would happen each time

14   that you would go up and meet with Khao and Dave.

15        How would that meeting start?

16   A.   It would start with me coming to Khao's house and parking

17   in the garage.  And we'd go inside and had a vacuum sealer and

18   vacuum-seal the ecstasy pills, and then begin the process of

19   taking the panels off of the car, then place the drugs inside

20   of the car, replace the panels.  And then I would leave and

21   head to the border.

22   Q.   Now, who would do that process of taking the panels off

23   and putting the drugs inside?

24   A.   It would be Dave, and I would usually be there with him.

25   And Khao would be there as well but not really doing the manual

1   labor.

2   Q.   So Khao wouldn't do the manual labor.  Would he tell you

3   guys what to do?

4   A.   Yes.

5   Q.   And what would happen next?

6   A.   After I left and would go across the border?

7   Q.   Yes.

8   A.   I would then go to my Uncle Richard's house and pull into

9   his garage.  And then he, I and my cousin Mamie would take the

10  panels off and take the drugs out.

11  Q.   Mr. Shavers, can you turn to what's been admitted to

12  Government's Exhibit 45 in that binder?

13  A.   I think that's Mamie, but it's a very bad picture.  I

14  believe it's Mamie Arterberry, though.

15          MR. NORWOOD:  Permission to publish what's been

16  admitted as Government's Exhibit 45, your Honor?

17          THE COURT:  Yes.

18  BY MR. NORWOOD:

19  Q.   So is this the same individual that you testified

20  introduced you to Khaopong?

21  A.   Yes.

22  Q.   And this is also the individual that helped you unload the

23  pills?

24  A.   Yes.

25  Q.   And can you also turn to what's been marked and admitted

1    at Government's Exhibit 46?

2    A.    That's my Uncle Richard Arterberry.

3              MR. NORWOOD:   Permission to publish what's been

4    admitted as Government's Exhibit 46, your Honor?

5              THE COURT:   Yes.

6    BY MR. NORWOOD:

7    Q.    And so you testified that you would take the pills to his

8    house?

9    A.    Yes.

10   Q.    And where was his house located?

11   A.    It was right off of Seven Mile, Van Dyke area.

12   Q.    In the Detroit metropolitan area?

13   A.    Yes.

14   Q.    And so every time you took a trip, was this the thing that

15   you would do, you would go up to Khao, and then you'd come back

16   down, and Richard and Mamie would help you unload?

17   A.    Yes.

18   Q.    I'd like to direct your attention to December 18th, 2008.

19              Did anything of significance happen that day?

20   A.    Yes, I was stopped at the border and arrested.

21   Q.    And can you tell us what happened at the beginning of that

22   day?

23   A.    The beginning of that day, I got a call from Richard

24   asking me what time I'd be going across the border and if

25   everything was set for the day.  I told him yes, it was set,

1  and gave him the time that I'd be going.

2  Q.   And so then once you went over to the border, what

3  happened?

4  A.   Went across the border, went to Khao's house.  We sat.  We

5  actually had lunch that day.  Only thing I remember as far as

6  what we ate is we had sticky rice, because it was my first time

7  having it.  And after we had lunch, we vacuum-sealed the pills,

8  put them into the truck -- well, the minivan, and then I left

9  and went to the border.

10  Q.   And so, on that day, you had lunch with Khao?

11  A.   Yes, it was me, Khao, Dave, and I believe -- I don't know

12  if it was his mother or his grandmother.

13  Q.   Okay.  And Khao told Dave and you to put it into the car?

14  A.   Yes.

15  Q.   And then you proceeded to the border?

16  A.   Yes.

17  Q.   What happened when you got to the border?

18  A.   I was stopped at the border and they impounded the car,

19  and I was arrested.

20  Q.   Mr. Shavers, can you turn to what's been marked as -- and

21  admitted as Government's Exhibit 22 in that binder?

22  A.   Okay.

23  Q.   What are those pictures of?

24  A.   My old van.

25  Q.   And is there anything else in those pictures, Mr. Shavers?

1    A.   Yes, the pills.

2            MR. NORWOOD:   Permission to publish what's been

3    admitted at Government's Exhibit 22, your Honor?

4            THE COURT:   Yes.

5    BY MR. NORWOOD:

6    Q.   And so this is the old van that you just described?

7    A.   Yes.

8    Q.   All right.  Page 2, same thing, Mr. Shavers?

9    A.   Yes.

10   Q.   Page 3, same thing, Mr. Shavers?

11   A.   Yes.

12   Q.   Page 4, what is that a picture of?

13   A.   That's a picture of the pills in the vacuum-sealed bags.

14   Q.   And is that the pills that you vacuum-sealed with Dave

15   that day at the direction of Khaopong?

16   A.   I believe so, yes.

17   Q.   Picture 5, same picture?

18   A.   Same picture, yes.

19   Q.   Same pills?

20           Picture 6?

21   A.   Same picture.

22   Q.   Now, this is a little hard to see, Mr. Shavers, but this

23   is the panel of the door.  What's inside that panel?

24   A.   You're talking about right?

25   Q.   Yes, the right.

1    A.    Right there, looks like it could be one of the bags

2    stuffed in there.

3    Q.    Next picture?

4    A.    Same thing, the bags stuffed behind the panels.

5    Q.    Next picture?

6    A.    More of the bags in the panels.

7    Q.    Now, often times when you would use your Plymouth Voyager

8    to pack these, would you always put them in the panels or would

9    you put pills somewhere else as well?

10   A.    I believe it was just the panels.  It might have been like

11   a wheel well or anything that we could take off and put back

12   and make it look normal.

13   Q.    Okay.  So when they were taking -- when the wheel wells

14   would be taken off and things like that, who would do that

15   particular part of the job?

16   A.    That would be Dave.

17   Q.    Next picture?

18         What is this a picture of, Mr. Shavers?

19   A.    Inside of the van with the pills in the panels.

20   Q.    Now, you said that you were arrested.  Were you later

21   charged, Mr. Shavers?

22   A.    Yes.

23   Q.    And did you plead guilty to unlawfully importing over

24   100,000 from the United States to Canada?

25   A.    Yes, I did.

1   Q.   And did you agree to cooperate with the Government?

2   A.   Yes, I did.

3   Q.   Now, at present, meaning today, have you been promised by

4   the Government anything for your testimony?

5   A.   They tried to offer me payment.  I refused.

6   Q.   And you're saying -- and I'm saying the Government, right

7   now, have we offered you anything for your testimony today?

8   A.   Reimbursement for being in court.  That was it.

9   Q.   Now, have you ever used controlled substances in your

10  life?

11  A.   Yes.

12  Q.   Which ones?

13  A.   Ecstasy, marijuana and alcohol.

14  Q.   And when was the last time that you used ecstasy?

15  A.   Ecstasy would have been 2018, December.  No, 2008,

16  December 18th.

17  Q.   About six years ago?

18  A.   No, 2008.

19  Q.   2008?

20  A.   December 18th.

21  Q.   Sixteen years ago?

22  A.   Yes.

23          MR. NORWOOD:  Your Honor, may I have a moment?

24          THE COURT:  Yes.

25          MR. NORWOOD:  Thank you, Mr. Shavers.  No further

1    questions at this time.

2              THE COURT:  You may proceed when you're ready.

3              DEFENDANT SYCHANTHA:  Okay.

4                        CROSS-EXAMINATION

5    BY DEFENDANT SYCHANTHA:

6    Q.   You just said somebody offered you money not to testify?

7    A.   No, for being at court.

8    Q.   Oh, who?

9    A.   That was the Government.  Reimbursement for being here.

10   Q.   How much?

11   A.   I don't know.  I refused the offer.

12   Q.   Okay.  You said that Mamie was smuggling guns for a street

13   gang?

14   A.   Mamie?

15   Q.   Yeah.  Gator Boys?

16   A.   I don't know exactly what Mamie was doing.

17   Q.   In your Homeland Security?

18   A.   If it was in the testimony prior, then yes.

19   Q.   Yeah.

20        And you got caught with ammunition in your car?

21   A.   Yes, there was a couple bullets in my car.

22   Q.   Yeah.

23        And you said that Mamie gave you the gun.

24   A.   I didn't have a gun.

25   Q.   Then you gave it back to her?

1   A.    I didn't have a gun.

2   Q.    You said it in the Homeland Security.

3   A.    You talking about before the arrest?

4   Q.    Yeah, before the arrest.

5   A.    If it was in the testimony, then yes.

6   Q.    Yes, it was in the testimony.

7         And you said that on that day you came over, December

8   18th --

9   A.    Yes.

10  Q.    -- 2008?

11        What time did you cross the border?

12  A.    That, I could not tell you.  You'd have to look into my

13  prior testimony.

14  Q.    At 12:00, right?  That's what you said.

15  A.    That's what it says?

16  Q.    Yeah.

17  A.    Okay.

18  Q.    And you said that you would call Mamie before you came

19  over?

20  A.    Yes.

21  Q.    You didn't call me?

22  A.    Call you?

23  Q.    Yeah.

24  A.    I don't believe I did.

25  Q.    Yes.

1             And when you got over, you would call Richard?

2   A.    Over to Canada?

3   Q.    No, to the U.S.

4   A.    To the U.S., yes.

5   Q.    Okay.  And on that day, you said you drove over to my

6   house straight from the border?

7   A.    Yes.

8   Q.    But, on the testimony, you said you went to your cousin

9   Mamie's house.

10  A.    It was in the testimony?

11  Q.    Yes.

12  A.    Well, I'm not going to refute any testimony I prior gave.

13  If it was in the testimony, then yes.

14  Q.    So are you saying you don't remember what really happened

15  that day, it's been so long ago?

16  A.    There are many details that are very fuzzy, yes, that's

17  correct.

18             THE COURT:  Sir, I apologize.

19             Speak up, okay?

20             THE WITNESS:  Oh, sorry.

21             There are many details that are very fuzzy because it

22  was so long ago.  Yes, you are correct.

23  BY DEFENDANT SYCHANTHA:

24  Q.    Yes.

25             So Mamie was the person that gave you the order, not

1   me.

2   A.   No, that is not correct.

3   Q.   Who gave you order?

4   A.   Orders would normally come from you, I believe.

5   Q.   But how?  You didn't have my number or --

6   A.   It would come in person.

7   Q.   Well, you never said on the testimony.  It says that we

8   talked and I just said --

9   A.   That we talked?

10  Q.   Yeah.

11        And I just said, "Okay.  How you doing?"

12        That was it on the testimony.

13  A.   Again, I said I will not refute what I testified to prior.

14  If it says it in the testimony, then yes.

15        DEFENDANT SYCHANTHA:  Can I have a minute, your

16  Honor?

17        THE COURT:  Sure.  Take your time.

18        DEFENDANT SYCHANTHA:  I'm done, your Honor.

19        THE COURT:  No further questions?

20        DEFENDANT SYCHANTHA:  No, that's it.

21        THE COURT:  Redirect?

22        MR. NORWOOD:  Yes, your Honor.  Thank you.

23                REDIRECT EXAMINATION

24  BY MR. NORWOOD:

25  Q.   Mr. Shavers, the U.S. Attorney's Office, as an

Jury Trial - Volume 4 - 10/16/2024

1   administrative procedure, said that you could be paid for your

2   witness testimony, correct?

3   A.   Yes.

4   Q.   And you refused.  You did not want that fee?

5   A.   Yes.

6   Q.   Now, throughout your involvement in this conspiracy with

7   the defendant, who directed you what to do?

8   A.   Khaopong.

9   Q.   Now, prior to taking these trips, you said that Mamie

10  Arterberry, your cousin, introduced you to Khaopong and that

11  they both worked, Mamie and Richard, for the defendant?

12  A.   Yes, that's correct.

13  Q.   And so when you would take these trips, you would go over

14  to Windsor to pick up the drugs and bring back the drugs to

15  Richard and Mamie, correct?

16  A.   That's correct.

17  Q.   Now, specifically, on December 18th, 2008, you testified

18  that you went over there and you met with who?

19  A.   Met with Khaopong and Dave.

20  Q.   And you guys had a meal?

21  A.   Yes, we did.

22  Q.   But after that meal was done, who told you and directed

23  you to get those pills from the Canadian border over to the

24  United States?

25  A.   Khaopong.

Jury Trial - Volume 4 - 10/16/2024

1    Q.   And who loaded those pills?

2    A.   It was me and Dave.

3    Q.   Under the supervision of Khaopong?

4    A.   Yes.

5    Q.   Now, this was 16 years ago.  There are certain things that

6    are fuzzy in your memory, correct?

7    A.   Yes.

8    Q.   Is this particular day fuzzy in your memory?

9    A.   There are aspects of it that are fuzzy, but the entire

10   time is -- but there are some things that stand out.

11   Q.   Right.

12        And the things that stand out, do they include the

13   100,000 pills that Khaopong gave to you?

14   A.   Yes.

15        MR. NORWOOD:  Thank you, your Honor.  No further

16   questions.

17        THE COURT:  Recross?

18                    RECROSS-EXAMINATION

19   BY DEFENDANT SYCHANTHA:

20   Q.   Okay.  You would call Mamie every other day.  How come you

21   didn't call her that day?

22   A.   I didn't need to call her that day.

23   Q.   Is it you are trying to hide her from the conspiracy?

24   A.   I was trying to what?

25   Q.   Like not -- not put her in the conspiracy.

1   A.   That wasn't what I was trying to do.  It was just nothing

2   for us to call at that moment.

