UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

**UNITED STATES OF AMERICA,**

Plaintiff,

vs. Case No. 05-81165

**KHAOPHONE SYCHANTHA,**

Defendant.

_____________________________/

**JURY TRIAL - VOLUME 6**
**BEFORE THE HONORABLE SEAN F. COX**
United States District Judge
Theodore Levin United States Courthouse
231 West Lafayette Boulevard
Detroit, Michigan
Friday, October 18, 2024

**APPEARANCES:**

**FOR THE PLAINTIFF:**

**JASON DORVAL NORWOOD**
**THOMAS PATRICK MARTIN**
United States Attorney's Office
211 W. Fort Street
Suite 2001
Detroit, Michigan 48226
313.226.9587
313.226.9168

**FOR THE DEFENDANT:**

**KHAOPHONE SYCHANTHA**
IN PRO PER
**DAVID S. STEINGOLD**
(STANDBY COUNSEL)
Law Offices of David S. Steingold, PLLC
30300 Northwestern Highway, Suite 111
Farmington Hills, Michigan 48334
313.962.0000

**APPEARANCES CONTINUED:**

**ALSO PRESENT:** Special Agent Brian Manns
Yannie Andrus - Government Assistant
Marissa Mandernach - Defense Assistant

- - -

To obtain a certified transcript, contact:
April A. Kurtz, CSR-7347, RPR, FCRR
www.transcriptorders.com

TABLE OF CONTENTS

MATTER PAGE

**Jury Trial - (Volume 6)............................ 3**

Closing Argument by Mr. Norwood..................... 6
Closing Argument by Defendant Sychantha............ 19
Closing Argument Rebuttal by Mr. Norwood........... 21
Jury Instructions.................................. 22
Jury Verdict....................................... 36

Certificate of Reporter............................ 43

Detroit, Michigan
Friday, October 18, 2024
9:03 a.m.

* * *

THE CLERK: All rise.

The United States District Court for the Eastern District of Michigan is in session. The Honorable Sean Cox presiding.

You may be seated.

The Court calls Case Number 05-81165, United States of America versus Sychantha, et al.

Counsel, can I have appearances, please?

MR. NORWOOD: Good morning, your Honor. Jason Norwood on behalf of the United States.

THE COURT: Good morning.

MR. MARTIN: Good morning, your Honor. Patrick Martin on behalf of the United States.

THE COURT: Good morning.

DEFENDANT SYCHANTHA: Good morning, your Honor. Khaophone Sychantha.

MR. STEINGOLD: Good morning, your Honor. David Steingold, advisory counsel for Mr. Sychantha.

THE COURT: Good morning. Please have a seat.

Who is giving close on behalf of the Government?

MR. NORWOOD: I am, your Honor.

THE COURT: And how much time do you need for your closing and then your rebuttal?

MR. NORWOOD: Approximately, 25, 30 minutes. And then for the rebuttal, 5 to 10 minutes.

THE COURT: Mr. Sychantha, how much time do you need to close?

DEFENDANT SYCHANTHA: I'm ready.

THE COURT: Yeah, I know. How much time?

DEFENDANT SYCHANTHA: About 5, 10 minutes.

THE COURT: Okay. Are we ready for the jury?

MR. NORWOOD: Yes, your Honor.

THE CLERK: All rise for the jury.

(JURY IN AT 9:05 a.m.)

THE CLERK: Please be seated.

THE COURT: Members of the jury, good morning.

JUROR: Good morning.

THE COURT: In a moment, we're going to start with closing arguments. On your seats, as you can see, I redid pages 45, 46, 47, and created a 47A, okay, and so that's the attachment that you have on your seats right now.

And if I recall correctly, I stopped at page 38 of the jury instructions when we broke yesterday. And after closing arguments, I will read 39 through 50 of the jury instructions to you, okay?

Everyone got it so far?

JURORS: Yes.

THE COURT: And in a moment, Mr. Norwood, on behalf of the Government, is going to give Government's closing argument. Again, in the closing arguments, the attorneys and the defendant tell you what they believe the evidence in this case has shown. And again, since the Government has the burden of proof, the law allows the Government a rebuttal argument to the defendant's closing argument, okay?

Everyone got it?

JURORS: Yes.

THE COURT: All right. You may proceed.

MR. NORWOOD: Thank you, your Honor.

Good morning, Mr. Sychantha. Good morning to the jury.

Over the course of the last several days, the Government has presented evidence of drug trafficking activities of the defendant, also known as Cal, Khao and Khaopong, between 2003 and 2011. Each of these periods could be characterized as chapters of the story, detailing the defendant's operations. Those chapters include: Chapter 1, A Background Into a Smuggling Operation; Chapter 2, Moving Marijuana; Chapter 3, One and Done, A Deal for Pills; Chapter 4, Co-Workers and Co-Conspirators; Chapter 5, A Heavy Load Headed to Detroit; and Chapter 6, A Friend and Partner in Crime.

Let's walk through each one.

In Chapter 1, A Background into a Smuggling Operation, the Government provided testimony from Agent Christensen. He testified that leaders would recruit couriers that were often young, and students, due to their frequency of crossing the border. He also testified that they would start with smaller responsibilities. But, over time, after they gained the confidence of the leaders, their loads would increase.