3   Q.   How do you remember so well after 16 years?

4   A.   Well, because I haven't spoken to any of my family since

5   that day.  It was the last day I got to talk to any of them.

6          THE COURT:  I apologize.  I didn't hear what you

7   said.

8          THE WITNESS:  Well, that was the last day that I

9   spoke to any of my family, as far as Richard, Mamie or my aunt.

10  I've never spoken to them again since that day, so that does

11  stand out.

12         DEFENDANT SYCHANTHA:  Okay.  That's it, your Honor.

13         THE COURT:  All right.  Sir, thank you very much for

14  coming in.  You're excused.

15         THE COURT:  Our next witness will be?

16         MR. NORWOOD:  Mr. Asad Malik, your Honor.

17         THE COURT:  Mr. Malik, could you come up and give

18  your full name to our court reporter, as well as the spelling?

19         THE WITNESS:  Asad Malik, A-S-A-D M-A-L-I-K.

20         THE COURT:  Could you raise your right hand?

21                         **ASAD MALIK,**

22      being first duly sworn to tell the truth, was

23      examined and testified upon his oath as follows:

24                         -   -   -

25         THE COURT:  Please have a seat in the witness chair.

```
 1            You may proceed.

 2            MR. NORWOOD:  Thank you, your Honor.

 3                                        (9:45 a.m.)

 4                    DIRECT EXAMINATION

 5    BY MR. NORWOOD:

 6    Q.   Good morning, Mr. Malik.  How are you?

 7    A.   I'm well.

 8    Q.   Where are you from?

 9    A.   Originally, I'm from Windsor, Ontario.

10    Q.   And how long did you live there?

11    A.   Until about before my 18th birthday.

12    Q.   Now, while in high school, did you meet an individual by

13    the name of Khaophone Sychantha?

14    A.   Yeah, probably towards the end of high school, maybe right

15    when I was graduating.  Something like that.

16    Q.   Now, did you call him something else?

17    A.   Khao.

18    Q.   Now, would you guys -- would you consider you two being

19    friends or --

20    A.   Yep.

21    Q.   Friends.

22            Okay.  And as friends, did you spend time together?

23    A.   Yep.

24    Q.   And can you just speak up a little bit for the jury,

25    please?
```

1    A.    Sorry.

2    Q.    Now, have you two been connected ever since childhood?

3    A.    No.

4    Q.    Did you reconnect at some point?

5    A.    Since the -- I mean --

6    Q.    Since high school time, was there a period where you guys

7    weren't talking?

8    A.    I mean, I haven't talked to him in years.  But, I mean,

9    back then, we were always --

10   Q.    Back then?

11   A.    We were always talking, yeah.

12          I mean, after I met him, we were always in connect,

13   yeah.

14   Q.    Now, what activities did you do together?

15   A.    We just used hang out, party.  And, you know, I used to

16   pick up off him sometimes, like, you know, marijuana and --

17          THE COURT:  Sir, speak nice and loud, okay?

18          THE WITNESS:  Sorry.

19   BY MR. NORWOOD:

20   Q.    Can you repeat what you just said?

21   A.    I used to pick off -- pick weed from him -- pick up weed

22   from him.

23   Q.    Can you explain that to the jury, when you picked up weed

24   from him?

25   A.    I mean, I used to pick up pounds of marijuana from him.

Jury Trial - Volume 4 - 10/16/2024

1   Q.   Now, would the defendant charge you for the marijuana?

2   A.   Yep.

3   Q.   How much would he charge you?

4   A.   I can't really remember.  Maybe -- it's such a long time

5   ago.  Maybe 2,500, or something like that, per pound.

6   Q.   And $2,500, U.S. currency?

7   A.   Yeah.

8   Q.   And so, at $2,500 a pound, how much would you purchase at

9   a time?

10  A.   I don't know.  Maybe like 10 pounds, 10, 15 pounds.

11  Something like that.

12  Q.   And how did you receive the marijuana?

13  A.   Here in Michigan.

14  Q.   And did the defendant ever personally deliver it to you in

15  Michigan?

16  A.   No.

17  Q.   And how many times did you receive marijuana from the

18  defendant during that period of time?

19  A.   I can't remember.

20  Q.   Just approximate.

21  A.   A lot of times.

22  Q.   Now, what would you do with that marijuana?

23  A.   I would sell it.

24  Q.   To redistributors?

25  A.   Just to people over here.

Jury Trial - Volume 4 - 10/16/2024

1    Q.    Okay.  Now, what would you do with the profits?

2    A.    What do you mean, what would I do?  I would keep the

3    profits.

4    Q.    Would you keep the profits?  Would you share that with the

5    defendant or --

6    A.    The profits were mine.

7    Q.    Now, did you only purchase marijuana from him?

8    A.    That's all I ever purchased, other than that one time.

9    Q.    And what prompted that change?

10    A.    I was just helping out a friend.

11    Q.    And when did this take place?

12    A.    In 2005.

13    Q.    And what did you purchase?

14    A.    Ecstasy.  But it wasn't -- it wasn't for me, because I

15    never really purchased ecstasy ever in my life.  I only dealt

16    with marijuana.

17    Q.    Now, were you purchasing a specific amount of ecstasy?

18    A.    I can't remember.

19          Yeah, it was a certain amount.  I think it was -- I

20    think it was about 5,000 pills.

21    Q.    How much did the defendant charge you for that 5,000

22    pills?

23    A.    I don't -- I can't remember.  I can't remember.

24    Q.    Did this deal also include marijuana?

25    A.    I don't think so.

Jury Trial - Volume 4 - 10/16/2024

1    Q.   How was the deal set up?

2    A.   One of his drivers was coming and the person that -- I was

3    just basically linking two people up together.  Because, like I

4    said, I never, ever purchased ecstasy, ever.  I only just got

5    marijuana from him, other than that one time.

6    Q.   Now, were you the only one involved in this deal?

7    A.   No.

8    Q.   Who else was involved?

9    A.   My friend, Hammad Khan, that I was linking him up with.

10   Q.   Now, what was your role in getting this delivery?  What

11   was your role?

12        After you purchased it, what else did you do?

13   A.   I don't --

14        What do you mean?

15   Q.   So let me ask you this question.  I'll strike that one.

16        Where was the deal set to take place?

17   A.   I think it was, like, at a -- off of Southfield Freeway, I

18   think by, like, maybe Six Mile or something like that, Five

19   Mile.  At a grocery store.  It was by the -- it was some plaza-

20   type off the freeway.

21   Q.   Now, can you explain for the jury what occurred during

22   that deal?

23   A.   The police came and we were arrested.

24   Q.   So, after that, what happened?  Did you meet with agents?

25   A.   Yeah, I met with Agent Manns.

1  Q.   And when you met with Agent Manns, were you asked to make

2  calls to the defendant?

3  A.   Right.

4  Q.   And did you agree to do so?

5  A.   Right, because I didn't know what was going on.  I was

6  just like -- I thought maybe someone was, you know, but

7  whatever.

8  Q.   So let's take just a quick step back.

9        You said you were working with Hammad Khan in order

10 to get these pills?

11 A.   Right.

12 Q.   There were about 5,000 pills --

13 A.   Right.

14 Q.   -- that you were getting from the defendant?

15 A.   Right.

16 Q.   Did the defendant actually come himself and give you these

17 pills?

18 A.   No.

19 Q.   Had he ever come and given you drugs?

20 A.   No.

21 Q.   And how would you get them?

22 A.   Just through different people that he was -- that were

23 coming -- that were driving over.

24 Q.   But you knew that the defendant was your direct contact

25 and he would send other people to do --

1  A.   Correct.

2  Q.   -- his work?

3        Okay.  How familiar are you with Khao's voice?

4  A.   I'm familiar.

5  Q.   Approximately, how many times have you talked to the

6  defendant in person?

7  A.   Hundreds of times.

8  Q.   And have you talked to him on the phone?

9  A.   Yes.

10  Q.   Just as much?

11  A.   Yep.

12        MR. NORWOOD:  Your Honor, permission to play what's

13  been admitted as Government Exhibit A, along with the

14  transcript, which is Government's Exhibit B?

15        THE COURT:  Yes.

16        And again, I'm just going to read the instruction to

17  you just once today regarding the transcripts, all right?

18        You're going to hear some recordings that were

19  received into evidence and you will be given written

20  transcripts of the recordings.  Keep in mind that the

21  transcripts are not evidence.  They were given or are given to

22  you only as a guide to help you follow what was -- what is

23  being said.  Only the recordings themselves are the evidence.

24        If you notice any differences between what you hear

25  on the recordings and what you read in the transcripts, you

1   must rely on what you hear, not what you read.  And if you

2   cannot hear or understand certain parts of the recordings, you

3   must ignore the transcripts as far as those parts are

4   concerned.

5            Did everyone hear the instruction?

6            JURORS:  Yes.

7            THE COURT:  All right.  Great.

8            You may proceed.

9            MR. NORWOOD:  Thank you.

10           Playing Government's Exhibit 1A.

11           (Audio played at 9:54 a.m.)

12  BY MR. NORWOOD:

13  Q.   Mr. Malik, have you listened to Government's Exhibit 1A

14  prior to today?

15  A.   Yes.

16  Q.   And when you listened to the recordings, did you recognize

17  the voices in the recording?

18  A.   Yes.

19  Q.   Who are the voices in the recordings?

20  A.   Khao and I.

21           (Audio played at 9:54 a.m.)

22  BY MR. NORWOOD:

23  Q.   Mr. Malik, what are you talking about right there?

24  A.   Like I was saying, I was hooking up the two people and

25  then all these cops came.  So I was like -- I didn't know what

1   was going on.  Because, like I said, I never dealt with ecstasy

2   or anything.  This was my very first time.

3             (Audio played at 9:55 a.m.)

4   BY MR. NORWOOD:

5   Q.    Now, Khao is telling you that this person is cool.  What

6   did you interpret that to mean?

7   A.    Like -- like, she's -- she's a friend of his.

8   Q.    That he trusts her?

9   A.    That he trusts her, yeah.

10            (Audio played at 9:55 a.m.)

11  BY MR. NORWOOD:

12  Q.    And when you said, "You lost all your pills," what did you

13  mean?

14  A.    Because the police came with all those pills that were

15  there.

16  Q.    Why did you say, "You lost all your pills"?

17  A.    Because they were his.

18            (Audio played at 9:56 a.m.)

19            MR. NORWOOD:  Playing call number 2.

20            (Audio played at 9:57 a.m.)

21  BY MR. NORWOOD:

22  Q.    Now, when you asked him, "Was this the first time sending

23  this girl or did she come before," what were you asking him

24  there?

25  A.    I meant had she made deliveries before.

1          (Audio played at 9:57 a.m.)

2   BY MR. NORWOOD:

3   Q.   And when you said, "A daily thing, some weekly thing,"

4   what did you take that to mean?

5   A.   That she's -- she's a regular driver for him, I guess.

6          (Audio played at 9:58 a.m.)

7   BY MR. NORWOOD:

8   Q.   And when you said, "Are you sure it's not because she went

9   there, okay, like, you know," what did you think he was talking

10  about there?

11  A.   Say that again.

12  Q.   When you said, "Are you sure it's not because she went

13  there, okay, like, you know," what was he saying to you there?

14  A.   I don't know.  I'm not sure.

15         (Audio played at 9:59 a.m.)

16  BY MR. NORWOOD:

17  Q.   And when he said that she would bring the other ones over

18  for you, the trees, what is he talking about?

19  A.   The weed that I usually get from him.

20  Q.   So, typically, you'd get marijuana?

21  A.   Right.

22  Q.   This time, it was ecstasy?

23  A.   Right.

24  Q.   But he said, "She typically bring them over to you."

25         Would he send multiple people over to you?

 1   A.    Yep.

 2               (Audio played at 10:00 a.m.)

 3               MR. NORWOOD:   Playing call 3.

 4               (Audio played at 10:00 a.m.)

 5   BY MR. NORWOOD:

 6   Q.    Now, when he's telling you that this person's been doing

 7   it for half a month now, what did you think he was talking

 8   about there?

 9   A.    Delivering.

10   Q.    Delivering what?

11   A.    Whatever she brings over.

12   Q.    Bringing over drugs?

13   A.    Yeah.

14   Q.    For who?

15   A.    For whoever.

16   Q.    Who would send her?

17   A.    Oh, Khao.

18               (Audio played at 10:02 a.m.)

19   BY MR. NORWOOD:

20   Q.    And when you said, "Twenty times that she's done this for

21   him," what did you interpret that to mean?

22   A.    Bringing drugs over.

23               (Audio played at 10:02 a.m.)

24   BY MR. NORWOOD:

25   Q.    And so when you said, "Some weed, some pills," what did

1  you mean when you said some weed?  Let's start with that.

2  A.   Some marijuana.

3  Q.   And then pills, what did you mean when you said that?

4  A.   Some ecstasy.

5  Q.   Okay.

6           (Audio played at 10:03 a.m.)

7  BY MR. NORWOOD:

8  Q.   Now, after these calls took place, did you have any other

9  involvement with Khao?

10  A.   No.

11  Q.   Do you see Khao in the courtroom today?

12  A.   Yes.

13  Q.   Where is he sitting and what is he wearing?

14  A.   Right over -- right over there with the red tie.

15  Q.   Can you just speak into the mic, Mr. Malik?

16  A.   With the black suit and the red tie.

17  Q.   Okay.  And two people have a red tie.  Can you further

18  describe him?