And he testified about dirty pills. And he said that they were dirty because they often included more than one illegal controlled substance. And he testified about the retail value of these dirty pills, approximately 15 to $20. And when asked a question about a hypothetical question of 100,000 pills in a load, he said it would be worth 1.5 million dollars.

He also testified about bulk cash that's associated with these deals and how that would cross the U.S./Canadian border. And he testified about the type of vehicles that would be used, because they had specific areas in their panels and in their front bumpers to fit the sizable load.

And finally, he testified that leaders don't cross the border themselves, their couriers do, in order to protect their identity.

In Chapter 2, Moving Marijuana, the Government

presented testimony from Tammy Thompson. Tammy testified that she would cross over the border to Windsor to meet the defendant and that she would go two to four times a month to get heavy loads of marijuana until February 3rd, 2004, when she was caught by law enforcement attempting to cross the border.

She testified that, on that day, she was stopped by law enforcement and they found over eight pounds of marijuana in her vehicle that was the defendant's.

And then you heard from Inspector Vaughn, who testified as part of the seizure team. And Tammy identified the defendant in court.

In Chapter 3, One and Done, A Deal for Pills, the Government presented testimony from Asad Malik. He testified that he would receive marijuana from the defendant and that he would go and he would speak to the defendant on the phone, and the defendant would send somebody to him, and he would deliver this marijuana that he would sell for redistribution in the Detroit metropolitan area for thousands of dollars per pound.

But, on the last deal, he ordered 5,000 dirty pills, and the defendant had that delivered to him, and he was caught on May the 26th, 2005, by law enforcement. And at that time, he agreed to cooperate. And as a part of his cooperation, he agreed to make recorded phone calls with the defendant.

And here's a picture of some of those 5,000 dirty pills.

During his testimony, he identified the defendant by face and by voice in the recordings that we played in court.

And Agent Manns testified about seizing these 5,000 dirty pills and how he reported the phone calls between the defendant and Asad Malik, including this one.

(Phone call played at 9:12 a.m.)

MR. NORWOOD: Through this recording, the defendant told you a few things. He told you that he sent this individual as a daily thing, a weekly thing, to bring his pills, his dirty pills, and drugs across the U.S./Canadian border. He also distinguished, through his words, the other ones, implying that there was another thing that was delivered that time, to Asad Malik that he was caught with. And he also mentioned trees, referring to marijuana, as Asad Malik told you.

When Asad was talking to him, he vouched for this individual, saying she went there okay. She went there okay, because he had sent her, and he confirmed that on this recording.

In Chapter 4, Co-Workers and Co-Conspirators, you heard from a group of individuals that worked together at Bahama Breeze together, and they also worked as couriers for the defendant.

First, you heard from Ron Quizon, who met the defendant through his girlfriend's brother. He testified that

the defendant told him to deliver his money from his proceeds of sales that he had in Detroit. And so Ron would cross the border with ten thousands of his dollars and he would deliver them to the defendant. And Ron also testified that he allowed the defendant to use his garage to store these dirty pills.

And so the defendant would call him and then they would show up with these pills in large Ziploc bags. And he helped them unload these pills out of the vehicles on several occasions. And he testified that there were thousands of pills at a time.

And in June 2008, while attempting to cross the border to give the defendant his money, he was caught with over 10,000 of the defendant's money. Ron, during his testimony, identified the defendant in court. He also identified John Tetreau and Mamie Arterberry. He said that this individual came to his house four to five times and gave him the defendant's money for him to deliver.

Next, you heard from John Tetreau. Ron said that he met this individual at work. And he introduced him to the defendant. And John embraced that role in working for the defendant, transporting thousands of pills and thousands of dollars across the U.S./Canadian border.

John testified that Richard and Mamie Arterberry ran the central hub of the defendant's operation in Detroit and that he frequently worked with them in order to fulfill the

defendant's operation.

He also testified that he introduced his childhood friend, Loren Pennington Oman, to the defendant, and that he purchased a car for her that had specific areas in it, in its panels and in its bumper to fit these pills, and that she had to work this car off. That's what she told you. She had to work this car off in order to work for the defendant so that she had a place -- a car to drive.

And Loren testified that she would go to the defendant's house, the defendant would tell her what to do, and Dave and Khao would always be at every location, whether it was at the house that he had in Windsor on Grandview or if it was at the other house. Cal and Dave were always the constants that were there. And the defendant would tell her what to do and give her spending money as compensation for what she was doing. And that was until October the 24th of 2008, when she was caught at the border with over nine pounds of the defendant's marijuana.

And at that point, she was caught and she agreed to work with law enforcement. And so she agreed to wear a wire. And she met with John Tetreau, and they had this conversation on November the 3rd.

(Phone call played at 9:17 a.m.)

MR. NORWOOD: In this recording, you can hear talking Loren talking about Cal and Dave, Cal and Dave multiple times.

And she testified that Cal was the defendant, the individual who was leading the operation, in her view, based on all the interactions she had with him.

And that was consistent with what John said. John said Cal and Dave would work together and that Dave was the mechanic who would put the drugs in the car and Cal was the one who was giving the orders.