19  A.   The Asian gentleman.

20           MR. NORWOOD:  Your Honor, I'd ask that the record to

21  reflect Mr. Malik has identified the defendant.

22           THE COURT:  It's noted.

23           MR. NORWOOD:  Your Honor, may I have a moment,

24  please?

25           THE COURT:  Sure.

44

```
 1          MR. NORWOOD:  Thank you, Mr. Malik.  No further
 2    questions at this time.
 3          THE COURT:  Questions?
 4          DEFENDANT SYCHANTHA:  Yep.
 5                    CROSS-EXAMINATION
 6    BY DEFENDANT SYCHANTHA:
 7    Q.   What did you gain from testifying today?
 8    A.   I didn't want to testify.  I was subpoenaed here.
 9    Q.   Okay.  What did you gain from cooperating with the cops,
10    to the police?
11    A.   Like I said, I didn't want to be here.  I was subpoenaed
12    here.  This is -- this is --
13    Q.   No, back in the day.
14    A.   Nothing at that time.  They still told me I was going to
15    be being charged.
16    Q.   What -- what -- what did you get charged with?
17    A.   I wasn't charged, ultimately.
18    Q.   So you bought pills -- you sold pills and you didn't get
19    charged?
20    A.   I didn't sell pills, no.
21    Q.   But over here it says --
22    A.   I sold weed.  That's what I sold.
23    Q.   Yeah, but you made an order for pills from me, you --
24    A.   Right, right.
25    Q.   And you sold them, obviously?
```

1  A.   I didn't -- I didn't sell them, because that was my first

2  time.  I was just helping -- helping you link up two people for

3  those, because --

4  Q.   But you were in the middle of selling pills.  That's why

5  you call.

6  A.   Okay.

7  Q.   What -- what did you get?  Did you go to jail or anything?

8  A.   Yeah, I did for a couple -- I think that -- yeah, for a

9  little bit, I did.

10 Q.   How long is a little bit?

11 A.   I mean, I think it was a day or two.

12 Q.   A day or two?

13 A.   Couple days, yep.

14         DEFENDANT SYCHANTHA:  Okay.  That's it, your Honor.

15         THE COURT:  Redirect?

16         MR. NORWOOD:  Briefly, your Honor.

17                      REDIRECT EXAMINATION

18 BY MR. NORWOOD:

19 Q.   So you just got asked a question by Mr. Sychantha.  Just

20 to be clear, in 2005, you made an order of pills from him?

21 A.   Correct.

22         MR. NORWOOD:  No further questions, your Honor.

23 Thank you.

24         THE COURT:  Recross?

25         DEFENDANT SYCHANTHA:  No.

1          THE COURT:  Mr. Malik, thank you very much.  You may

2    step down.

3          THE COURT:  Next witness?

4          MR. MARTIN:  Yes, your Honor.

5          Government calls Mr. Tim Anderson to the stand.

6          THE COURT:  Sir, could you give us your full name,

7    please?

8          THE WITNESS:  Timothy C. Anderson.

9          THE COURT:  And how do you spell your last name?

10         THE WITNESS:  A-N-D-E-R-S-O-N.

11         Could you raise your right hand?

12                    **TIMOTHY C. ANDERSON,**

13         being first duly sworn to tell the truth, was

14         examined and testified upon his oath as follows:

15                         -  -  -

16         THE COURT:  Please have a seat in the witness.

17         You may proceed.

18                                        (10:07 a.m.)

19                    DIRECT EXAMINATION

20   BY MR. MARTIN:

21   Q.   Good morning, Mr. Anderson.

22   A.   Good morning.

23   Q.   Could you introduce yourself to the members of the jury,

24   please?

25   A.   My name is Timothy C. Anderson, and I'm employed by the

1   DEA North Central Laboratory in Chicago, Illinois.

2   Q.   And, Mr. Anderson, where do you -- you already said where

3   you worked.

4        So, how long have you worked for that laboratory?

5   A.   I've been at the North Central Laboratory for 27 years.

6   Q.   What does the laboratory do?  And, more specifically, what

7   do you do at the laboratory?

8   A.   The DEA North Central Laboratory is a regional laboratory

9   for the DEA.  The laboratory analyzes exhibits submitted to the

10  laboratory from federal -- mostly federal agencies, mostly DEA,

11  analyzes substances for the presence or absence of controlled

12  substances.

13  Q.   And as a member of that laboratory, were there -- was

14  there some period of time where you did the actual analysis on

15  suspected controlled substances?

16  A.   Yes, I was employed as a forensic chemist and senior

17  forensic chemist between the years of 1997 and 2018.

18  Q.   What type of education did you get in order to become a

19  forensic chemist for the DEA?

20  A.   Initially, I completed a Bachelor of Science degree in

21  chemistry from the University of Wisconsin at Madison.  Upon

22  graduating from the university, I was hired by the DEA and then

23  underwent a six-month training program at the North Central

24  Laboratory.  After which point, then I began analysis of live

25  or active samples.

1    Q.   After your initial training on the scale set, I suppose,

2    of forensic chemistry, did you receive follow-on training

3    throughout your years?

4    A.   Yes, I did, both in the -- in seminars, in specialized

5    training for the particular substances that we would analyze,

6    as well as the scientific and instrumental techniques that I

7    would use in the laboratory on a yearly basis.

8    Q.   Over the course of your time as a forensic chemist, how

9    many suspected drug samples have you analyzed, if you could

10   ballpark it?

11   A.   Approximately, 5,000.

12   Q.   And have you been allowed to testify as to your opinions

13   of your analysis in court before?

14   A.   Yes, I have.

15   Q.   On how many occasions?

16   A.   Fifty-three times.

17   Q.   Any in this courthouse here?

18   A.   Yeah, several.

19   Q.   Could I ask -- or direct your attention, if you will, to

20   April of 2009?

21        Were you asked to analyze certain suspected drug

22   substances in relation to this case?

23   A.   Yes, I was.

24        MR. NORWOOD:  Your Honor, I'm showing the defendant

25   what's been previously marked and admitted as Exhibits 13, 14

1  and 15.

2          THE COURT:  Okay.  You may proceed.

3          MR. MARTIN:  May I approach?

4          THE COURT:  Yes.

5          MR. MARTIN:  Thank you, your Honor.

6  BY MR. MARTIN:

7  Q.   Mr. Anderson, I have put on the witness stand there

8  Exhibits 13, 14 and 15.  Could you take a look at those briefly

9  and look up when you're done?

10          Have you seen those exhibits before?

11  A.   Yes, I have.

12  Q.   How do you know?

13  A.   These -- each of them are a DEA evidence envelope, heat-

14  sealed at the bottom with a DEA heat-seal.  On the labels, on

15  the outside of the envelope, as well as the heat seal at the

16  bottom, my signature is on both, as well as I recognize my

17  handwriting.  And then the interior packages of all three

18  evidence envelopes have my handwriting, my initials and date

19  and case information.

20  Q.   Do those appear to be, then, the exhibits you analyzed in

21  this case?

22  A.   Yes, they are.  And they are still heat-sealed.

23  Q.   Thank you.

24          Now, did you prepare a report in conjunction with

25  your analysis of those substances?

1   A.   Yes, I did.

2   Q.   Would you have recorded at the time the substances you

3   determined them to be?

4   A.   Yes, I would have.

5   Q.   Would you also have recorded other pertinent information,

6   including net weight?

7   A.   Yes, I would.

8   Q.   And are you able to testify, to the best of your

9   recollection without the report, at least for now?

10  A.   Yes.

11  Q.   With respect to Exhibit 13, if you could just pick that

12  up, did you find the presence of any controlled substances when

13  you analyzed that suspected drug exhibit?

14  A.   Yes, I did.

15  Q.   And what was your conclusion as to the active drug

16  ingredient in Exhibit 13?

17  A.   Exhibit 13 contained N-Benzylpiperazine, also known as

18  BZP.

19  Q.   Do you mind if I call it BZP going forward?

20  A.   No, that's fine.

21  Q.   Thank you.  And you should feel free to do the same.

22  A.   Okay.

23  Q.   With respect to Exhibit 13, did you weigh it?  In other

24  words, do you get a net weight for the BZP?

25  A.   Yes, I did.

1    Q.   What was the net weight, if you recall?

2    A.   597.2 grams.

3    Q.   Turning now to Government's Exhibit 14, if you could pick

4    that up.

5              Same series of questions.

6              Did you determine that that exhibit, Exhibit 14,

7    contained controlled substances?

8    A.   Yes, I did.

9    Q.   What were they?

10   A.   In Exhibit 14, this contained

11   3,4-Methylenedioxymethamphetamine, or MDMDA, as well as BZP.

12   Q.   Now, with respect to MDMA, feel free to use that short

13   form, is there a commonly known name for that?

14   A.   Other than MDMA, ecstasy is a common street term.

15   Q.   And you said it was a combination of both the MDMA and the

16   BZP?

17   A.   That's correct.

18   Q.   Did you determine a net weight for the entire substance

19   that you tested?

20   A.   Yes, I did.

21   Q.   What was that?

22   A.   620.8 grams.

23   Q.   Now, turning to Exhibit 15, same series of questions.  If

24   you could pick that up.

25              Did you come to any conclusions based on your

Jury Trial - Volume 4 - 10/16/2024

1  analysis as to the presence of controlled substances in that

2  exhibit?

3  A.   Yes, I did.

4  Q.   What was your conclusion?

5  A.   That this Exhibit 15 contained BZP.

6  Q.   Did you also determine a net weight?

7  A.   Yes, I did.

8  Q.   What was that, sir?

9  A.   609.1 grams.

10         MR. MARTIN:  Your Honor, may I approach the witness.

11         THE COURT:  Yes.

12  BY MR. MARTIN:

13  Q.   All right.  Mr. Anderson, I just had you testify as to

14  Exhibits 13, 14 and 15.  And I'm going to ask you on what's

15  been marked for identification only at this time as

16  Government's Exhibit 70, which, for the Court's identification,

17  this is not part of the binder, your Honor.  It is meant to be

18  a demonstrative exhibit that may be used later with the Court's

19  permission.

20         THE COURT:  All right.

21  BY MR. MARTIN:

22  Q.   So what's been marked for identification, Exhibit 70, I'm

23  going to turn to the first page of this exhibit, and I'm going

24  to direct you to the left-hand column that says Government

25  Exhibit 13, 14, 15.  And then as you go across, do you see your

1   name there under chemist?

2   A.   Yes, that's correct.

3   Q.   And to be clear, the top of this document says drug types

4   slash quantities summary?

5   A.   Yes, it does.

6   Q.   Now, can you confirm that the information I have here with

7   respect to Government's Exhibit 13, 14 and 15, that we have the

8   right drug type that you've testified to?

9   A.   That's correct.

10  Q.   And can you confirm under the column for those same three

11  exhibits that the drug substance quantity in grams and pills,

12  that that is consistent on the gram side?

13  A.   Yes, that's accurate.

14  Q.   And I see in reviewing this, I did not ask you for the

15  pill count, is that correct?

16  A.   That's correct.

17  Q.   Now, based on your recollection, is that an accurate pill

18  count?

19  A.   Yes, it is.

20  Q.   All right.  And then, finally, there is not a pure meth

21  quantity with respect to your testimony, is that correct?

22  A.   That's correct.

23  Q.   We've got you indicated as the chemist here, is that

24  correct?

25  A.   Yes.

1    Q.   All right.  And that's accurate?

2    A.   Yes, it is.  All of it.

3    Q.   Thank you.

4         THE COURT:  Is this for all three exhibits or just

5    13?  I missed that.

6         MR. MARTIN:  Yes, your Honor.

7         Apologies.  Exhibit 12, 13 and 14, correct.

8         THE COURT:  We haven't talked about 12 yet.

9         MR. MARTIN:  Oh, I'm sorry, your Honor.  My mistake.

10        Thirteen, 14 and 15.

11        And, your Honor, if you'll permit, I do have another

12   copy.  I should have submitted it to the Court.

13        THE COURT:  Sure.  Thank you.

14        MR. MARTIN:  May I approach?

15        THE COURT:  Yes.

16        MR. MARTIN:  Your Honor, subject to your question,

17   those are all the questions I have for Mr. Anderson.

18        THE COURT:  All right.  You may proceed.

19                         CROSS-EXAMINATION

20   BY DEFENDANT SYCHANTHA:

21   Q.   Did you test all the pills?

22   A.   I tested a representative portion of each exhibit.

23   Q.   So you only tested a little bit of each package?

24   A.   A certain number of tablets, yes, based on statistics.

25   Q.   Yeah.  So they could be different pills, they could be

1    different amount of drugs in the pills?

2    A.   Different amount in each -- in each tablet?

3    Q.   Yeah.

4    A.   It's possible, yes.

5         DEFENDANT SYCHANTHA:  Okay.  That's all, your Honor.

6         THE COURT:  Okay.  Redirect?

7         MR. MARTIN:  Just briefly, your Honor.

8                    REDIRECT EXAMINATION

9    BY MR. MARTIN:

10   Q.   Mr. Anderson, of the approximately 4,000 pills and three

11   separate exhibits that you tested, did you find controlled

12   substances known as BZP and MDMA in those pills?