You also heard from Officer Wolentarski, who was a part of the seizure team, on October 4th, 2008.

And you heard from Officer Oakley, who testified about a couple of incidents. He testified about the seizure of marijuana from Loren and Jacob. And then he also testified about the January 24th pickup of 30,000 of these dirty pills. Loren and Jacob testified that they received these pills from the defendant and there was a recipient in Boston that they were supposed to take them to. And so Loren worked with law enforcement and was watched as a control delivery to deliver these pills to this individual in Boston.

And Officer Oakley was involved in that as well.

On January 24th, 2009, law enforcement seized these pills that were delivered and ordered by the defendant. And there were 30,000 pills packed into this Huggies box.

And then Officer Koch testified that he was on the transport team for Loren and her boyfriend Jacob to take them to Boston to execute this control operation, which was

successful. And in Boston, the alleged recipient, the intended recipient, was caught.

During Loren's testimony, she identified the defendant, she identified David Sok, and she identified John Tetreau, her childhood friend. And John identified the defendant, David Sok, Ron Quizon, Mamie Arterberry, Richard Arterberry and Loren.

In Chapter 5, A Heavy Load Headed to Detroit, the Government presented testimony from Donte Shavers. He told you that Mamie Arterberry was his cousin, and that Mamie introduced him to the defendant, and the defendant asked him if he wanted to make some money. And he agreed to do so.

And so Donte Shavers worked with the defendant. And on his first load, because of the relationship he had with Mamie and Richard, he had about 30 to 50,000 pills. And he said that he would go to the defendant's house every time. Dave would load the vehicle in the panels and in the other parts of the vehicle and he would bring it across the border to his uncle, Richard Arterberry, and then they would unload the vehicle themselves for redistribution throughout the Detroit Metropolitan area.

And on December the 18th of 2008, while attempting to cross the border, Donte Shavers was stopped, and he was stopped with over 100,000 of the defendant's dirty pills.

The first picture on the top shows the pills that are

lined up in the panels of the vehicle and then the bottom two pictures show the significant weight of this heavy load.

And Officer Wolentarski also testified about his role in seizing these 100,000 pills.

Inspector Bertram testified. He testified that he saw the defendant's vehicle and Shavers' vehicle together in Canada before Donte Shavers crossed the border.

During his testimony, he identified the defendant, David Sok, his cousin, Mamie Arterberry, and his uncle, Richard Arterberry.

In Chapter 6, A Friend and Partner in Crime, through the testimony of Donte Shavers, Loren Pennington Oman and John Tetreau, they identified Dave, several times, saying that he was the right-hand man of Cal. John and Donte described his role as a mechanic in taking off the tires and the tire wells and the panels and loading these vehicles every time for the defendant.

The final chapter of the defendant's drug trafficking operation is "This Trial." In this -- in this timeline, it shows the significant loads and weights that the defendant was involved in. The February 2003 -- February 3rd, 2004, seizure of marijuana from Tammy Thompson, the seizure of 5,000 dirty pills from Asad Malik and the phone calls where the defendant tells you about his operation. Ron Quizon, who is there on the bottom, who was caught with over $10,000 of the defendant's

money, the Oman seizure of marijuana, over nine pounds of marijuana on October the 24th, 2008, the pill pickup of those 30,000 dirty pills on January 26th, 2009, and the Donte seizure of over 100,000 dirty pills on December 18th, 2008.

John Tetreau, Donte Shavers, Loren Pennington Oman, Ron Quizon, Tammy Thompson and Asad Malik, all described the defendant as the point person, the person who led and told people what to do when they were there, the person who would send individuals across the border, the person that they would meet with to give him his money, the person who would fill the cars by telling individuals what to do. Every single one of those individuals said that the defendant, Khaophone Sychantha, whether it was by Khao, Khaopong or Cal, was the individual who was running the operation, placing him at the top of the hierarchy.

So let's look at the counts for a moment. And I know there's a lot of words here, but we're going to walk through each part, and this is just a portion.

First, that beginning on or about May the 3rd, 2003, and continuing throughout on or about January of 2011, the defendant, together with others known and unknown, did knowingly, intentionally and unlawfully combine, conspire, confederate and agree to possess with the intent to distribute controlled substances.

And there's four controlled substances here. Well,

three, but we'll talk about the distinctions in a moment.

The first one is a substance containing a detectable amount of Benzylpiperazine, also known as BZP.

The second is 500 grams or more of a detectable amount of methamphetamine, and then there's five grams or more of methamphetamine.

And we'll talk about the distinctions between those two in a second.

And then a substance containing a detectable amount of methylenedioxymethamphetamine, also known as MDMA and ecstasy.

And second, the defendant knowingly and voluntarily joined the conspiracy.

Now, looking at this drug chart, what we have is, aside Malik's seizure, 5,000 pills. And you heard from the -- you heard from Carrie Gallagher, who is a forensic chemist. And she told you -- Dr. Gallagher told you that she tested these pills and what she found was MDMA and meth in all of these pills that she tested and what the quantities were -- and I'll do the math in a moment, was 120, 15.8 and 365.4. That's the entire weight.

So, all of that, a detectable amount -- of an amount containing a detectable amount of methamphetamine, you look at all the quantity. You look at all the quantity to determine that.