13   A.   Yes.  In the ones I tested, correct.

14        MR. MARTIN:  Thank you, Mr. Anderson.  Those are all

15   the questions we have, your Honor.

16        THE COURT:  Any further questions, sir?

17        DEFENDANT SYCHANTHA:  No, your Honor.

18        THE COURT:  Thank you very much.  You may step down.

19        THE WITNESS:  Thank you.

20        MR. MARTIN:  Your Honor, we're prepared with a new

21   witness, but we also understand the Court had a recess planned.

22        THE COURT:  At 10:30.

23        MR. MARTIN:  Thank you, your Honor.

24        So we're prepared with Ms. Carrie Gallagher.

25        THE COURT:  Okay.  Great.

56

1    Ms. Gallagher, could you give us your full name and

2  the spelling to our court reporter?

3    THE WITNESS:  Carrie Gallagher, C-A-R-R-I-E,

4  G-A-L-L-A-G-H-E-R.

5    THE COURT:  Raise your right hand.

6    **CARRIE GALLAGHER,**

7    being first duly sworn to tell the truth, was

8    examined and testified upon his oath as follows:

9    -  -  -

10    THE COURT:  Please have a seat in the witness chair.

11    You may proceed.

12    MR. MARTIN:  Thank you, your Honor.

13    (10:19 a.m.)

14    DIRECT EXAMINATION

15  BY MR. MARTIN:

16  Q.  Ms. Gallagher, could you please introduce yourself to the

17  members of the jury?

18  A.  I'm Carrie Gallagher.  I'm currently employed with the

19  Department of Defense and previously was employed by the

20  Department of Justice, formerly DEA.

21  Q.  Ms. Gallagher, I can hear you fine, but not always

22  everyone, so you can pull the microphone a little closer.

23  A.  Okay.

24  Q.  Thank you.

25    Ms. Gallagher, you mentioned you are employed

1  currently for the Department of Defense?

2  A.   Yes, sir.

3  Q.   At some point, did you then work for the DEA?

4  A.   Yes, sir.

5  Q.   Roughly, when was that?

6  A.   I worked for the DEA from 2002 to, approximately, 2009.

7  Q.   In what capacity?

8  A.   As a forensic chemist.

9  Q.   And how did you become a forensic chemist in terms of

10 education and training?

11 A.   I received my bachelor's degree in chemistry from the

12 University of Northern Iowa, and then went on to get my

13 master's degree in forensic science from the University of

14 Illinois, Chicago.

15 Q.   I see here, did you also have a Ph.D.?

16 A.   I also have my doctorate in public administration, but

17 that was after I worked at DEA.

18 Q.   Am I mis-titling you?  Are you a Dr. Gallagher?

19 A.   Yes, sir.

20 Q.   Okay.

21 A.   But I answer to anything.

22 Q.   Oh, I should be calling you ma'am.

23        So, Dr. Gallagher, I'm sorry, when you were working

24 with the DEA as a forensic chemist, approximately, how many

25 suspected drug substances did you analyze for the presence of

1  controlled substances, ballpark?

2  A.   Hundreds.  About seven years' worth, so definitely

3  hundreds.

4  Q.   During that time, what types of chemical substances did

5  you find in your analysis?

6  A.   Throughout that time, there was a gambit of substances,

7  from various types of cocaine to marijuana to methamphetamine,

8  heroin, MDMA; wide range of controlled substances.

9  Q.   When you say MDMA, are you also referring to what's

10  commonly known as ecstasy?

11  A.   Yes, sir.

12  Q.   And you may have mentioned this, but did you also, at

13  times, determine that a substance included methamphetamine?

14  A.   Yes, sir.

15  Q.   And just briefly, methamphetamine is different in chemical

16  composition than MDMA?

17  A.   Yes, sir.

18  Q.   All right.  Thank you.

19       Approximately, how many times, if you did, did you

20  test- -- or were you allowed to testify in court as to your

21  opinions as to your forensic analysis?

22  A.   I've testified in state, federal, and even military court,

23  approximately, 15 to 20 times.

24  Q.   Thank you, ma'am.

25       Let me turn your attention to work you did in this

```
 1   case.

 2            Were you asked to analyze certain suspected

 3   substances for controlled substances in May of 2005 -- I'm

 4   sorry, in September of 2005?

 5   A.   Yes, sir.

 6   Q.   All right.

 7            MR. MARTIN:  Your Honor, showing the defendant what

 8   has been marked and admitted as Government's Exhibit 36,

 9   Exhibit 37 and Exhibit 38.

10            May I approach, your Honor?

11            THE COURT:  Yes.

12   BY MR. MARTIN:

13   Q.   Ms. Gallagher, I'm going to put -- excuse me.

14   Dr. Gallagher, I'm going to put Exhibit 36, 37 and 38 on the

15   witness stand here.  If you could take a look at those exhibits

16   and look up when you're satisfied.

17            MR. MARTIN:  Your Honor, may I approach again?

18            THE COURT:  Yes.

19   BY MR. MARTIN:

20   Q.   Dr. Gallagher, if you could help me out here.  I'm looking

21   at Government's Exhibit 36.  And as part of the exhibit, there

22   is some writing on the exhibit and I'm going to point to the

23   location here.

24            Do you see what I'm pointing to?

25   A.   The location?
```

1    Q.   Yes, location.  Let's start with location.

2    A.   I don't see location.  I'm sorry.

3    Q.   Oh, okay.

4              How about violator, the name there?

5              Just the best of your pronunciation.

6    A.   Hammad Khan.

7    Q.   And is that spelled K-H-A-N?

8    A.   It appears to be.

9    Q.   And in terms of date, time of seizure, can you read out

10   loud what is marked on this exhibit?

11   A.   May 26th, 2005, at 18:30 hours, so 6:30 p.m.

12   Q.   And turning now to Exhibit 37.  Same drill here.

13             The violator indicated there is?

14   A.   Hammad Khan.

15   Q.   And the date, time of seizure?

16   A.   May 26th, 2005, at 18:30 hours.

17   Q.   And then, finally, with respect to Exhibit 38, the

18   violator indicated there?

19   A.   Hammad Khan.

20   Q.   And the date, time of seizure?

21   A.   May 26th, 2005, 18:30.

22   Q.   Thank you.

23             Now, with respect to those three exhibits, you've

24   indicated previously that you analyzed those in, approximately,

25   September 2005, is that correct?

1  A.   Yes, sir.

2  Q.   And how do you know you examined those particular

3  exhibits?  Are there markings of yours on those exhibits?

4  A.   Yes, sir.

5        I see my initials inside of the packaging, as well as

6  my signature in writing on the seal.

7  Q.   Do you recall, as you sit here today, what instruments or

8  testing procedures you have used on those particular exhibits?

9  A.   I know for certain, some.  But, admittedly, it's been

10 about 20 years.

11 Q.   Okay.  At the time, would you have followed standard DEA

12 protocols?

13 A.   Yes, sir.

14 Q.   At the time, were there particular instruments that you

15 were allowed to use?

16 A.   Yes, sir.

17 Q.   And do you have any reason to believe you did not use the

18 approved instruments?

19 A.   No, sir.

20 Q.   If we could turn to Government's Exhibit 6 -- sorry, 36,

21 and you can go ahead and pick that up if you don't mind.

22        Based on your analysis, did you come to a conclusion

23 as to whether that exhibit contained any controlled substances?

24 A.   I would have to refer to the report.

25 Q.   Few questions on that.

Jury Trial - Volume 4 - 10/16/2024

1    Did you prepare a report in conjunction with your

2  analysis of those three exhibits?

3  A.    Yes, sir.

4  Q.    At the time you prepared it, was the knowledge fresh in

5  your head?

6  A.    Yes, sir.

7  Q.    Were you recording that knowledge in the report in the

8  potentially likely event that you might have to testify even 15

9  years later?

10 A.    Yes, sir.

11 Q.    Do you have that report with you?

12 A.    I do not.

13    MR. MARTIN:  Your Honor, showing defendant what

14 should be in defendant's binder as Government's Exhibit.  21.

15 And I believe your Honor has a copy of it as well.

16    On the top of the -- 21, it's chemical analysis

17 report, dated September 6th, 2005.

18    THE COURT:  All right.  I have 21.

19    MR. MARTIN:  Your Honor, may I approach?

20    THE COURT:  Sure.

21 BY MR. MARTIN:

22 Q.    Ms. Gallagher, I'm handing you Government's Exhibit 21,

23 and that's a three-page document.

24    Do you recognize the document I've handed you?

25 A.    Yes, sir.

1   Q.   What is that, ma'am?

2   A.   This is a chemical analysis report for Exhibit 36.

3   Q.   And 37 and 38, if you flip the pages?

4   A.   Yes, sir.

5   Q.   Now, Dr. Gallagher, is that one in the same with the

6   report you prepared at some -- would have been close to 19

7   years ago?

8   A.   Yes, sir.

9        MR. MARTIN:  And with the Court's permission, may

10  Dr. Gallagher refer to that report as she testifies here today?

11       THE COURT:  Any objection?

12       DEFENDANT SYCHANTHA:  No.

13       THE COURT:  You may.

14       MR. MARTIN:  Thank you, your Honor.

15  BY MR. MARTIN:

16  Q.   Dr. Gallagher, with respect to Exhibit --

17       THE COURT:  Tell you what.  It's 10:29 right now.

18  This might be a good idea or a good place to break and give the

19  jury their morning break, okay?

20       MR. MARTIN:  Thank you, your Honor.

21       THE COURT:  Members of the jury, you're getting your

22  morning break.  It will be about 20 minutes, no more than 25

23  minutes, okay?

24       THE CLERK:  All rise for the jury.

25       (JURY OUT AT 10:29 a.m.)

1          THE CLERK:  Please be seated.

2          THE COURT:  I see that Mr. Daly's in the courtroom.

3          Mr. Daly, did you get a chance to talk to Mr. Sok?

4          MR. DALY:  No.

5          I went down at 9:05.  He was not in lockup.  I was

6    told to return at about 10:00.  I went back at 10:05.  He was

7    not there.  And I was told they have no idea when he would

8    arrive.

9          THE COURT:  Okay.  We'll figure it out.

10          All right.  Thank you.

11          MR. DALY:  Yep.

12          THE CLERK:  All rise.

13          Court is in recess.

14          (Off the record at 10:31 a.m.)

15          (Back on the record at 10:56 a.m.)

16          THE CLERK:  All rise.

17          The United States District Court is back in session.

18          Please be seated.

19          THE COURT:  Please have a seat.

20          Are we ready to continue?

21          MR. MARTIN:  Yes, your Honor.

22          Your Honor, may Dr. Gallagher resume the witness

23    stand?

24          THE COURT:  Yes.

25          Was 21 received?

1          THE CLERK:  All rise for the jury.

2          MR. MARTIN:  Received not published, your Honor.

3          THE COURT:  Received into evidence?

4          MR. MARTIN:  No, wait.  I'm sorry.

5          No, it was not received.

6          THE COURT:  Okay.

7          MR. MARTIN:  It was only a refreshing document.

8          THE COURT:  Okay.

9          (JURY IN AT 10:58 a.m.)

10          THE CLERK:  Please be seated.

11          THE COURT:  All right.  Mr. Martin, you may continue.

12          MR. MARTIN:  Thank you, your Honor.

13  BY MR. MARTIN:

14  Q.   Dr. Gallagher, I believe when we left off, we were about

15  ready to turn our attention to the three exhibits in front of

16  you.

17          And you also have, now, the report in front of you,

18  Exhibit 21, for identification, is that correct?

19  A.   Yes, sir.

20  Q.   And is this one in the same with the report that you would

21  have prepared contemporaneously or at least soon thereafter

22  analyzing those three exhibits?

23  A.   Yes, sir.

24  Q.   And if permitted by the Court, would you like to rely upon

25  that when you're testifying here today?

1    A.   Yes, please.

2             MR. MARTIN:  Your Honor, may the Court permit

3    Dr. Gallagher to use her report to assist her in testifying

4    today?

5             THE COURT:  Any objection?

6             DEFENDANT SYCHANTHA:  No, your Honor.

7             THE COURT:  All right.  She may.

8             MR. MARTIN:  Thank you, your Honor.

9    BY MR. MARTIN:

10   Q.   So turning now to -- I believe you have Exhibit 36 to the

11   far left, the physical exhibit, or am I --

12   A.   Yes.

13   Q.   Okay.  With respect to 36, you conducted an analysis of

14   the substance?

15   A.   Yes.

16   Q.   And did you determine whether or not that substance

17   included controlled substances?

18   A.   Yes, sir.

19   Q.   Did it?

20   A.   Yes, sir.

21   Q.   What were the controlled substances?

22   A.   It's MDMA and methamphetamine.

23   Q.   And MDMA, is that long for this commonly known street term

24   of ecstasy?

25   A.   Yes, sir, it's the chemical abbreviation.

1    Q.   Thank you.

2           Dr. Gallagher, with respect to the MDMA in Exhibit

3    21 -- that's wrong -- Exhibit 36, did you get a net weight for

4    that MDMA?

5    A.   Yes, sir.

6    Q.   What was that?

7    A.   The net weight was 120.3 grams.

8    Q.   Thank you.

9           And was there a pill count associated with the drug

10   substance that you've identified as MDMA?

11   A.   Yes, sir.

12   Q.   What is that number?

13   A.   501 tablets.

14   Q.   Now, turning -- the drug type, was that pure MDMA or was

15   it a combination of different controlled substances?