And in that second column that's circled here, you see the pure weight of methamphetamine. And in the ones that she tested, it was 4.2, .38 and 10.2. So that's the pure weight. But that first column is the amount, the detectable amount that contains meth.

And then you look down to the 100,000, Donte Shavers' seizure with the defendant. And it talks about Benzylpiperazine.

And this adds up the numbers on this slide.

And so when you look at it, you have 501.5 grams of a substance containing methamphetamine and MDMA, but about 14.7 grams of pure methamphetamine. And that's the distinction that is in Count One in that jury instruction.

And then you have December 18th, 2008, that has 2,427.5 grams of a substance containing BZP and then 620.8 grams containing MDMA. And that was tested by Forensic Chemist Heather Miller.

And then you have the Boston controlled operation, those 30,000 dirty pills, and those contained 1,858.5 grams of a substance that had MDMA, meth and BZP. The entire sub- -- the entire amount of the substance contained all of those things: Methamphetamine, MDMA and BZP. And then that pure amount is 19.6 grams of pure methamphetamine.

And then Count Two, this deals with the Donte Shavers' seizure of 100,000 pills. First, on or about December

18th, 2008, the defendant knowingly possessed a controlled substance, specifically BZP, and there's no quantity. That's for that. That's just a substance containing BZP. And then a substance containing MDMA. No quantity specified there either.

And second, the defendant intended to distribute these controlled substances.

And then Count Three is identical to Count Two, but it deals with the Boston controlled operation. And it talks about, first, on or about January 26, 2009, the defendant knowingly possessed a controlled substance specifically, and all four are listed here: BZP, no quantity specified, 500 grams or more of a substance containing methamphetamine, five grams or more of methamphetamine, that pure amount that we were talking about, and then a substance containing MDMA. No amount required for that, but there needs to be the substance found.

And second, the defendant intended to distribute these controlled substances. And that's the total amount with meth, MDMA and BZP again, and then the pure amount.

So how does this story end?

Over the course of this trial, the Government has presented testimony from several individuals who worked for the defendant to further his cause. The Government also presented testimony from several individuals in law enforcement that worked for years to uncover his operation. For eight years, the defendant worked. And there was also those recordings with

Asad Malik, where the defendant told you how he ran his scheme. In his own voice, he told you.

And so, at this point, at the end of the chapters of the story of the defendant, it's now your decision to make.

His cause, his operation, his voice, his scheme.

And based on the evidence presented in this trial, the Government asks you to take a look at that, take a look at it, and look at the individuals who testified, look at the law enforcement who testified, and look at the evidence that's before you, and that you insert the final pages of the chapter in your verdict forms, and that you find the defendant guilty of Count One, conspiracy of possession with the intent to distribute a controlled substance; Count Two, possession with the intent to distribute a controlled substance from that Donte Shavers' seizure; and Count Three, from the January 26 controlled operation, possession with the intent to distribute controlled substances.

Thank you.

THE COURT: Sir, do you wish to give a closing argument?

DEFENDANT SYCHANTHA: Yes.

THE COURT: You may proceed when you're ready.

DEFENDANT SYCHANTHA: Okay. The Court don't want the jury to know that I was kidnapped from Canada without an extradition hearing.

THE COURT: Okay. That's --

No.

DEFENDANT SYCHANTHA: That's my defense. That's --

THE COURT: No.

Your closing argument, with all due respect, needs to deal with the evidence that the jury has seen during the course of this trial, what you believe the evidence has shown to the jury.

There's absolutely no evidence about a kidnapping.

DEFENDANT SYCHANTHA: The case was --

THE COURT: Nope, nope, nope, nope.

DEFENDANT SYCHANTHA: Okay. This case is 21 years old. This is a violation of my due process right and my speedy trial right. None of the --

THE COURT: Your due process and speedy trial is not an issue in this case.

DEFENDANT SYCHANTHA: Okay. None of the witnesses recall -- recall nothing about this case because the case is 21 years old. My Constitution right has been violated over and over in this case.

THE COURT: I -- no constitutional rights are at issue.

DEFENDANT SYCHANTHA: Okay.

And I never been in the U.S. ever in my life. That's why the Government don't have extradition warrant for my

arrest.

THE COURT: Warrants, extradition, that is not an issue in this case.

DEFENDANT SYCHANTHA: (Inaudible) Canadian citizen.

THE COURT: You're to disregard those remarks.

Did you hear what I said?

JURORS: Yes.

THE COURT: Will you do so?

JURORS: Yes.

DEFENDANT SYCHANTHA: Okay. Just -- that's it then.

That's it, your Honor.

THE COURT: Feel free to give a closing argument, but it needs to be based upon the evidence presented, okay?

Sir, anything further?

DEFENDANT SYCHANTHA: No.

THE COURT: Rebuttal?

MR. NORWOOD: Your Honor, just briefly.

THE COURT: Remember, it needs to be within the scope of the defendant's closing.

MR. NORWOOD: Yes, your Honor. I'll be very brief.

The defendant said that he had never been in the United States due to these pills. But through the testimony of individuals that worked with him and did his traveling for him, those are the individuals that came before you and testified.