16   A.   This exhibit contained multiple controlled substances.

17   Q.   Could you name those, please?

18   A.   Yes, sir.  MDMA and methamphetamine.

19   Q.   I apologize.  I have to rewind a little bit.

20          With respect to the drug substance quantity, is that

21   the quantity of substance that included both MDMA and

22   methamphetamine?

23   A.   The net weight was -- yes, the weight of the tablets.

24   Q.   And aggregate?

25   A.   Yes, sir.

1  Q.   All right.  And then I just want you to focus just on the

2  methamphetamine portion of that analysis.

3         Did you determine a pure meth quantity weight?

4  A.   Yes.

5  Q.   For that exhibit?

6  A.   Yes, sir.

7  Q.   What was your determination as to the net grams of pure

8  meth?

9  A.   4.2 grams.

10 Q.   Thank you.

11        Now, I think one question I haven't asked you, are

12 you familiar with the term detectable amount?

13 A.   I'm familiar with it, but I haven't done chemistry for 19

14 years.

15 Q.   We'll pass on that question.

16        How about Exhibit 37, could you pick that exhibit up,

17 please?

18        And with respect to that exhibit, did you find any

19 controlled substances in that exhibit?

20 A.   Yes, sir.

21 Q.   What were those?

22 A.   MDMA and methamphetamine.

23 Q.   Similar to Exhibit 36?

24 A.   Yes, sir.

25 Q.   And in terms of a net weight of the substance in

1    combination of MDMA and meth, what was the gram weight that you

2    determined?

3    A.    The net weight was 15.8 grams.

4    Q.    Thank you.

5          And the number of pills associated with that weight?

6    A.    63 tablets.

7    Q.    Now, I'm going to focus you on the pure meth quantity.

8          Did you determine the pure meth quantity of that

9    exhibit, 37?

10   A.    Yes, sir.

11   Q.    What was that?

12   A.    0.38 grams.

13   Q.    So less than a gram?

14   A.    Yes, sir.

15   Q.    And you can set that down.

16         If you could pick up Exhibit 38.  Same series of

17   questions there.

18         Did you find any controlled substances in

19   Government's Exhibit 38?

20   A.    Yes, sir.

21   Q.    What were those, ma'am?

22   A.    MDMA and methamphetamine.

23   Q.    The same as the previous two exhibits?

24   A.    Yes, sir.

25   Q.    And in terms of the drug substance quantity of that

1  combined substance, did you determine a net weight for that?

2  A.   Yes, sir.  The net weight was 365.4 grams.

3  Q.   Was there a pill count associated with that?

4  A.   Yes, sir.  1,464 tablets.

5  Q.   And, again, focusing on just the pure meth quantity as

6  part of that broader substance, did you determine a net weight

7  of pure meth?

8  A.   The amount of pure meth was 10.2 grams.

9          MR. MARTIN:  Court's indulgence.

10          MR. MARTIN:  Dr. Gallagher, your Honor, those are all

11  the questions I have.

12          THE COURT:  Any questions?

13          DEFENDANT SYCHANTHA:  Yes, your Honor.

14          THE COURT:  You may proceed.

15                      CROSS-EXAMINATION

16  BY DEFENDANT SYCHANTHA:

17  Q.   How did you test the pill?  By, like, how many at a time?

18  A.   I used the standard operating procedures that we had at

19  the time, as well as there was a formula that was used.  There

20  was a certain amount of tablets that you would take a

21  representative sample.

22  Q.   So you're saying you didn't test all the pills?

23  A.   Correct.

24  Q.   Yes.

25          How -- how did you calculate the meth in each pill?

1    A.   So it's an extrapolation by the amount of tablets and a

2    purity that is found that is quantitated.

3    Q.   Would you say that it's, like, different amount of meth in

4    each pill?

5    A.   That, I can't say.

6            DEFENDANT SYCHANTHA:  That's all, your Honor.

7            THE COURT:  Okay.  Redirect?

8            MR. MARTIN:  Yes, your Honor.  Briefly.

9            May I approach the witness?

10           THE COURT:  Yes.

11                        REDIRECT EXAMINATION

12   BY MR. MARTIN:

13   Q.   Dr. Gallagher, I realized I was going to ask you to look

14   at what's been marked at for identification as Government's

15   Exhibit 70.  And I'll just direct your attention here to the

16   column that says 36, 37 and 38.

17           To the best of your knowledge and your report, if you

18   need to refer to it, are the -- is the information contained in

19   the drug type column consistent with your testimony in your

20   report?

21   A.   Yes, sir.

22   Q.   And is the information in the drug substance quantity in

23   terms of grams and pills consistent with your testimony and

24   your report?

25   A.   Yes, sir.

Jury Trial - Volume 4 - 10/16/2024

1  Q.   And the pure meth quantity in grams, is that consistent

2  with your testimony and your report?

3  A.   Yes, sir.

4  Q.   And then, finally, your name is correct?

5  A.   Yes.

6  Q.   All right.  Thank you.

7        And last, in terms of these three exhibits, without

8  having you do much math, is it fair to say somewhere around 14

9  and a half grams of pure meth in these three exhibits?

10  A.   Yes, sir.

11        MR. MARTIN:  Thank you, Dr. Gallagher.

12        THE COURT:  Recross?

13        DEFENDANT SYCHANTHA:  Yes.

14                RECROSS-EXAMINATION

15  BY DEFENDANT SYCHANTHA:

16  Q.   How much pills did you test, average?

17  A.   I don't recall.

18  Q.   Okay.  You could say that some of the pills may not have

19  methamphetamine in it, right?

20  A.   It's possible.

21        DEFENDANT SYCHANTHA:  Okay.  That's all, your Honor.

22        THE COURT:  All right.  Thank you.

23        All right.  Dr. Gallagher, thank you very much.

24        Next witness.

25        MR. MARTIN:  Your Honor, the Government calls

1   Ms. Alexandra Ambriz to the stand.

2          THE COURT:  Ms. Ambriz, could you give your full name

3   to our court reporter, nice and loud, and the spelling?

4          THE WITNESS:  Yes.

5          Alexandra Ambriz, A-L-E-X-A-N-D-R-A, last name

6   Ambriz, A-M-B-R-I-Z.

7                        **ALEXANDRA AMBRIZ,**

8          being first duly sworn to tell the truth, was

9          examined and testified upon his oath as follows:

10                          -   -   -

11         THE COURT:  Please have a seat in the witness chair.

12         You may proceed when you're ready.

13         MR. MARTIN:  Thank you, your Honor.

14         Showing defendant what has been marked, and in the

15  exhibit book, as Government Exhibit 18.  And the Court should

16  have a copy as well.

17         May I approach the witness, your Honor?

18         THE COURT:  Yes.

19                                          (11:08 a.m.)

20                      DIRECT EXAMINATION

21  BY MR. MARTIN:

22  Q.  Ms. Ambriz, would you please introduce yourself to the

23  jurors?

24  A.  Hi.  Good morning.  My name is Alexandra Ambriz.  I am a

25  senior forensic chemist with the Drug Enforcement

1  Administration in Vista, California.

2  Q.   Ms. Ambriz -- I apologize for mispronouncing your name --

3  where do you currently work, ma'am?

4  A.   In -- at the Southwest Laboratory of the DEA in Vista,

5  California.

6  Q.   How long have you worked in that laboratory?

7  A.   Since September of 2011.

8  Q.   And that is the laboratory with the DEA?

9  A.   Yes.

10  Q.   What do you do for that laboratory?

11  A.   I analyze evidence for the presence or absence of a

12  controlled substance, I write reports based on my analysis, I

13  testify in court, and I assist in the dismantling of

14  clandestine laboratories.

15  Q.   Are you also known as a forensic chemist?

16  A.   Yes.

17  Q.   What do did you do to become a -- excuse me.  Bad

18  question.

19        What was your education and training to become a

20  forensic chemist?

21  A.   I have a Bachelor's of Science in Biology from the

22  University of California Irvine, as well as taking graduate

23  courses in criminalistics, which is another term for forensic

24  science, from the California State University, Los Angeles.

25  Q.   Have you been trained as a forensic chemist?

Jury Trial - Volume 4 - 10/16/2024

1  A.   Yes, I have.  I participated in approximately six-month

2  in-house program at the DEA North Central Laboratory in

3  Chicago, Illinois, as well as basic training in Quantico,

4  Virginia.

5  Q.   Have you received ongoing training as a forensic chemist?

6  A.   Yes.  We receive training in the various instrumentation

7  that we use, as well as current trends and drugs.

8  Q.   Over the course of your long career as a forensic chemist,

9  how many exhibits of suspected controlled substances have you

10  examined, ballpark?

11  A.   Ballpark, somewhere above 5,500.

12  Q.   Have you previously been allowed to testify as to your

13  opinions on your forensic chemist conclusions in court?

14  A.   Yes, I have.

15  Q.   Approximately, how many times?

16  A.   Approximately, 32 times.

17  Q.   Okay.  Have you ever testified here in Detroit?

18  A.   I don't believe I have.

19  Q.   And in terms of your work as a forensic chemist, what

20  types of controlled substances have you encountered?

21  A.   Different types of cocaine, methamphetamine, fentanyl,

22  heroin, ecstasy, marijuana, different types of drugs.

23       MR. MARTIN:  Showing the defendant what's been marked

24  and admitted as 33.1, 33.2 and 34.

25       May I approach, your Honor?

1    THE COURT:  Yes.

2  BY MR. MARTIN:

3  Q.   Ms. Ambriz, I'm handing you Government Exhibit 33.1, 33.2

4  and 34.  I'll just put those up there for now and I'll keep

5  your report here.

6          As part of your duties with the DEA lab, were you

7  asked to analyze certain drug exhibits in the June 2009 time

8  frame related to this case?

9  A.   Yes, I was.

10 Q.   And if you could take a look at Government's Exhibit 33-1,

11 33-2 and 34, do you recognize those exhibits?

12 A.   Yes.

13 Q.   Did you analyze those exhibits?

14 A.   Yes, I did.

15 Q.   How do you know that?

16 A.   I know that by the signature -- my signature at the bottom

17 on the seal, as well as my handwriting at the bottom of the

18 seal, as well as my handwriting and my initials on the interior

19 packaging.

20          And that's on all three of them.

21 Q.   Did you use the standard processes that the DEA allows

22 with respect to instrumentality -- or, excuse me, instruments

23 that you analyzed those exhibits?

24 A.   Yes, I did.

25 Q.   Did you come to any conclusions as to whether those three

Jury Trial - Volume 4 - 10/16/2024

1    exhibits contained controlled substances?

2    A.   Yes, they do.

3    Q.   At the time that you did that analysis, did you record

4    your findings in a report?

5    A.   Yes.

6    Q.   And off to the left there, the piece of paper, is that

7    your report?

8    A.   Yes, it is.

9    Q.   Is that Government's Exhibit 18?

10          And the lower right-hand corner will have an exhibit

11   number on it.

12   A.   Yes.

13   Q.   All right.  Now, would it assist you to have reference to

14   your report while you testify here today?

15   A.   Yes.

16          MR. MARTIN:  Your Honor, permission to allow the

17   witness to refer to her report as part of her testimony?

18          THE COURT:  Any objection?

19          DEFENDANT SYCHANTHA:  No, your Honor.

20          THE COURT:  All right.  She may.

21          MR. MARTIN:  Thank you, your Honor.

22   BY MR. MARTIN:

23   Q.   Ms. Ambriz --

24          MR. MARTIN:  May I approach, your Honor, the witness?

25          THE COURT:  Yes.

1  BY MR. MARTIN:

2  Q.   I'm holding up Government Exhibit 33.1, and could I ask

3  you to just read out loud the date and time of seizure of this

4  exhibit?

5  A.   Yes.  It's January 24th, 2009, 8:00 a.m.

6  Q.   And the description?

7  A.   It says green ecstasy pills with pistol.

8  Q.   And then the seizing officer?

9  A.   Mark Koch, I believe.

10  Q.   Starts with a K and O?

11  A.   K-O, yeah.

12  Q.   And I'm handing up now 33.2.  Same information.

13       The seizing officer?

14  A.   Mark -- maybe it's Koch, K-O-C-H.

15  Q.   I know it's a little hard to read, but date and time of

16  seizure?

17  A.   January 24th, '09, as well.  I believe it says '09, but

18  it's been erased.

19  Q.   And then Government's Exhibit 34, seizing officer?

20  A.   Seizing officer, Mark, K-O-C-H, Koch.  Date and time of

21  seizure is January 24th, 2009.  It looks like it's 900 --

22  9:00 a.m.  The description is yellow ecstasy pills, elephant.

23  Q.   Okay.  A few questions on those.

24       So with respect to 33.1, do you recall what

25  controlled substance you determined that exhibit to contain?

1  A.    Yes, that exhibit contained N-Benzylpiperazine, also known

2  as BZP, 3,4-methylenedioxymethamphetamine, also known as MDMA,

3  and methamphetamine.  It also contained a couple of

4  non-controlled substances.

5  Q.    In terms of the aggregate weight of that particular drug

6  substance, did you determine a net weight?

7  A.    Yes, the net weight was 612.7 grams.

8  Q.    Now, I think you testified that that exhibit had three

9  different controlled substances, one of which was

10  methamphetamine?