And so, based on those things, the defendant says

that he didn't come, and that's what he intended. He intended those individuals to do his dirty work, to get caught, but what he did not intend was those individuals to come to this trial and testify about what he told them to do.

Thank you, your Honor.

THE COURT: Thank you, Mr. Norwood.

All right. Members of the jury, do you have your jury instruction packet?

And please turn to page 39.

I read to you, yesterday, the part of the instruction explaining the rules considering some of the testimony and evidence. And, of course, you have heard the closing arguments now of the Government and the defendant.

Now, let me finish up by explaining some things about your deliberations in the jury room and your possible verdicts.

The first thing you should do in a jury room is to choose someone to be your foreperson. Again, that person will manage and guide your discussions and will speak for you here in court.

Once you start deliberating, do not talk to the jury officer, or to me, or to anyone else, except each other, about the case.

If you have any questions or messages, you must write them down on a piece of paper, sign them, and then give them to the jury officer. The officer will give the -- will give them

to me and I will respond as soon as I can. I may have to talk to the lawyers or the defendant about what you have asked, so it may take me some time to get back to you.

Any questions or messages normally should be sent through your foreperson to me.

Again, if you want to see any or all the exhibits that were admitted into evidence, just send me a message and those exhibits will be provided to you.

Page 40.

One more thing about messages. Do not ever write down or tell anyone, including me, how your -- how you stand on your votes. For example, do not write down or tell anyone that you are split.

Your verdict, whether it is guilty or not guilty, must be unanimous. To find the defendant guilty, every one of you must agree that the Government has overcome the presumption of innocence with evidence that proves his guilt beyond a reasonable doubt.

To find him not guilty, everyone must -- every one of you must agree that the Government has failed to convince you beyond a reasonable doubt that he is guilty.

Either way, guilty or not guilty, your verdict must be unanimous.

Now, once I complete with the jury instructions, you go into the jury room. You are free to talk about the case in

the jury room. In fact, it is your duty to talk with each other about the evidence and to make every reasonable effort you can to reach a unanimous agreement. Talk with each other and listen carefully and respectfully to each other's views. And keep an open mind as you listen to what your jurors have to say. Try your best to work out your differences. Do not hesitate to change your mind if you are convinced that other jurors are right and that your original position was wrong. But do not ever change your mind just because other jurors see things differently or just to get the case over with.

In the end, your vote must be your own -- sorry -- in the end, your vote must be exactly that, your own vote.

It is important for you to reach unanimous agreement, but only if you can do so honestly and in good conditions. No one will be allowed to hear your discussions in the jury room and no record will be made of what you say, so you should feel to speak your minds.

Listen carefully to what the other jurors have to say and then decide for yourself if the Government has proved the defendant guilty beyond a reasonable doubt.

Page 43, punishment.

If you decide that the Government has proved the defendant guilty, then it will be my job to decide what the appropriate punishment should be. Deciding what the punishment should be is my job, not yours. It would violate your oaths as

jurors to even consider the possible punishment in deciding your verdict. Your job is to look at the evidence and decide if the Government has proved the defendant guilty beyond a reasonable doubt.

So what I'm going to do is I'm going to cover 45 -- pages 45, 46, 47, 47A at the very end of the jury instructions, okay?

So I'm going to jump over now to page 48.

The verdict limited to charges against the -- this defendant. Remember that the defendant is only on trial for the particular crimes charged in the indictment. Your job is limited to deciding whether the Government had proved that crime or those crimes charged.

Page 49, Court has no opinion.

Let me finish up by repeating something that I said to you earlier. Nothing I have said or done during this trial was meant to influence your decision in any way. You decide for yourselves if the Government has proved the defendant guilty beyond a reasonable doubt.

Juror notes, page 50.

Remember that if you've elected to take notes during the trial, your notes should be used only as memory aids. You should not give your notes greater weight than your independent recollection of the evidence. You should rely upon your own independent recollection of the evidence or lack of evidence,

and you should not be unduly influenced by the notes of other jurors. Notes are not entitled to any more weight than the memory or impression of each juror. Whether you took notes or not, each of you must form and express your own opinion as to the facts of this case.

Okay. All right. Are we at the verdict form?

Now, juror numbers are -- so this will be the verdict form that will be given to your foreperson, all right? And it's page 1, page 2, page 3, page 4.

So I'm just going to correspond to what you have in your jury instruction packet, but this is what the actual verdict form will look like, okay?

All of you have copies of the verdict form.

So the three charges, three counts, right?

Count One is the charge -- Count One of the indictment charges the defendant with conspiracy to possess with intent to distribute or to distribute a controlled substance.

Under question one, you have two options. You will make one decision. Your options are not guilty or guilty.

Everyone understand?

JURORS: Yes.

THE COURT: Then, moving down, if you answered guilty in response to question 1, proceed to question 1A.

If you answered not guilty in response to question 1,

then you will proceed to Count Two.

All right. Everyone got it?

If you answer guilty in response to question 1, you will proceed to 1A.

If your answer is not guilty, then you jump to Count One, okay?

Let's look at 1A.

Question 1A, with respect to Count One, did the offense involve at least 500 grams of a substance containing a detectable amount of meth?

Okay. You have two options. Again, yes or no. If you answer yes to question 1 -- sorry, 1A, then skip question 1B and proceed to question 1C.