11  A.    Yes.

12  Q.    Did you determine a weight for the methamphetamine?

13  A.    Yes, the methamphetamine in the exhibit weighed 10.3

14  grams, was the amount of actual drug.

15  Q.    Thank you.

16       Now, I'd like to turn to 33.- -- 33-2.  Excuse me.

17  And did that exhibit contain controlled substances?

18  A.    Yes, it did.

19  Q.    What were those?

20  A.    The BZP, MDMA and methamphetamine.

21  Q.    Similar to 33-1?

22  A.    Yes.

23  Q.    Did you determine a net weight of that substance?

24  A.    Yes, it was 621.5 grams.

25  Q.    And I should have asked you this question on the previous

Jury Trial - Volume 4 - 10/16/2024

1   exhibit, but did you have a pill count associated with 33-2?

2   A.   Yes, it's 1,998 tablets.

3          THE COURT:  You mean 33.1?

4          THE WITNESS:  33.1.  Yeah, sorry.

5   BY MR. MARTIN:

6   Q.   So the pill count for 33-1 was what again?  I'm sorry.

7   A.   1,998.

8   Q.   And now, back to 33-2, the second exhibit, what was the

9   pill count associated with that?

10  A.   1,992.

11  Q.   With respect to a pure meth quantity for 33-2, the second

12  exhibit, did you determine a net quantity of meth?

13  A.   No, I did not.

14  Q.   Why is that?

15  A.   Meth was found to be the secondary controlled substance

16  and under five percent, so no purity was determined.

17  Q.   Now, let's turn to Exhibit 34.

18          With respect to that exhibit, did you determine the

19  presence of controlled substances?

20  A.   Yes, I did.

21  Q.   What were those?

22  A.   It was BZP as well, MDMA, methamphetamine and Ketamine.

23  Q.   What was the net weight you determined for that mixed

24  substance?

25  A.   624.3 grams.

1    Q.   And the pill count?

2    A.   1,992.

3    Q.   And to be clear, there was a difference in the composition

4    of substances from 33-1 and -2 to 34?

5    A.   Yes.

6    Q.   What was the difference between the first two and the

7    third exhibit?

8    A.   The third exhibit contained Ketamine and the other two did

9    not contain Ketamine.

10   Q.   Now, back to the last exhibit, 34, that exhibit contained

11   methamphetamine, is that correct?

12   A.   That is correct.

13   Q.   Did you get a net weight of the meth?

14   A.   Yes, the amount of actual drug of methamphetamine was 9.3

15   grams.

16   Q.   Thank you.

17            And just a follow-up question --

18            MR. MARTIN:  May I approach again, your Honor?

19            THE COURT:  Yes.

20   BY MR. MARTIN:

21   Q.   I had you read out loud here a couple things, the

22   description here on 33-1, green ecstasy pills, and then it

23   said, "with pistol."

24   A.   Yes.

25   Q.   The reference "with pistol," what does that mean?

1   A.   It was the impression that's on the tablet itself.

2   Q.   Okay. In the form of a pistol?

3   A.   Yes.

4   Q.   And then on -- I'll look at, now, 34, and the description

5   I had you read out loud was yellow ecstasy pills, elephant.

6   A.   Yes.

7   Q.   And what does the reference to elephant mean?

8   A.   Again, it's the design that's on the tablet itself, image

9   of an elephant.

10         MR. MARTIN: Your Honor, may I approach once more?

11         THE COURT: Yes.

12   BY MR. MARTIN:

13   Q.   I'm showing you Government's Exhibit 70 for

14   identification, and I'll just direct your attention,

15   Ms. Ambriz, to the bottom three rows, starting with Government

16   Exhibit 33-1, going from left to right, is the information

17   correct as far as you know it in columns 2, 3 -- well, I'll

18   call it 3, 4, 5 and 6?

19   A.   Yes.

20   Q.   And now, with respect to the row marked Government Exhibit

21   33-2, is the information correct, as far as you know it, as to

22   drug type, drug substance, pure meth and chemist?

23   A.   Yes.

24   Q.   And then, finally, with respect to Government's Exhibit 34

25   row, the drug type -- and I've written in here MDMA and

```
 1  Ketamine as well -- but is that information correct across the
 2  row?
 3  A.   Yes.
 4  Q.   Thank you.
 5        MR. MARTIN:  Your Honor, those are all the questions
 6  we have at this time.
 7        THE COURT:  All right.  Very good.
 8        Cross?
 9        DEFENDANT SYCHANTHA:  Yeah.
10                    CROSS-EXAMINATION
11  BY DEFENDANT SYCHANTHA:
12  Q.   So you only tested a portion of the 30,000 pills?
13  A.   Yes.
14  Q.   Could you say that some of it don't contain meth?
15  A.   I cannot say that.
16        DEFENDANT SYCHANTHA:  Okay.  That's it, your Honor.
17        THE COURT:  Redirect?
18        MR. MARTIN:  Yes, your Honor.
19                    REDIRECT EXAMINATION
20  BY MR. MARTIN:
21  Q.   With respect to this pure meth quantity, are the
22  determinations you're making in terms of grams that you've
23  testified to, are they consistent with the scientific protocols
24  that you are using and testing the drugs?
25  A.   Yes.
```

1          MR. MARTIN:  Okay.  Thank you, your Honor.  That is

2    all.

3          THE COURT:  Any further questions?

4          DEFENDANT SYCHANTHA:  No, your Honor.

5          THE COURT:  All right.  Thank you very much.

6          Your Honor, with the Court's permission, we'd like to

7    call to the stand Dr. Heather Miller.

8          THE COURT:  Okay.

9          MR. MARTIN:  May I approach, your Honor, the stand?

10         THE COURT:  Yes.

11         Dr. Miller, could you come up, please, and give your

12   full name to our court reporter nice and loud?

13         THE WITNESS:  Heather Miller.

14         THE COURT:  And could you raise your right hand?

15                         **HEATHER MILLER,**

16         being first duly sworn to tell the truth, was

17         examined and testified upon his oath as follows:

18                            -  -  -

19         THE COURT:  Please have a seat in the witness chair.

20         THE WITNESS:  Thank you.

21                                          (11:22 a.m.)

22                       DIRECT EXAMINATION

23   BY MR. MARTIN:

24   Q.   Dr. Miller, good morning.

25   A.   Good morning.

Jury Trial - Volume 4 - 10/16/2024

1  Q.   Can you take a second and introduce yourself to the

2  members of the jury, please?

3  A.   Hi.  My name is Heather Miller.  I'm a senior forensic

4  drug chemist for the Drug Enforcement Administration in

5  Chicago, Illinois.

6  Q.   Dr. Miller, how long have you done that work?

7  A.   I've worked for the DEA for 21 years.

8  Q.   What is your current role there?

9  A.   I'm a senior forensic chemist.

10 Q.   And over the course of your 20-plus years, have you had an

11 opportunity to examine suspected drug substances for the

12 presence of controlled substances?

13 A.   Yes.

14 Q.   How many times?

15 A.   I've testified -- or I've analyzed a little more than

16 9,200 exhibits.

17 Q.   And as part of your work there, have you had an

18 opportunity from time to time to present your opinions on your

19 analysis in a court such as this?

20 A.   Yes.

21 Q.   Approximately, how many times?

22 A.   I've testified in court 61 times.

23 Q.   Have you ever testified in this building?

24 A.   Yes, I have.

25 Q.   When was the last time?

1    A.    September 10th, so last month.

2    Q.    Were you asked recently to analyze some controlled

3    substances or at least suspected controlled substances in this

4    case?

5    A.    Yes.

6    Q.    And did you prepare a report as part of your analysis?

7    A.    Yes, I did.

8           MR. MARTIN:  Your Honor, showing the defendant what's

9    been marked and admitted as Government Exhibit 12, and also

10   showing the defendant what is part of his binder, Government

11   Exhibit 49.

12          May I approach?

13          THE COURT:  Yes.

14          MR. MARTIN:  And, your Honor, this may be a

15   replacement exhibit for the Government Exhibit 49.  I'd ask the

16   Court, if the Court has a document marked as 49 and then also

17   in the upper left-hand corner U.S. Department of Justice Drug

18   Enforcement Administrations --

19          THE COURT:  I don't have a 49.

20          MR. MARTIN:  You do not?

21          May I submit one to the Court?

22          THE COURT:  Sure.

23          Thank you.

24   BY MR. MARTIN:

25   Q.    Dr. Miller, I'm handing you what's been marked for

1   identification as Government Exhibit 49.

2          Do you recognize that exhibit?

3   A.   Yes, I do.

4   Q.   What is that, ma'am?

5   A.   This is an exhibit that I analyzed and prepared a report.

6   It has my electronic digital signature on the bottom.

7   Q.   And to be clear, that report was authored in early

8   October, is that correct?

9   A.   Correct.

10  Q.   Does it indicate the date?

11  A.   Yes, it was submitted and approved on October 7th, 2024.

12  Q.   Now, I'd ask you to set that to the side for a second.

13         Could you pick up the exhibit, physical exhibit,

14  Number 12, I believe?

15  A.   Yes.

16  Q.   And do you recognize that exhibit?

17  A.   Yes, I do.

18  Q.   What is that, ma'am?

19  A.   This is an exhibit that was submitted to the laboratory

20  that I analyzed for the presence of controlled substances.  It

21  contains my handwriting, my initials along the seals, and all

22  of the inner contents as well.

23  Q.   Do your conclusions and your lab report correspond with

24  the work you did on that particular suspected drug exhibit?

25  A.   Yes, they do.

1  Q.   Did you come to a conclusion based upon your experience as

2  to whether that exhibit contains controlled substances?

3  A.   Yes.

4  Q.   What was that?

5  A.   This exhibit contains N-Benzylpiperazine, or BZP.  It also

6  contains a non-controlled substance, caffeine.

7  Q.   Now, the presence of caffeine, is that common or uncommon

8  in your experience?

9  A.   It's very common.

10         MR. MARTIN:  May I approach the witness, your Honor?

11         THE COURT:  Yes.

12  BY MR. MARTIN:

13  Q.   Take a second here.  On Government Exhibit 12, if I could

14  ask you to just read out loud certain aspects of the markings

15  here.

16         If you could start by reading out loud, the violator?

17  A.   Donte Shavers.

18  Q.   And the date, time of seizure?

19  A.   December 18th, 2008.

20  Q.   And then, finally, the description?

21  A.   Ecstasy, and then in parenthesis, it says green animal.

22  Q.   All right.  The reference to green animal, what is that a

23  reference to?

24  A.   It's a reference to the imprint in the tablets.  I thought

25  it looked like a pig personally, but it's definitely a green

1   tablet with an imprint of some kind of an animal in the tablet.

2   Q.   In your over 20 years of experience, is it uncommon to

3   have tablets with impressions on them?

4   A.   Not uncommon at all.

5   Q.   And do you have any opinion as to why they may have

6   impressions on them?

7   A.   That's not really for my -- that's not my wheel house

8   there.

9   Q.   Absolutely.

10          So turning to your analysis, which is your

11  wheelhouse, you determined there was BZP there?

12  A.   Yes.

13  Q.   Did you come up with a net weight for the BZP?

14  A.   Yes.  So the net weight -- well, the net weight of the

15  entire tablet, because I didn't conduct a purity test on this,

16  so the net weight of those tablets was 600.4 grams.

17  Q.   And a pill count associated with the tablets?

18  A.   I calculated that were -- there were 1,963 tablets.

19  Q.   Thank you.

20          MR. MARTIN:  May I approach the witness, your Honor?

21          THE COURT:  Yes.

22  BY MR. MARTIN:

23  Q.   I'm going to show you what's been marked for

24  identification only as Government Exhibit 70, and direct you to

25  this line here, the row that starts with Government Exhibit 12,

Jury Trial - Volume 4 - 10/16/2024

1   which is corresponding to drug exhibit.

2          Do you see the drug type indicated there?

3   A.   Yes.

4   Q.   Does that correspond with your findings?

5   A.   Yes, it does.

6   Q.   And that's BZP?

7   A.   Yes.

8   Q.   And in terms of the drug quantities, both in grams and

9   pills, does that correspond with your findings?

10  A.   Yes, it does.

11  Q.   And then, finally, you are the chemist?

12  A.   Yes.

13          MR. MARTIN:  All right.  Thank you.  Your Honor,

14  those are all the questions we have at this time.

15          THE COURT:  All right.  Any questions?

16          DEFENDANT SYCHANTHA:  Yes, your Honor.

17                      CROSS-EXAMINATION

18  BY DEFENDANT SYCHANTHA:

19  Q.   Did you test all the pills?

20  A.   No.  We have a sampling plan so we only test a specific

21  number of pills and then that is just extrapolated to the rest

22  of the exhibit.

23  Q.   Would you say that some of the pills may just contain

24  caffeine?

25  A.   There's no way for me to say since I did not test all of

 1   them.

 2          DEFENDANT SYCHANTHA:  Okay.  And that's all, your

 3   Honor.

 4          THE COURT:  Redirect?

 5          MR. MARTIN:  No, your Honor.  Thank you.

 6          THE COURT:  All right.  Doctor, thank you very much.

 7          THE WITNESS:  Thank you.

 8          MR. MARTIN:  Your Honor, may we approach?

 9          THE COURT:  Sure.

10          MR. NORWOOD:  Your Honor, at this point, we'd like to

11   call Mr. Sok because everyone else is contingent upon his

12   testimony.