If you answer no to question 1A, then proceed to 1B, all right?

And question 1B, with respect to Count One, did the offense involve at least 50 -- at least 50, but not more than 50, grams of a detectable -- sorry, of a substance -- containing a detectable amount of meth?

Again, two options, yes or no. You make one decision.

Everyone with me so a far?

JURORS: Yes.

THE COURT: And then, again, regardless of your answer, proceed to question 1C.

Question 1C, with respect to Count One, did the offense involve at least five grams of pure meth?

Again, two options, one decision, yes or no.

Everyone good?

JURORS: Yes.

THE COURT: Count Two, with respect to the charge in Count Two of the indictment, which charges the defendant with possession with intent to distribute a controlled substance, we find -- we, the jury, find the defendant -- again, two options, one decision. It's either going to be not guilty or guilty.

Everyone good so far?

JURORS: Yes.

THE COURT: Then, we jump to Count Three, and that's on page 3 of the foreperson's verdict form.

Question 3, with respect to the charge in Count Three of the indictment, which charges the defendant with possession with intent to distribute a controlled substance, we, the jury, find the defendant either -- again, not guilty or guilty. Two options, one decision.

And this kind of tracks again with the form as to Count One.

Question 3A, with respect to Count Three, did the offense involve at least 500 grams of a substance containing a detectable amount of meth? Again, yes or no.

If you answer yes to question 3A, you will skip 3B

and proceed to question C.

If you answer no to 3A, then you will proceed to question 3B.

3B, with respect to Count Three, did the offense involve at least 50, but not more than 500, grams of a substance containing a detectable amount of meth?

Again, yes or no.

Again, regardless of your answer, you will proceed to 3C.

With respect to Count Three, did the offense involve at least five grams of pure meth?

Again, yes or no.

When you've made your decision, when you've reached your verdict, your foreperson will sign it in ink, not pencil, ink, and date it, and then knock on the door and give us a note indicating that you have reached a verdict.

Everyone understand the process?

JURORS: Yes.

THE COURT: Is the Government satisfied with the reading of the jury instructions, as well as the review of the verdict form?

MR. NORWOOD: Yes, your Honor.

THE COURT: Defense?

DEFENDANT SYCHANTHA: Yes.

THE COURT: Now -- oh, I forgot something.

Alex, hand me the packet there.

So, when you select your foreperson, all right? -- and this is a packet for the foreperson. It is the complete jury instruction packet. It is an exhibit list and as well as a -- as well as the verdict form, which I just reviewed with you, okay?

So this goes to the foreperson.

And, right now, we are going to have only 12 deliberate, and we have 13. And unfortunately for Mr. Menge, you're the alternate, so you won't be deliberating. Should something happen during the course of the trial and one of the jurors is unavailable, we will be calling you back in to deliberate. But I'm going to have everybody go in a moment.

I'm going to have the 12 go in the jury room, start deliberations, and you and I will have a chat in a little bit, too, okay?

Okay. Mr. Furtaw and Ms. McCoy, raise your right hand.

(Oath administered at 9:50 a.m.)

THE COURT: Members of the jury, you are to start your deliberations. Again, after you have selected your foreperson, then we will give you your notes and your jury instruction packet. And again, the foreperson --

So the jury can start your deliberations.

First duty, first obligation is to select your

foreperson. Don't rush. Take your time. It's a very important role because the foreperson manages your discussions.

And, of course, if you want any or all the exhibits that have been admitted into evidence, just ask for them.

With respect to any drugs that were admitted into evidence, again, a court officer will be taking them into the jury room, show them to you, and then when you're done looking at them, the officer will take them back out here, okay?

All right. You may start.

THE CLERK: All rise for the jury.

(JURY OUT AT 9:51 a.m.)

THE CLERK: Please be seated.

THE COURT: Stick around for the first 10 minutes, okay?

So we're going to let you go, okay? Like I indicated to you earlier, and it's happened during the course of my career as a judge, on certainly more than one occasion where a juror becomes sick or unavailable to continue to deliberate and we had to bring in one of the alternates to come in and take over and participate in the jury discussions.

So what that means is you still can't discuss the case.

JUROR: Okay.

THE COURT: Okay. And what I'd ask is that at the end of every day, or, actually, the beginning of every day or

in the morning, whatever.

THE CLERK: In the morning.

THE COURT: Why don't you give us a call at, like, 9:00 in the morning and ask whether or not -- you know, if the jury is still deliberating. And if it is still deliberating, then, obviously, you can't talk about the case. But if it's -- if they've reached the verdict, we'll tell you what the verdict was, and then you can discuss your experience with anybody.

JUROR: All right. Do I call the number on your card?

THE CLERK: Yes.

Do you still have that?

DEFENDANT SYCHANTHA: Yes.

THE COURT: I should know the answer to this question.

So does he need to go to the fifth floor or not?

THE CLERK: He does, yes.

THE COURT: Okay. So go to the fifth floor, let them know that the jury is deliberating and you're an alternate and you're free to go, okay?

JUROR: Okay.

THE COURT: We greatly appreciate your participation. I'm sure you're disappointed, because once you've sat through a trial, you do want to get in and deliberate.