13          THE COURT:  We're not ready for Mr. Sok.

14          MR. NORWOOD:  Okay.  We have no additional witnesses

15   before him.

16          THE COURT:  He's the only witness you wish to call?

17          MR. NORWOOD:  All of the witnesses that would be

18   called after Mr. Sok are related to the seizures that he would

19   testify about.  So we have no additional witnesses, other than

20   those after Mr. Sok.

21          THE COURT:  It's 11:30.  We're supposed to go until

22   1:00.

23          MR. NORWOOD:  I understand, your Honor.

24          THE COURT:  Members of the jury, I need to give you

25   about a 15-minute break, okay?

Jury Trial - Volume 4 - 10/16/2024

1          THE CLERK:  All rise for the jury.

2          (JURY OUT AT 11:32 a.m.)

3          THE CLERK:  You may be seated.

4          THE COURT:  So I guess we need to wait for Mr. Daly

5   to get a chance to talk to his client.

6          MR. MARTIN:  Your Honor, may I excuse myself from

7   counsel's table for a minute?

8          THE COURT:  Sure.

9          (Off the record at 11:33 a.m.)

10          (Back on the record at 11:34 a.m.)

11          THE CLERK:  All rise.

12          THE COURT:  Mr. Daly, good morning.

13          MR. DALY:  Good morning.

14          THE COURT:  So tell us, how are you going to proceed?

15          MR. DALY:  What I'd like to do -- may I enter the --

16          THE COURT:  Yes.

17          Everyone can have a seat.

18          MR. DALY:  Judge, what I'd like to do is, at some

19   point, give you a historical background to what has happened

20   before we get to the ultimate question about whether or not

21   he's going to testify, the Court's order, and the reasons why

22   he will not testify.

23          So I don't know if you want to do that in his

24   presence.  I would suggest we do that in his presence.

25          THE COURT:  Okay.

1              MR. DALY:  But that will take some time, not a great

2        deal of time.

3              THE COURT:  Okay.  So we don't know if he's going to

4        testify or not?

5              MR. DALY:  We do know.

6              THE COURT:  We do know?

7              MR. DALY:  We do know.

8              THE COURT:  Okay.

9              MR. DALY:  Yes.

10             THE COURT:  Okay.  All right.  Let me get Ms. McCoy.

11             THE CLERK:  All rise.

12             Court is in recess.

13             (Off the record at 11:36 a.m.)

14             (Back on the record at 11:48 a.m.)

15             THE CLERK:  All rise.

16             THE COURT:  So I'm not going to go to Florida.  I was

17       supposed to go to a conference next week, and so I decided I'm

18       not going to do it.  So that means I'm available for trial next

19       week.  So if we are going -- if we are still going next week,

20       we're going to add Tuesday and Wednesday as trial dates, okay?

21       Obviously, if they -- jury is in deliberations, that creates

22       another schedule, but I -- so I'm not -- I'm -- I cancelled the

23       conference, so we should be okay.

24             Before Mr. Sychantha goes back, there's an issue that

25       I want to put on the record.  We'll deal with that after we

1    hear from Mr. Daly, okay?

2              So we'll bring up Mr. Sok.

3              And, Mr. Daly, you tell me when you're ready to

4    start, okay?

5              MR. DALY:  Yes.

6              THE COURT:  I'm not rushing you.  You tell me, okay?

7              MR. DALY:  Yes.

8              THE COURT:  All right.  Just let Jen know and we'll

9    do it.

10             MR. DALY:  Thank you.

11             THE COURT:  Okay.  He's going to be brought up when

12   you're ready, Mr. Daly.

13             MR. DALY:  I'm ready to have him brought up.  Thank

14   you.

15             MR. MARTIN:  Your Honor, and I don't know if this

16   helps, but to be clearly transparent with the Court, if Mr. Sok

17   testifies, we have a few more witnesses.  If he doesn't, we'll

18   be resting.  And even with Mr. Sok's testimony, we believe --

19   well, there's a chance we wouldn't get done today, I guess, if

20   Mr. Sok testifies in terms of the Government's case in chief.

21             THE COURT:  Okay.  See how it plays out.

22             MR. MARTIN:  Yes, your Honor.  I just wanted to

23   inform the Court.

24             THE COURT:  If you think the jury is going to get

25   charged tomorrow, please have your jury instructions ready and

95

1    verdict form.  Go through them carefully.  And make sure that

2    Mr. Steingold and Mr. Sychantha have an opportunity to see them

3    as well.

4            Do you have a draft?

5            MR. NORWOOD:  Yes, your Honor.

6            THE COURT:  Then make sure they have one before you

7    go.

8            MR. STEINGOLD:  Your Honor, I have them.

9            THE COURT:  You got it?

10           MR. STEINGOLD:  They gave it to me the other day.

11           THE COURT:  Okay.  All good.

12           And we also have a letter -- note from Mr. Sychantha

13   yesterday.  I would like a docket sheet for Case Number

14   05-81165, which was provided to him this morning.

15           All right.  Have a seat.

16           And I need the Government's motion that was filed

17   last night.

18           Mr. Furtaw?

19           Oh, no.  I have it.

20           (Off the record at 11:52 a.m.)

21           (Back on the record at 11:59 a.m.)

22           THE CLERK:  All rise.

23           THE COURT:  I guess calling the matter of Mr. David

24   Sok.

25           Everyone, please have a seat.

1          MR. DALY:  Your Honor, for the record, Craig Daly on

2    behalf of Mr. Sok.

3          THE COURT:  Good afternoon.

4          MR. DALY:  Good afternoon.

5          THE COURT:  And is it Mr. Martin that's going to

6    argue?

7          MR. MARTIN:  Yes, your Honor.

8          THE COURT:  Okay.

9          MR. MARTIN:  Patrick Martin for the United States.

10          THE COURT:  Yesterday, I signed an order compelling

11    Mr. Sok's testimony in this trial, United States versus

12    K-H-A-O-P-H-O-N-E, Sychantha, S-Y-C-H-A-N-T-H-A, Case Number

13    05-81165.

14          There was supposed to be a hearing regarding this

15    issue yesterday at 1:00.  It didn't occur.  Mr. Daly was here.

16    It was adjourned to 8:30 this morning.  And, last night,

17    Mr. Daly filed a motion to quash order compelling testimony.

18    And, last night, the Government filed a motion to hold

19    compelled witness, David Sok, in contempt should he refuse to

20    testify.

21          Mr. Daly?

22          MR. DALY:  Thank you.

23          Judge --

24          THE COURT:  And your client is here, right?

25          MR. DALY:  He is.  He's in the witness chair.

1            THE COURT:  Okay.  Very good.

2            If I can, you have indicated that we'll take this

3    step-by-step.

4            THE COURT:  Right.

5            MR. DALY:  What I'd like to do is give you the

6    background circumstances of how we've gotten to this point,

7    because, I think in part, it raises important due process

8    issues, procedural due process in terms of noticing the

9    opportunities to be heard.

10            So we should go back to around May of 2023 when

11   Mr. Sok was debriefed with the Government, and that debriefing

12   lasted about three and a half hours.  It was very detailed.

13   And that debriefing was pursuant to a Kastigar letter.  The

14   Government provided a copy of that letter to you earlier today.

15            Then, on January 17th of this year, Mr. Sok pled

16   guilty and then he was sentenced.  And the judgment was entered

17   on May 31st.  And Mr. Sok is now serving time on that sentence.

18            The Government has met with Mr. Sok, in my memory, at

19   least two times, one was before he was sentenced and one was on

20   October 3rd, where they wanted to speak with him about whether

21   or not he was going to testify and what he would say.

22            At both of those occasions, Mr. Sok expressed his

23   concern about his own safety and the safety of his family.  And

24   he was concerned about his safety, both in the facility, that

25   he may be harmed if he was known as a snitch, but also upon

1    release and going back to Canada.

2        It's my recollection that at no time did Mr. Sok

3    inform the Government that he was going to refuse to testify on

4    his Fifth Amendment grounds, but he did indicate to them

5    repeatedly that he would not testify.

6        The Government then, in response, sent an application

7    and an order to the court to compel this testimony that you

8    just made reference to, Judge.  And that was sent out.  And I

9    received a copy of that on October 8th of this year.  And when

10   you review the application, which you've done, as well as the

11   order, it indicates that the Government believes that Mr. Sok

12   was going to assert his Fifth Amendment right.  And based on

13   that, they were asking for an order to compel his testimony.

14       And the order that you issued is essentially a use

15   immunity order, that -- it provides in the last paragraph that

16   whatever he testifies to can't be used to prosecute him in a

17   criminal case, except if he committed perjury.

18       So, as you indicated, there was going to be a hearing

19   yesterday at 1:00 before you issued the order, and I was

20   present, and you indicated that the hearing was being

21   cancelled.  That was at about 1:00.  And then after I left, the

22   Court issued the order.

23       THE COURT:  I think we were going to conduct the

24   hearing this morning.

25       MR. DALY:  The hearing that I'm referring to is

 1  whether or not you should issue the order itself, because the

 2  order was issued.

 3         THE COURT:  Okay.  Whether or not I should issue an

 4  order, right.

 5         MR. DALY:  Yeah.

 6         THE COURT:  I was going to find -- at 8:30 this

 7  morning, we were going to determine whether he was going to

 8  agree to testify or not.

 9         But go ahead.

10         MR. DALY:  Yes.

11         But what I'm speaking about is the issuance of the

12  order, the compulsion order itself.

13         It's my understanding that we were going to have a

14  hearing around that as to whether or not it was appropriate for

15  you to even issue the order.  That was my understanding.

16         THE COURT:  It wasn't mine.  But, again, I wish we

17  would have proceeded with the 1:00 hearing yesterday.

18         But go ahead.

19         MR. DALY:  Thank you.

20         So last night at about 8:30, then the Government

21  filed the motion, that they provided a copy to you today,

22  seeking to hold Mr. Sok in contempt if he refused to testify.

23         Shortly thereafter, at about 9:46, I filed the motion

24  to quash the compulsion order.  And I should say I didn't set

25  forth, quite frankly, every ground that I'm going to argue to

1   you in a moment about why he shouldn't be held in contempt,

2   assuming that you don't quash or revoke your order.

3        So I was told to appear today at 8:00.  I did.

4   Mr. Sok wasn't here.  And eventually, he did arrive.  And I

5   have spoken to Mr. Sok, and we reviewed what the pleadings are,

6   the history of the case, and what he would do here today.

7        So, let me say, first of all, that the first step I

8   believe for you is to determine whether or not to quash,

9   revoke, rescind the compulsion order.  Because the reason why

10  Mr. Sok is not going to testify is not based on his Fifth

11  Amendment right to refuse to testify.  And he doesn't need that

12  for two reasons.  The first is, is his right, his double

13  jeopardy right.

14       Mr. Sok has pled guilty and has been sentenced.  The

15  Government cannot prosecute him if he got on the stand and

16  testified about this case because he's been prosecuted and

17  sentenced and, therefore, he doesn't need and will not assert

18  his Fifth Amendment right against self-incrimination.

19       The importance of that is the order that you issue

20  and the application from the Government is based on his

21  assertion of his Fifth Amendment right.  He's not going to

22  assert his Fifth Amendment right and he doesn't need to because

23  of the double jeopardy provisions, number one.

24       Number two, what the Government is trying to do is to

25  violate the Kastigar letter.  The Kastigar letter said that

1   anything that Mr. Sok told them in that very extensive

2   debriefing would not be used against him in any other

3   proceeding, with some exceptions, such as perjury.

4          So that what the Government is trying to do now is

5   they're taking that information that he gave them during the

6   Kastigar hearing, and what their intent would be is to put him

7   on the stand and ask him questions about what happened in that

8   debriefing, that very extensive debriefing.  Even though they

9   promised not to do that, they're ready to engage in a breach of

10  their own agreement to compel him to testify.

11         THE COURT:  So where is that statement made in the

12  letter?

13         MR. DALY:  In the Kastigar letter itself?

14         THE COURT:  Yeah.

15         I have it right in front of me.

16         MR. DALY:  Okay.  Paragraph 7 says restrictions on

17  the use of the proffered statement.

18         THE COURT:  Okay.  Just give me a minute.

19         Where does it indicate they will not call him at the

20  trial?

21         MR. DALY:  Paragraph subsection A, "Except as

22  otherwise specified in this agreement, this office will not

23  offer any proffered statement made by you or your client in

24  this office, case in chief in any criminal prosecution of your

25  client."

 1          So one of the things they've asked for is criminal

 2   contempt, which is a form of criminal prosecution.

 3          THE COURT:  It is, but it's a separate prosecution.

 4          MR. DALY:  It's a separate prosecution.  The word

 5   "any."

 6          THE COURT:  And it says, "and prosecution of your

 7   client."

 8          MR. DALY:  Right.

 9          THE COURT:  Which would be Mr. Sok, which would not

10   be Mr. Sychantha.

11          MR. DALY:  Right.

12          But what it's saying here in this paragraph, as I

13   interpret it, is they're not going to use anything he says to

14   prosecute him in any criminal prosecution, whether it be this

15   case or a different case, it really doesn't matter.  The word

16   "any" means exactly that, any.  And that's exactly what they're

17   trying to do here, Judge.  They're trying to punish him by

18   using that information by forcing him to testify.

19          So that's -- that's the Kastigar letter.

20          THE COURT:  Okay.

21          MR. DALY:  Okay.  So the one thing that the -- well,

22   that's the first part.