JUROR: No problem. Thank you. Have a great day.

THE COURT: Okay. Have a great weekend.

THE CLERK: Court is in recess.

(Off the record at 9:55 a.m.)

(Back on the record at 9:59 a.m.)

THE COURT: They have a foreperson, all right?

So we're going to hand them the packet, all right?

MR. NORWOOD: Thank you, your Honor.

(Off the record at 9:59 a.m.)

(Back on the record at 11:16 a.m.)

THE CLERK: The United States District Court for the Eastern District of Michigan is back in session and it recalls Case Number 05-81165, United States of America versus Sychantha, et al.

THE COURT: We have a note from the jury, which I've shared with everybody, that the jury is requesting Exhibits 10, 11, 12, 13, 14, 15 and 16, which we have pulled.

Of course, those exhibits are, I think, all the drugs that were admitted into evidence.

MR. MANNS: They're a portion, your Honor.

THE COURT: Okay. Great.

And so what we're going to do, as I understand is agreeable to everybody, two CSOs are going to take the drugs into the jury room, allow -- wear gloves and allow the jury to look at them, look at it only, all right?

Is that agreeable to everybody?

MR. NORWOOD: It is, your Honor.

MR. STEINGOLD: Yes, your Honor.

DEFENDANT SYCHANTHA: Yes.

THE COURT: And then when they're done, bring them out, okay?

CSO: We'll put them in order as well.

THE COURT: That will be fantastic.

MR. STEINGOLD: Just so we're clear, they're not going to be answering any questions, they're just --

THE COURT: Right. No.

If they -- any communications has to be written down and given to me.

CSO: Yes, sir.

THE COURT: Thank you very much.

(Off the record at 11:17 a.m.)

(Back on the record at 11:32 a.m.)

THE COURT: So we have another request from the jury, Exhibits 33-1, 33-2, 34, 46, 37, 37.

That's the rest of the remaining drugs.

MR. NORWOOD: The rest of the pills, your Honor, yes.

THE COURT: Any objection if the CSOs take those exhibits back?

MR. NORWOOD: No objection, your Honor.

DEFENDANT SYCHANTHA: No.

THE COURT: And same procedure as the last time.

Thank you very much.

CSO: Yes. Thank you.

(Off the record at 11:32 a.m.)

(Back on the record at 12:09 p.m.)

THE CLERK: All rise.

The United States District Court for the Eastern District of Michigan is in session.

Please be seated.

Court recalls Case Number 05-81165, United States of America versus Khaophone Sychantha.

THE COURT: Your appearances, please.

MR. NORWOOD: Good afternoon, your Honor. Jason Norwood on behalf of the United States.

MR. MARTIN: Good afternoon, your Honor. Patrick Martin on behalf of the United States.

THE COURT: Good afternoon.

DEFENDANT SYCHANTHA: Good afternoon, your Honor. Khaophone Sychantha.

MR. STEINGOLD: David Steingold for Mr. Sychantha.

THE COURT: Good afternoon.

Please have a seat.

We have received a note from the jury that they have reached a verdict.

Is the Government ready to receive the verdict?

MR. NORWOOD: Yes, your Honor.

THE COURT: Defense?

DEFENDANT SYCHANTHA: Yes.

THE COURT: All right. Let's bring the jury out.

THE CLERK: All rise for the jury.

(JURY IN AT 12:11 p.m.)

THE CLERK: Please be seated.

THE COURT: Will the foreperson please rise?

Has the jury agreed upon a verdict?

FOREPERSON: Yes, we have.

THE COURT: Could you please hand the verdict form to our clerk?

No, no. Hand the verdict form to our clerk.

In the matter of United States of America versus Sychantha, the jury find as follows: With respect to Count One, question 1, with respect to the charge in Count One of the indictment, which charges the defendant with conspiracy to possess with intent to distribute or to distribute a controlled substance, we, the jury, find the defendant guilty.

Next question, if you've answered guilty in response to question number 1, proceed to question 1A.

And I'm proceeding to 1A.

Question 1A, with respect to Count One, did the offense involve at least 50 -- sorry, at least 500 -- 500 grams of a substance containing a detectable amount of meth -- of methamphetamine?

The jury answers that question yes.

Then, I'm proceeding to question C.

With respect to Count One, did the offense involve -- offense involve at least five grams of pure methamphetamine?

The jury answers the question as yes.

Count Two, question 2, with respect to the charge in Count Two of the indictment, which charges the defendant with possession with intent to distribute a controlled substance, we, the jury, find the defendant guilty.

I am proceeding to Count Three.

Count Three, question 3, with respect to the charge in Count Three of the indictment, which charges the defendant with possession -- with possession with intent to distribute a controlled substance, we, the jury, find the defendant, the jury answers guilty.

I'm proceeding to question 3A.

With respect to Count Three, did the offense involve at least 500 grams of a substance containing a detectable amount of methamphetamine?

The jury answers the question yes.

Question 3C, with respect to Count Three, did the offense involve at least five grams of pure methamphetamine?

The jury answers the question as yes.

That is the verdict of the jury.

Do either one of you wish to have the jury polled?

DEFENDANT SYCHANTHA: Yes.