23          I think you really need to decide that before we even

24   get to the question of, is he in contempt of court because he

25   violated the order?  Because our position is, set the order

1   aside, and Mr. Sok and I will be done, because he's not going

2   to assert his Fifth Amendment right, and the order was

3   improvidently issued, and then we can stop.

4           Now, if you disagree with me, then we can talk about

5   what is left, about the statute that deals with the

6   recalcitrant witness, which the Government, for whatever

7   reason, didn't refer to, which is 28 U.S.C. Section 1826, and

8   whether or not you should proceed with civil or criminal

9   contempt.

10          But we haven't got there yet, Judge.

11          THE COURT:  Okay.

12          MR. DALY:  So once you make a ruling with regards to

13  this, Judge, then I'll pick it up from there with your

14  permission.

15          THE COURT:  Ruling as to what?

16          MR. DALY:  As to whether or not you're going to hold

17  him in contempt, because he --

18          THE COURT:  Whether or not I'm going to hold him in

19  contempt if he refuses to testify?

20          MR. DALY:  Yes, which gets you to the statute, too,

21  because the statute provides that if he has just cause shown,

22  is the language under the statute, then the Court can hold him

23  in contempt.  But if he's got a valid just cause, which I've

24  given you two examples of, then he's not in contempt.

25          THE COURT:  So the examples were safety of his

1    family, his safety in the community and in the immigrant

2    community that he's from?

3            MR. DALY:  That's the factual reason, correct.

4            THE COURT:  All right.

5            MR. DALY:  The legal reasons are the other two.

6            THE COURT:  Which is kind of similar to U.S. versus

7    Farah, which I cited earlier to everyone this morning, I think

8    around 9:00.

9            MR. DALY:  I have not read the case, so --

10           THE COURT:  I saw you taking down the -- when I was

11   speaking, I saw you taking down the name of the case.

12           MR. DALY:  I was taking down notes, but I didn't read

13   it, Judge.

14           But, yes, so I don't want to keep repeating myself,

15   but I don't believe you can hold him in contempt under the

16   order that you issued.  He would have to assert his Fifth

17   Amendment right, which he's not going to do.

18           THE COURT:  I don't know.  I think the -- possibly

19   the mere fact -- and I haven't had a chance to go through what

20   the Government sent me last night and what you sent me last

21   night yet.  The issue may be not asserting any Fifth Amendment

22   right, it might be refusing to testify.

23           Is the Government asserting that he's a material

24   witness?

25           I -- you mentioned -- there's no mention of that in

1    anything you've filed that I can recall.

2              MR. MARTIN:  Yes, your Honor.

3              THE COURT:  That I've seen at least.

4              MR. MARTIN:  We haven't provided that in writing.  Of

5    course, as the Court indicated earlier today and asked the

6    Government, has he been served with the subpoena, he has been

7    served with his subpoena, which is the equivalent of a court

8    order.

9              So, aside from the compulsion order, that subpoena,

10   he's under obligation to testify here, and we would ask that

11   the Court, his having been served with that subpoena.

12   Secondly, he would have an obligation to testify pursuant to

13   that subpoena.

14             So if what Mr. Daly is arguing is that the compulsion

15   order doesn't apply, which we disagree with.  The reason we got

16   the compulsion order is because, previously, he had asserted

17   that he had a Fifth Amendment and he would assert that.  So we

18   went through the process statutorily to get the compulsion

19   order, which the Court, in our view, appropriately granted.

20   Pursuant to the statute, there are no exceptions once the

21   Government has said we are extending use immunity and they

22   apply to the court, we believe the Court appropriately issue

23   the compulsion order.

24             But if Mr. Daly is saying that doesn't apply here,

25   which we disagree with, he still has a trial subpoena under

1    which he should testify.  And we are asking that the Court hold

2    him to the Court's order via the trial subpoena to testify in

3    this case.

4              THE COURT:  Okay.  Continue, Mr. Daly.

5              MR. DALY:  The subpoena is not a court order.  It's

6    just a subpoena from a party saying you need to come to court.

7              So just to clarify that.

8              Again, it's a step-by-step thing.  If you decide that

9    he's in some form of contempt, then I think you have to go to

10   the statute, what I just cited, and determine -- and you can

11   look at Kastigar versus United States, the procedure that was

12   involved in that case, and how they resolved it.

13             And I suspect, without having read what you told me

14   to read anyhow about Judge Drain, is that the procedure that

15   they used in that case was having determined that the witness

16   was in contempt of court, that he would be held in contempt

17   until one of two things happened, he changed his mind and he

18   testified or the proceedings for which he was held in contempt

19   ended.

20             So, if you get to that point, that would be the

21   remedy that we would suggest to you under the statute, because

22   the statute is real clear, says exactly what I just said as a

23   recalcitrant witness.

24             So that's what I have to say.

25             Do you have any questions for me at this point,

1    Judge, that I might be able to answer?

2              THE COURT:  Not right now.

3              MR. DALY:  Thank you.

4              THE COURT:  Anything else, Mr. Martin?

5              MR. MARTIN:  No, your Honor.

6              Just to point out, what the Court is probably very

7    much aware of, which is every trial subpoena contains this

8    language.  It's a two -- in this instance, David Sok --

9              THE COURT:  Well, I'll say I'm very much aware of,

10   maybe not entirely accurate.  I don't recall having this

11   situation before.

12             MR. MARTIN:  It uses the --

13             THE COURT:  If I have, it's been many years.

14             MR. MARTIN:  It uses the term commanded.  And in our

15   view, that's an order from the Court via the clerk signs off on

16   it.

17             THE COURT:  Did you provide me with the subpoena?

18             MR. MARTIN:  No, your Honor.

19             We can have this printed out.

20             THE COURT:  Why don't you have it emailed to me later

21   on to Ms. McCoy?

22             MR. MARTIN:  Yes, your Honor.

23             THE COURT:  And I assume you have it, Mr. Daly?

24             MR. DALY:  It was sent to me, yes.

25             THE COURT:  Okay.  So what we're going to do, we'll

Jury Trial - Volume 4 - 10/16/2024

1    get together tomorrow around 8:30, 8:45, and I'll give you my

2    decision.

3            I just want to -- I need to read what was sent late

4    last night.  And, obviously, I didn't -- was not aware of it

5    until after we started with the trial today.  And I just want

6    to go through everything.

7            Okay.  Will that work for you, Mr. Daly?

8            MR. DALY:  Yes, I will be back, Judge.

9            THE COURT:  Okay.  Would there be an objection if I

10   asked Mr. Sok why he's refusing to testify?

11           MR. DALY:  I'm not opposed to that, Judge.

12           THE COURT:  Mr. Sok, it appears that, if called, you

13   may not be willing to testify.

14           If so, why would you be refusing to testify?

15           And could you raise your right hand?

16           (Oath administered at 12:20 p.m.)

17                        **DAVID SOK,**

18       being first duly sworn to tell the truth, was

19       examined and testified upon his oath as follows:

20                          -  -  -

21           THE COURT:  And, sir, could you give us your full

22   name, please?

23           THE WITNESS:  David Sok.

24           THE COURT:  Okay.  Do you remember the question I

25   just asked?

Jury Trial - Volume 4 - 10/16/2024

1           THE WITNESS:  What my name was?

2           THE COURT:  No.  Before that.

3           THE WITNESS:  What --

4           THE COURT:  If you're called to testify, it's my

5  understanding that you would be refusing to testify.

6           Why would you be refusing to testify?

7           THE WITNESS:  One, the double jeopardy; and two, the

8  Kastigar letter.

9           THE COURT:  Okay.  Any other reasons?

10          THE WITNESS:  My safety, my family's safety, inside

11  the facility and in the world.

12          THE COURT:  Okay.  Anything else you want to ask your

13  client right now for me to consider?

14          MR. DALY:  No, sir.

15          THE COURT:  Okay.  All right.  Thank you.

16          MR. DALY:  Thank you, Judge.

17          MR. MARTIN:  Thank you, your Honor.

18          THE CLERK:  All rise.

19          THE COURT:  We do have one other issue before we

20  break for the day, but, Mr. Daly, we're done with you.  Thank

21  you.  See you tomorrow.

22          MR. DALY:  See you tomorrow.

23          THE COURT:  There's one other issue.  I'm following

24  up with Livingston County Jail and I'm waiting for an answer,

25  okay?

1          MR. STEINGOLD:  Your Honor, are we going to resume

2     the trial?  Has the jury been excused?

3          THE COURT:  They're gone.  I let them go.

4          MR. STEINGOLD:  Okay.

5          (Off the record at 12:22 p.m.)

6          (Back on the record at 12:22 p.m.)

7          THE COURT:  Regarding the jury instructions, since

8     we're all here, why don't we just walk through the jury

9     instructions, which I think Mr. Steingold is already doing.

10         MR. STEINGOLD:  I've gone through them already.

11         THE COURT:  Okay.  Are there any objections to what's

12    been proposed for the jury instructions?

13         MR. STEINGOLD:  Your Honor, the prosecution is -- I'm

14    sorry -- the Government has indicated they're going to add

15    7.07.  And subject to my client's review of these instructions

16    with the addition of 7.07, I have no objections.

17         THE COURT:  Okay.  So is there an issue to 7.07 or

18    not?

19         MR. STEINGOLD:  No, they've agreed to put it in.

20         THE COURT:  Oh, okay.

21         MR. NORWOOD:  No issue, your Honor.

22         THE COURT:  So, right now, there's no issues.

23         MR. NORWOOD:  No, your Honor.

24         THE COURT:  And the verdict form.

25         MR. NORWOOD:  Yes, your Honor.

```
1          THE COURT:  And remember, each member of the jury
2    gets a jury instruction packet and verdict form.
3          THE CLERK:  Court is in recess.
4          (Off the record at 12:24 p.m.)
5          (Back on the record at 12:25 p.m.)
6          THE CLERK:  All rise.  Court is back in session.
7          You can be seated.
8          THE COURT:  There's a jury instruction issue?
9          MR. NORWOOD:  No issue, your Honor.  We're just
10   asking if the Court wanted us to resubmit with 7.07?
11         THE COURT:  Yeah, absolutely.
12         MR. NORWOOD:  Okay.  We will do so.
13         THE COURT:  Yeah, because we need a packet.
14         MR. NORWOOD:  That's it.
15         THE COURT:  All right.  So Mr. Sychantha made mention
16   about a discovery issue yesterday --
17         DEFENDANT SYCHANTHA:  Yes.
18         THE COURT:  -- that he didn't have access.  And his
19   statement is on the record.  And we're doing the best we can to
20   make sure he has the opportunity to review his discovery.
21         But, as always, there's two sides to every story.
22   And I would thank the Marshal service for following up today
23   with Lieutenant Asquith at the Livingston County Sheriff's
24   Department, as well as Lieutenant Pringle at the Livingston
25   County Sheriff's Department.  And I have an email from Sergeant
```

1   Neil at Livingston County Sheriff's Department in response to

2   an email our Marshals sent this morning right when

3   Mr. Sychantha brought up the issue.

4           And Sergeant Neil writes:  I spoke to Defendant

5   Sychantha during legal mail yesterday approximately 14:45 and

6   explained to him the process to request his discovery material.

7   I also offered for him if he wanted to view his discovery at

8   that time.  And he refused by saying he wanted to wait until

9   after dinner.  I'm not sure if he's -- if he's only mentioning

10  when he views it, but he should also mention when he refuses

11  it.  Dinner ends at 18:00.  However, shift change and inmate

12  count starts at 18:00.  The deputies have medical clinic

13  shortly after inmate count.  Defendant's discovery material was

14  placed in a locked classroom at 21:29.  He walked in at 21:50

15  to start viewing it.  He departed the classroom at 00:01.

16          We understand the importance of allowing the

17  defendant the ability to view his discovery.  The process has

18  been explained to him.  We document refusals, as well as viewed

19  time, for all inmates who view their discovery material.

20          Please note the defendant refused to view his

21  discovery earlier yesterday, which would have allowed him more

22  time to prepare for court today.

23          And that's the jail's response.

24          All right.  So I shall see everyone tomorrow.

25          MR. STEINGOLD:  Before 8:30?

1          THE COURT:  Yeah.  I mean, like, 8:15-ish, 8:30, you

2     know, and then 8:45, 9:00, I'll give the ruling, and then we'll

3     roll one way or another with testimony at 9:30.

4          MR. STEINGOLD:  Thank you, your Honor.

5          THE COURT:  Okay.

6          THE CLERK:  All rise.

7          Court is in recess.

8          THE COURT:  But if he doesn't -- if he refuses to

9     testify, then we need to have the jury instruction packets

10    ready to go.

11         MR. NORWOOD:  We will, your Honor.

12         THE COURT:  And take a break and go into closings,

13    would be my thought.

14         As a heads-up, it seems like he's not going to

15    testify, but we'll find out.

16         (PROCEEDINGS CONCLUDED AT 12:30 p.m.)

17                         *  *  *  *  *

18              C E R T I F I C A T I O N

19        I certify that the foregoing is a correct transcription of

20    the record of proceedings in the above-entitled matter.

21

22    **s/ April A. Kurtz, CSR-7347, RPR, FCRR        10/30/2024**
      April A. Kurtz, CSR-7347, RPR, FCRR          Date
23    Official Court Reporter

24

25