THE COURT: Okay. So, members of the jury, right now, you are going to be polled. And then as a whole, you're going to be asked is this your verdict, okay? And then, of course, you will answer. And then after that question is posed to you, we will ask each one of you individually, all right?

Do you understand the process?

JURORS: Yes.

THE CLERK: Question number 1, the verdict form, with respect to the charge in Count One of the indictment, which charges the defendant with conspiracy to possess with intent to distribute or to distribute a controlled substance, the jury finds the defendant guilty.

Members of the jury, is that your verdict?

JURORS: Yes.

THE COURT: The other two questions underneath.

THE CLERK: Yes.

Question 1A, with respect to Count One, did the offense involve at least 500 grams of a substance containing a detectable amount of methamphetamine?

The verdict is yes.

Members of the jury, is that your verdict?

JURORS: Yes.

THE CLERK: Question 1C, with respect to Count One, did the offense involve at least five grams of pure

methamphetamine?

The answer is yes.

Members of the jury, is that your verdict?

JURORS: Yes.

THE COURT: As to Count Two, question 2, with respect to the charge of Count Two of the indictment, which charges the defendant with possession with intent to distribute a controlled substance, the jury finds the defendant guilty.

Members of the jury, is that your verdict?

JURORS: Yes.

THE CLERK: As to Count Three, question 3, with respect to the charge in Count Three of the indictment, which charges the defendant with possession with intent to distribute a controlled substance, the jury finds the defendant guilty.

Members of the jury, is that your verdict?

JURORS: Yes.

THE COURT: Question 3A, with respect to Count Three, did the offense involve at least 500 grams of a substance containing a detectable amount of methamphetamine?

The answer is yes.

Members of the jury, is that your verdict?

JURORS: Yes.

THE COURT: Question 3C, with respect to Count Three, did the offense involve at least five grams of pure methamphetamine?

The answer is yes.

Members of the jury, is that your verdict?

JURORS: Yes.

THE COURT: Juror in seat number 1, as you heard the verdict, was that and is that your verdict?

JUROR: Yes.

THE CLERK: Juror in seat 2, as you heard the verdict, was that and is that your verdict?

JUROR: Yes.

THE CLERK: Juror in seat 3, as you heard the verdict, was that and is that your verdict?

JUROR: Yes.

THE CLERK: Juror in seat 4, as you heard the verdict, was that and is that your verdict?

JUROR: Yes.

THE CLERK: Juror in seat 5, was that and is that your verdict?

JUROR: Yes.

THE CLERK: Juror in seat 6, as you heard the verdict, was that and is that your verdict?

JUROR: Yes.

THE CLERK: Juror in seat number 8, as you heard the verdict, was that and is that your verdict?

JUROR: Yes.

THE CLERK: Juror in seat nine, as you heard the

verdict, was that and is that your verdict?

JUROR: Yes.

THE CLERK: Juror in seat 10, as you heard the verdict, was that and is that your verdict?

JUROR: Yes.

THE CLERK: Juror in seat 11, as you heard the verdict, was that and is that your verdict?

JUROR: Yes.

THE CLERK: Juror in seat 12, as you heard the verdict, was that and is that your verdict?

JUROR: Yes.

THE CLERK: And juror in seat 13, as you heard the verdict, was that and is that your verdict?

JUROR: Yes.

THE COURT: The jury has been polled.

Is the Government satisfied with the polling of the jury?

MR. NORWOOD: The Government is satisfied, your Honor.

THE COURT: Is the --

DEFENDANT SYCHANTHA: Yes.

THE COURT: Let me finish.

Is the defense satisfied with the polling of the jury?

DEFENDANT SYCHANTHA: Yes.

THE COURT: Members of the jury, you're excused from further service with us. You paid attention. You were very conscientious. You were very good to work with. You served our justice system very well. And, right now, I would ask that you return to the jury room and I'll be there in a moment to speak with you, okay?

THE CLERK: All rise for the jury.

(JURY OUT AT 12:19 p.m.)

THE CLERK: Please be seated.

THE COURT: All right. We shall set a sentence date of?

THE CLERK: Sentencing date is going to be February the 19th at 2:00.

THE COURT: All right. Any other issues for today?

MR. NORWOOD: No, your Honor. Thank you.

THE COURT: Defense?

MR. STEINGOLD: I don't know where my representation ends. I don't know if it ends today or if I'm supposed to be his advisory counsel through sentencing.

THE COURT: It would be through sentencing.

MR. STEINGOLD: Okay.

THE COURT: Okay. Thank you.

Anything else?

MR. NORWOOD: Nothing else, your Honor. Thank you.

THE COURT: Anything else from the defense?

DEFENDANT SYCHANTHA: No, your Honor.

THE COURT: All right. Thank you very much.

MR. STEINGOLD: Thank you, your Honor.

THE CLERK: All rise.

Court is in recess.

(PROCEEDINGS CONCLUDED AT 12:21 p.m.)

* * * * *

**C E R T I F I C A T I O N**

I certify that the foregoing is a correct transcription of the record of proceedings in the above-entitled matter.

**s/ April A. Kurtz, CSR-7347, RPR, FCRR** **10/31/2024**
April A. Kurtz, CSR-7347, RPR, FCRR Date
Official Court Reporter